**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON, | Civil Action No. 20-cv-1689 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA, | |
| Defendants. | |

**INTRODUCTION**

1.     This lawsuit challenges a U.S. Department of Labor regulation that would unlawfully narrow the joint employment standard under the Fair Labor Standards Act, undermine critical workplace protections for the country's low- and middle-income workers, and lead to increased wage theft and other labor law violations. *Joint Employer Status Under the Fair*

1

*Labor Standards Act*, 85 Fed. Reg. 2820 (Jan. 16, 2020) (to be codified at 29 C.F.R. §§ 791.1-791.3) (the "Final Rule").

2.      For generations, the Fair Labor Standards Act ("FLSA") has preserved an essential baseline for working conditions across industries. Congress enacted the statute in 1938 to remedy the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." S. Rep. No. 75–884, at 4 (1937).

3.      In light of the FLSA's broad remedial purposes, the statute has been interpreted flexibly to prevent circumvention and subterfuge. Congress intended the FLSA to impose liability on the individuals and businesses that exercise significant influence over—and, in many cases, derive substantial profit from—employees. When two businesses both suffer or permit employees to perform work, they are both considered employers that share liability under the statute—commonly referred to as "joint employers."

4.      The Final Rule would upend this legal landscape by providing a de facto exemption from joint employment liability for businesses that outsource certain employment responsibilities to third parties. The Final Rule, which excludes from the definition of a joint employer any entity that does not exercise direct control over employees, would impermissibly narrow the FLSA's coverage.

5.      Over the past few decades, businesses have increasingly outsourced or subcontracted many of their core responsibilities to intermediary entities, instead of hiring workers directly. Because these intermediary entities tend to be less stable, less well funded, and subject to less scrutiny, they are more likely to violate wage and hour laws. As a result, employees that find work through intermediaries, such as subcontractors and temporary or

staffing agencies, earn significantly less than their counterparts directly hired into permanent positions.

6.      The Final Rule makes workers even more vulnerable to underpayment and wage theft. The Final Rule provides an incentive for businesses best placed to monitor FLSA compliance to offload their employment responsibilities to smaller, less-sophisticated companies with fewer resources to track hours, keep payroll records, and train managers. It is estimated the Final Rule will cost workers, many of whom work at minimum wage jobs and live paycheck to paycheck, more than $1 billion annually.[1]

7.      The Final Rule's radical changes to the joint employment framework violate the Administrative Procedure Act ("APA"). First, the Final Rule is contrary to law because it is inconsistent with the FLSA's statutory text and remedial purpose. In addition, the Final Rule expressly contradicts controlling Supreme Court authority interpreting the FLSA.

8.      Second, the Final Rule is arbitrary and capricious. The Department of Labor failed to justify departing from its longstanding interpretation of joint employment, and disregards evidence that this change will cause greater confusion among employers and employees. The Final Rule also fails to consider and quantify adequately the harms that the Final Rule will cause workers in terms of underpayment and stolen wages.

9.      Plaintiffs the State of New York, the Commonwealth of Pennsylvania, the State of California, the State of Colorado, the State of Delaware, the District of Columbia, the State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of New Jersey, the State of New Mexico, the State of Oregon, the

---

[1] Economic Policy Institute ("EPI"), Comment Letter on Proposed Rule: Joint Employer Standards Under the Fair Labor Standards Act, 10 (June 25, 2019), https://www.regulations.gov/contentStreamer?documentId=WHD-2019-0003-12772&attachmentNumber=1&contentType=pdf ("EPI Letter").

3

State of Rhode Island, the State of Vermont, the Commonwealth of Virginia, and the State of Washington bring this action to vacate the Final Rule and enjoin its implementation because it is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the APA, 5 U.S.C. § 706(2)(C) and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

11.    Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff the State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

13.    Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

14.    Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney

General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority under 71 Pa. Stat. § 732-204.

15.     Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action. As California's Chief Law Officer, the Attorney General has the authority to file civil actions to protect public rights and interests and promote the health and welfare of Californians. Cal. Const. art V, § 13. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

16.     Plaintiff the State of Colorado, by and through Attorney General Philip J. Weiser, brings this action. The Attorney General is authorized to pursue this action on behalf of the State under Colo. Rev. Stat. § 24-31-101.

17.     Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America.  The Attorney General is Delaware's chief law officer, and is empowered to exercise all such constitutional, statutory, and common law power and authority as the public interests may require.  *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941); Del. Code, tit. 29, § 2504.

18.     Plaintiff the District of Columbia (the "District") is a municipal corporation empowered to sue and be sued and is the local government for the territory constituting the permanent seat of the federal government. The District brings this case through Karl A. Racine, the Attorney General for the District of Columbia, who is the chief legal officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District. The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest. D.C. Code § 1-301.81.

19.     Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign state of the United States of America. The Attorney General is the chief legal officer of the State, Ill. Const. 1970, art. V, § 15, and is authorized to pursue this action under 15 ILCS 205/4.

20.     Plaintiff the State of Maryland, by and through its Attorney General Brian E. Frosh, brings this action. Maryland is a sovereign state in the United States of America. The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

21.     Plaintiff the Commonwealth of Massachusetts is represented by Attorney General Maura Healey, its chief law officer, who is granted traditional common law duties to represent the Commonwealth and broad statutory authority to act in the public interest.  M.G.L. c. 12, § 3; *Feeney v. Commonwealth*, 373 Mass. 359, 366, 366 N.E. 2d 1262, 1266 (1977).

22.     Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General, Dana Nessel, is Michigan's chief law enforcement officer and is authorized to pursue this action by Mich. Const. art. V, § 3 and Mich. Comp. Laws § 14.28.

23.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Keith Ellison is the chief

6

legal officer of the State of Minnesota.  Minn. Stat. § 8.01.  This action is brought to protect

Minnesota's sovereign, quasi-sovereign, and proprietary interests.

24.     Plaintiff the State of New Jersey is a sovereign state of the United States of

America.  This action is being brought on behalf of the State by Attorney General Gurbir S.

Grewal, the State's chief legal officer.  *See* N.J. State. Ann.  § 52:17A-4(e), (g).

25.     Plaintiff the State of New Mexico, represented by and through its Attorney

General, is a sovereign state of the United States of America.  Attorney General Hector Balderas

is the chief legal officer of the State of New Mexico.  He is authorized to prosecute all actions

and proceedings on behalf of New Mexico when, in his judgment, the interest of the State

requires such action.  N.M. Stat. Ann. § 8-5-2(B). This challenge is brought pursuant to Attorney

General Balderas's statutory and common law authority.

26.     Plaintiff the State of Oregon is a sovereign state of the United States of America.

This action is brought on behalf of the State of Oregon by Attorney General Ellen Rosenblum,

the chief law enforcement officer of Oregon. Attorney General Rosenblum brings this action on

behalf of Oregon pursuant to her authority under Oregon Revised Statutes, title 18, chapter 180.

27.     Plaintiff the State of Rhode Island, represented by and through its Attorney

General, is a sovereign state of the United States. Attorney General Peter F. Neronha is the chief

legal advisor to the State of Rhode Island and is authorized to pursue this action pursuant to his

constitutional, statutory, and common law authority. R.I. Const. art. IX § 12, R.I. Gen. Laws §§

42-9-1 et. seq.

28.     Plaintiff the State of Vermont, represented by and through its Attorney General,

Thomas J. Donovan, is a sovereign state of the United States of America.  The Attorney General

is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

29.     Plaintiff the Commonwealth of Virginia, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Mark Herring is the chief legal advisor to the Commonwealth of Virginia and is authorized to pursue this action pursuant to Va. Code §2.2-513.

30.     Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign state of the United States of America. The Attorney General is the chief legal adviser to the State of Washington and is authorized to pursue this action pursuant to RCW 43.10.030. The Attorney General's powers and duties include acting in federal court on matters of public concern.

31.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Final Rule harms their sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated.

32.     Defendant Eugene Scalia is the Secretary of Labor and is sued in his official capacity.

33.     Defendant United States Department of Labor ("DOL" or the "Department") is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). DOL promulgated the Final Rule and is responsible for its enforcement.

34.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

## ALLEGATIONS

I.    **The FLSA Protects Workers, and Courts and DOL Have Long Recognized Joint Employment.**

35.    Since 1938, the FLSA has served as a foundational protection for workers across the country, particularly those in low-wage industries. The statute safeguards workers from minimum wage and overtime violations, late payment of wages, dishonest time- and record-keeping, and retaliation, among other common types of employer misconduct. The FLSA's expansive scope—clear from the statute's text and purpose—represented an intentional departure from more rigid interpretations of "employer" and "employee" found in the common law of agency relationships.

36.    Consistent with Congressional intent, courts and DOL have long recognized that employees can be simultaneously employed by two or more employers, both of which are subject to liability under the FLSA. Holding both employers jointly and severally liable enables workers and enforcement agencies to recover unpaid wages even if one of the businesses closes or becomes insolvent. The potential for liability incentivizes both employers to take steps to comply with FLSA's obligations.

37.    Joint employment liability is essential to ensuring that the FLSA continues to provide meaningful protections for workers and that businesses may not reap all the benefits of employment without assuming the reciprocal burdens and responsibilities.

38.    In determining whether an individual is employed by more than one employer, the U.S. Supreme Court has established a fact-based inquiry that focuses on the economic realities of the workplace. The analysis assesses whether a potential employer has authority to control an employee as well as whether the potential employer and employee are economically interdependent. In the nearly 75 years that courts have applied this framework, the joint

9

employment analysis has maintained sufficient flexibility to adapt to changes in employment structures, including the increase in outsourcing and subcontracting labor to third parties.

**A.    The FLSA's Text and Purpose Require an Expansive Definition of "Employer."**

**1.    The FLSA's Broad and Remedial Purpose Is to Protect Workers across Industries from Overwork and Underpayment.**

39.    Congress passed the FLSA to set minimum standards for wages and working conditions in an era when employees suffered intolerably low pay and long hours. The statute sought to eradicate the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." S. Rep. No. 75–884, at 4 (1937).

40.    The FLSA created requirements for working age, minimum wage, overtime, and recordkeeping to remedy poor labor conditions that were "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202.

41.    As additional justification for the legislation, Congress concluded that substandard labor conditions had larger economic impacts, beyond harm to workers, by (1) causing commerce "to spread and perpetuate such labor conditions," (2) burdening commerce and the free flow of goods, (3) constituting "an unfair method of competition," (4) leading to labor disputes and obstructions of commerce, and (5) interfering with the "orderly and fair marketing of goods." 29 U.S.C. § 202.

42.    Congress intended the FLSA not just to apply narrowly to certain employees in certain industries but to broadly change workplace practices across the national labor market. The statute announced a federal policy "to correct and as rapidly as practicable to eliminate the

10

[detrimental labor] conditions . . . without substantially curtailing employment or earning power." 29 U.S.C. § 202.

### 2. The FLSA Extended the Meaning of Employer beyond the Common Law Definition.

43. Crucial to the FLSA's framework is the statute's broad scope, which extends protections to and imposes liability on parties that previously had been beyond the reach of the common law definitions of employee and employer.

44. The common law recognizes only agency relationships between an employer and an employee. An agency relationship arises when a principal employs an agent to perform service in its affairs and "controls or has the right to control the physical conduct of the other in the performance of the service." Restatement (Second), Agency §§ 2(1), (2) (Am. Law Inst. 1958); *see also* Restatement (Third) of Agency § 1.01 cmt. f (Am. Law Inst. 2006) ("An essential element of agency is the principal's right to control the agent's actions.").

45. The FLSA, by contrast, defines "employ" expansively to include "to suffer or to permit to work." 29 U.S.C. § 203(g). Both "employer" and "employee" are defined with respect to the meaning of employ. "Employee" means "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The statute does not provide a comprehensive definition of "employer" but clarifies that the term "includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d). "Person," in turn, is defined expansively to include any natural or legal person, including "any organized group of persons." 29 U.S.C. § 203(a).

11

46.    Unlike at common law, the employment relationship under the FLSA does not hinge on a potential employer's formal control or right to control an employee. Any business that suffers or permits an employee to work is subject to liability under the statute as an employer.

47.    Then-Senator Hugo Black, one of the FLSA's primary drafters, emphasized that the definition of "employee" was "the broadest definition that has ever been included in any one Act." 81 Cong. Rec. 7657 (1937).

### 3.    Congress Intended the FLSA to Apply to Employers Regardless of Their Use of Intermediaries or Business Practices.

48.    The FLSA prevents businesses from evading liability simply by discharging their hiring and supervision responsibilities to third parties. Congress intended the definition of employer to be sufficiently broad to reach entities that use intermediary employers to exercise control over employees.

49.    Congress modeled the "suffer or permit" definition of "employ" on language from child labor statutes that courts had applied for many years to hold business owners responsible for using child labor even where middlemen and third parties had hired and supervised the minors.

50.    Indeed, Congress had considered adding a provision to ensure that employers would not be able to "circumvent[t] . . . the [A]ct . . . through the use of agents, independent contractors, subsidiary or controlled companies, or home or off-premise employees, or by any other means or device."[2] Legislators concluded, however, that in light of the statute's clear and

_____

[2] *Bills to Provide for the Establishment of Fair Labor Standards in Employments in and Affecting Interstate Commerce and for Other Purposes: Joint Hearings on S. 2475 and H.R. 7200 Before the S. Comm. on Educ. and Labor and the H. Comm. on Labor*, 75th Cong. 77-78, 190 (1937) (discussion of whether Section 6(a) of the proposed Act would prevent circumvention through home work) ("Joint Hearings").

expansive coverage over these employers and their intermediaries, such a provision was

unnecessary.[3]

    51.     Congress intended the scope of the FLSA to be broad and flexible enough to

accommodate changes in employment practices or business models that could enable businesses

to evade liability under the statute.

    52.     In hearings before the House and Senate, lawmakers expressed concern that

employers would be able to shield themselves from liability through use of business practices

that fell outside of the traditional employer-employee relationship, such as requiring employees

to work from home or paying employees on a commission basis.[4]

    53.     Members of Congress recognized that in order to achieve the remedial purpose of

improving labor conditions across the country, the coverage of the FLSA had to extend widely.

The statute does not allow businesses to circumvent liability through loopholes or technicalities.

    **B.**     **Courts Have Established a Joint Employment Framework Consistent with the FLSA's Text and Purpose.**

    54.     Based on the language and purpose of the statute, the Supreme Court and Courts

of Appeals have extended the FLSA's coverage to a wide range of businesses with varying

employment structures. Consistent with Congress' intent to hold all entities that suffer or permit

---

[3] H.R. Rep. No. 76-522, at 10 (1939). *See generally Walling v. Am. Needlecrafts*, 139 F.2d 60, 64 (6th Cir. 1943).

[4] *See, e.g.*, *Joint Hearings*, 75th Cong. at 77 (hearing discussion in which Representative William Fitzgerald opposed an exemption for "home work"—a practice common in the garment industry whereby workers assembled clothes from home—and explained that the FLSA could not incentivize "unfair manufacturers" to "extend the home work racket in this country by taking work out of the factory and putting it into the homes at miserable wages."); *id.* (response of then-Assistant Attorney General Robert H. Jackson that FLSA was designed to capture this scenario: "the factory which sends out and makes use of people in their homes are [sic] not exempted just because they are using premises they do not pay any rent for."); *see also* 81 Cong. Rec. 7921 (1937) (floor debate in which Senator Robert La Follette declared: "I am opposed to [the exemption] lest it might provide a device whereby employers could, through a commission arrangement, take themselves out from under the terms of the bill. . . . What I fear . . . is that through arrangements which may be made by employers[,] persons who are not ordinarily working upon a commission basis may be employed under such arrangements when obviously they should be under the terms of the bill" and cautioning "in passing on the bill we should be very careful and should reject amendments so sweeping in their nature that they may become a device which will defeat the purposes of the proposed legislation.").

work—including those that do not directly hire or supervise employees—responsible for FLSA violations, courts have long held entities may be considered joint employers and thus jointly liable for unpaid wages and penalties to workers.

### 1. *Joint Employment Inquiries Determine Whether a Potential Employer Suffers or Permits an Employee to Work.*

55.     In most joint employment inquiries, an employee's work benefits two entities simultaneously and a dispute arises as to whether one or both entities are employers. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on the Fair Labor Standards Act (FLSA), *Joint employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act*, WHD Administrator's Interpretation No. 2016-1, 2016 WL 284582, at *8 (Jan. 20, 2016) (the "Joint Employment Administrator's Interpretation") (withdrawn June 7, 2017). In this kind of joint employment relationship, an employee is typically employed by both an intermediary employer—that directly hires, pays, and supervises the employee—and a lead employer that exerts significant economic influence over the employee, even if not formal control. Employees working for joint employers may appear to have a single employer, when, in fact, they have two.

56.     When a potential joint employer disclaims liability for FLSA violations, courts must assess the economic realities of the relationship between the employee and the potential joint employer to determine whether the potential employer has "suffered or permitted" the employee to work. *See id.* at *3.

> a. *The Supreme Court has interpreted the suffer or permit standard to require consideration of economic factors beyond an employer's right to control the employee.*

57.     The Supreme Court's seminal decision in *Rutherford v. McComb*, 331 U.S. 722 (1946), is the controlling authority on when an employee is employed by two employers and sets

14

forth a range of considerations to determine when each employer suffers or permits an employee to work.

58.     In *Rutherford*, the Court held an employment relationship to exist between a slaughterhouse and meat de-boners who worked in the slaughterhouse under an employment agreement with one of the slaughterhouse's independent contractors.

59.     The *Rutherford* Court found that that the FLSA's "definition of 'employ' is broad," and "comprehensive enough to require its application [to] many persons and working relationships, which prior to this Act"—under the common law—"were not deemed to fall within an employer-employee category." *Id*. at 728—29 (internal citation omitted). The Court concluded, consequently, that determining whether an employment relationship exists "does not depend on [] isolated factors but rather upon the circumstances of the whole activity." *Id.* at 730.

60.     There was no dispute in *Rutherford* that the workers were hired and supervised by an intermediary employer and that the slaughterhouse never attempted to set the workers' hours.

61.     Despite this, the Court directed a close examination of the economic relationship between the workers and the slaughterhouse, specifically taking into consideration: whether the slaughterhouse's activities functioned as an "integrated economic unit"; whether the workers performed a specialty job in the slaughterhouse's production line; whether responsibility under the de-boning contracts passed from one de-boner to another without material changes; whether the slaughterhouse supplied the equipment and the premises for the work; whether the workers could or did perform work for other employers outside of the slaughterhouse; whether the slaughterhouse's manager kept in close touch with the workers; and whether the amount the slaughterhouse paid the workers depended on the workers' skill, initiative, and judgment. *See id.*

The *Rutherford* Court did not consider in its employment analysis whether the slaughterhouse was acting in the interest of the independent contractor.

62.    The Court concluded that the "underlying economic realities" of the working relationship supported a finding that the slaughterhouse had suffered or permitted the work of the de-boners.

> b.    *Courts of Appeals have followed* Rutherford *in examining the economic realities of the employment relationship.*

63.    Following the Supreme Court's decision in *Rutherford*, federal appellate courts considering whether joint employment status exists have repeatedly recognized the broad meaning of employer under the FLSA. Accordingly, courts have interpreted the suffer or permit standard of employment to require an assessment that looks beyond a potential employer's control or right to control over an employee. The U.S. Court of Appeals for the Second Circuit, for example, has explained that a joint employment determination should be based on "'the circumstances of the whole activity' . . . viewed in light of 'economic reality,'" *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71 (2d Cir. 2003) (quoting *Rutherford*, 331 U.S. at 730 and *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)). In examining whether a garment manufacturing company jointly employed the employees of its subcontractor, the Second Circuit listed a series of factors it found "illuminating in these circumstances," but emphasized that it was not an exclusive list. The list was designed to assess whether "an entity has functional control over workers even in the absence of the formal control." *Id.* at 72. The court emphasized that, in the joint employment analysis, focus "solely on the formal right to control the physical performance of another's work . . . is not consistent with the breadth of employment under the FLSA." *Id.* at 69.

64.     Courts from nearly every other circuit have developed similar tests, derived from the standard set forth in *Rutherford*, to determine whether a business has sufficient control or economic influence over an employee to be considered a joint employer. These analyses, though applying slightly varied factors, are generally referred to as the "economic realities" test.

### 2.    *Inquiries Under Section 203(d) Determine Whether a Party Acts in the Interest of an Employer.*

65.     Separate from the employment analysis, the FLSA also defines "employer" to include any individual, corporation, or other group of persons "acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203(a) and (d). The analysis of whether an individual or corporation is acting in the interest of an employer may, but does not necessarily, overlap with the joint employment analysis.

66.     Courts have regularly found individuals and entities to be acting in the interest of an employer under 29 U.S.C. § 203(d) outside of the joint employment context, particularly in the determination of whether an individual owner or manager's conduct constitutes an FLSA violation, in addition to the employer's liability. The Second Circuit, consistent with many other circuit courts, examines whether the individual possesses "operational control" over the corporate employer, particularly with respect to its employment-related functions. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999), *superseded in part by Zheng*, 355 F.3d at 61. This analysis is distinct from the joint employment analysis in that it looks at the individual's control over the corporate entity, rather than its control over the employees. Conversely, joint employment status often exists without a finding that one employer is acting in the interest of another. Most joint employment inquiries, which focus on the relationship between the potential joint employer and the employee, do not require the intermediary employer to act "in the interest of" the potential joint employer.

67.     Although conceptually distinct from the joint employment analysis, the shared interest inquiry under 29 U.S.C. § 203(d) between an employer and a natural or corporate person similarly expands the range of actors subject to FLSA liability.

**C.     DOL's Interpretation of Joint Employment Is Controlled by Judicial Precedent.**

68.     DOL has consistently relied on guidance from judicial interpretations of FLSA to determine when a joint employment relationship exists.

69.     DOL is required to enforce the FLSA consistent with the agency's purpose to "foster, promote, and develop the welfare of the wage earners of the United States, to improve their working conditions, and to advance their opportunities for profitable employment." 29 U.S.C. § 551.

70.     In 1997, DOL issued regulations defining joint employment under the Migrant and Seasonal Agricultural Worker Protection Act (the "MSPA Regulations"), a statute that incorporates the FLSA's definitions of "employ," "employee," and "employer." 29 C.F.R. § 500.20(h). The MSPA Regulations explain that, under the statute, the "definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act" and, in particular, that "[i]n determining whether or not an employment relationship exists between the agricultural employer/association and the agricultural worker, the ultimate question to be determined is the economic reality—whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii). The MSPA Regulations enumerate a list of illustrative, non-exhaustive factors to serve as "analytical tools . . . in determining the ultimate question of economic dependency." 29 C.F.R. § 500.20(h)(5)(iv). In promulgating the MSPA Regulations, DOL explained that "the courts have given an expansive interpretation to the statutory definition of

employ under the FLSA" and reviewed Supreme Court and appellate court jurisprudence relating

to the definition of employee and the joint employment doctrine. 62 Fed. Reg. 11,745.

71.     The MSPA Regulations remain in effect and are not affected by the Final Rule. 85

Fed. Reg. 2828, n.55.

72.     In 2014, DOL issued Administrator's Interpretation No. 2014-2, "Joint

employment of home care workers in consumer-directed, Medicaid-funded programs by public

entities under the Fair Labor Standards Act," which explained that "[w]hether an entity is an

employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court

and other federal appellate courts interpreting the Act." U.S. Dep't of Labor, Wage and Hour

Div., Opinion Letter on the Fair Labor Standards Act (FLSA), *Joint employment of home care*

*workers in consumer-directed, Medicaid-funded programs by public entities under the Fair*

*Labor Standards Act*, Administrator's Interpretation No. 2014-2, 2014 WL 2816951, at *2 (June

19, 2014) ("Home Care Administrator's Interpretation"). The Home Care Administrator's

Interpretation provided a list of commonly applied, illustrative factors relevant to determining

whether a home care worker is "economically dependent" on a potential public-entity employer.

*Id.* at *7-11. The Home Care Administrator's Opinion has not been withdrawn.

73.     In 2016, DOL issued the Joint Employment Administrator's Interpretation, which

set forth a comprehensive interpretation of the relevant joint employment analyses under the

FLSA intended to provide additional guidance on joint employment under the FLSA and MSPA.

*See* WHD Administrator's Interpretation No. 2016-1. Reviewing case law, the Joint Employment

Administrator's Interpretation explained, "[a]lthough they do not all apply the same factors,

several Circuit Courts of Appeals have also adopted an economic realities analysis for evaluating

vertical joint employment under the FLSA. Regardless of the exact factors, the FLSA and MSPA

19

require application of the broader economic realities analysis, not a common law control analysis, in determining vertical joint employment." *Id.* at *4.

74.     The Joint Employment Administrator's Interpretation specifically incorporates the economic realities test from the MSPA Regulations in determining whether an employment relationship exists between a potential joint employer and an employee, and further explained that the joint employment analysis "must be an economic realities analysis and cannot focus only on control," consistent with Supreme Court and federal appellate precedent. *Id.* at *9.

75.     The Joint Employment Administrator's Interpretation observed that, "[m]ore and more, businesses are varying organizational and staffing models by, for instance, sharing employees or using third-party management companies, independent contractors, staffing agencies, or labor providers" and this trend "made joint employment more common." *Id.* at *1.

76.     On June 7, 2017, DOL withdrew the Joint Employment Administrator's Interpretation without explanation. *See* News Release, U.S. Dep't of Labor, *U.S. Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance* (June 7, 2017), https://www.dol.gov/newsroom/releases/opa/opa20170607.

## II.     <u>Shifting Business Structures in Today's Economy Render Joint Employment Liability a Critical Tool to Protect Workers.</u>

77.     In recovering underpaid and stolen wages, workers and enforcement agencies rely on joint employer liability now more than ever. In the past several decades, businesses increasingly subcontract and outsource their work, in an arrangement commonly referred to as "fissuring" of the workplace.[5] Fissuring includes a variety of different forms, including

---

[5] *See* David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (Harvard Univ. Press 2014) ("*Fissured Workplace*").

subcontracting, outsourcing, and franchising, in which the main or "lead" business sheds certain business functions to other "subsidiary" businesses.[6] These practices occur in a variety of industries, such as construction, agricultural, janitorial, warehouse and logistics, and hospitality.[7] A significant amount of employment growth in recent years has occurred in such fissured work arrangements.[8]

78.     This trend has had a devastating impact on workers. Research shows that the wage decreases associated with this kind of domestic outsourcing are substantial, on the order of 10 percent relative to jobs that are not outsourced.[9] In particular, workers employed through intermediaries like temporary and staffing agencies earn less money and endure worse working conditions than permanent, direct-hires.[10] Those workers are also especially vulnerable to violations of workplace laws.[11]

79.     The current joint employment analysis provides workers with an essential protection against wage theft by subjecting to liability all employers who "suffer or permit"

---

[6] *Id*. at 24-25.

[7] Joint Employment AI, at 1.

[8] Lawrence F. Katz & Alan B. Krueger, *The Rise and Nature of Alternative Work Arrangements in the United States, 1995-2015*, 7 (Working Paper No. 22667) (2016), https://www.nber.org/papers/w22667 (independent contractors, freelancers, on-call workers, contract workers, and workers employed by temporary staffing agencies together accounted for 94 percent of net employment growth from 2005-2015).

[9] *See* Deborah Goldschmidt & Johannes F. Schmieder, *The Rise of Domestic Outsourcing and the Evolution of the German Wage Structure*, 132 Quarterly Journal of Economics 1165-1217 (2017); Arindrajit Dube & Ethan Kaplan, *Does Outsourcing Reduce Wages in the Low-Wage Service Occupations? Evidence from Janitors and Guards*, 63 ILR Review 287-306 (2010).

[10] NELP, *America's Nonstandard Workforce Faces Wage, Benefit Penalties, According to U.S. Data* (2018), https://www.nelp.org/news-releases/americas-nonstandard-workforce-faces-wage-benefit-penalties-according-us-data/ (full-time staffing and temporary help agency workers earn 41 percent less than do workers in standard work arrangements).

[11] Weil, *The Fissured Workplace*, *supra* note 5, at 17-18.

employees to work.[12] These longstanding frameworks serve as a meaningful check on employers' ability to circumvent the FLSA through outsourcing.

### III.    The "Joint Employer Status Under the Fair Labor Standards Act" Rule.

####     A.    The 2019 Proposed Rule.

80.    On April 9, 2019, the Department published in the Federal Register a Notice of Proposed Rulemaking to "update and clarify" DOL's "interpretation of joint employer status" under FLSA. *Joint Employer Status Under the Fair Labor Standards Act*, 84 Fed. Reg. 14,043 (Apr. 9, 2019) (the "Proposed Rule").

81.    In a radical departure from the frameworks established by courts and the Department itself, which recognize joint employment in many different kinds of employment relationships, the Proposed Rule stated that joint employment status could only be conferred when a potential joint employer acts "in the interest" of the second employer, proposing an unprecedented test that permitted consideration only of whether a potential joint employer hires, pays, supervises, and maintains records for an employee.

82.    The Proposed Rule further explained that many of the factors that courts and DOL had previously found integral to the joint employment analysis, such as an employer's right to control an employee's hiring, wages, or schedule, were irrelevant and prohibited from consideration under the new test. 84 Fed. Reg. at 14,059.

83.    DOL received nearly 57,000 comments in response to the Proposed Rule from organizations, government offices, businesses and individuals, including from the Plaintiff States. Many commenters raised concerns that DOL ignored the constraints of the FLSA and

---

[12] *See* Daniel J. Galvin, *Deterring Wage Theft: Alt-Labor, State Politics, and the Policy Determinants of Minimum Wage Compliance*, 14 Persp. Pol. 324-50 (2016) (through a state-by-state comparative study, concluding that strong laws, combined with strong enforcement, have a deterrent effect on labor standards compliance).

controlling Supreme Court authority and had failed to take into consideration the Proposed Rule's impact on wages and working conditions.

### B.    The Final Rule.

84.    DOL published the Final Rule on January 16, 2020, with an effective date of March 16, 2020. 85 Fed. Reg. at 2820. The Final Rule made only minor modifications to the Proposed Rule and, in a complete realignment of the joint employment analysis, permits a finding of joint employment status only in the narrowest circumstances.

85.    Under the Final Rule, the only relevant question is whether the potential joint employer is "acting directly or indirectly in the interest of [the other] employer," and not whether the potential joint employer "suffer[s] or permit[s]"—that is, employs—the employees in question. 85 Fed. Reg. at 2820. The Final Rule declares that the language in 29 U.S.C. § 203(d) "alone provides the textual basis for determining joint employer status under the FLSA." *Id.*

86.    In order to determine whether employers meet the new joint employment standard, the Final Rule sets forth a four-factor test.[13]

87.    For joint employment scenarios where an employee's work benefits two entities simultaneously—the majority of joint employment cases—the Final Rule drastically alters the established economic realities analysis. In assessing whether an employment relationship exists between an employee and a potential joint employer, DOL no longer permits an analysis of whether the potential employer suffers and permits the work of the employee.

---

[13] The Final Rule also sets forth a second test for assessing horizontal joint employment, which is not at issue in this action. 85 Fed. Reg. 2859 (setting forth new § 791.2(e)). Horizontal joint employment refers to a circumstance when an employee performs work for two employers at separate times during the same workweek, but when the employers are "sufficiently associated," the total hours are combined to evaluate liability for overtime purposes. *Id.* The joint employment scenario at issue in this case is sometimes referred to as "vertical" joint employment.

88.     The Final Rule thus jettisons the economic realities test on which courts and DOL have relied at least since *Rutherford* and replaces it with a new four-factor test (the "control test") that considers only four factors. The factors include whether the potential joint employer: (i) hires or fires the employee; (ii) supervises and controls the employee's work schedule or conditions of work; (iii) determines the employee's rate and method of payment; and (iv) maintains the employee's records. 85 Fed. Reg. at 2859. The Final Rule, which characterizes these factors as "indicia of control," *id.*, does not permit the consideration of any additional factors. *Id.* at 2821.

89.     DOL purports to have adopted the control test from the U.S. Court of Appeals for the Ninth Circuit's decision in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), but DOL misconstrues *Bonnette*. The Final Rule claims that *Bonnette* is a "seminal joint employer decision" that "multiple courts" follow, 85 Fed. Reg. at 2822; that is also incorrect.

90.     In fact, the Final Rule does not permit consideration of many of the factors essential to the determination of joint employment status. Thus, the Final Rule prohibits consideration of factors related to an employee's economic dependence on the putative joint employer, such as whether the employee performs a specialized job and whether she supplies her own work materials or relies on the putative employer to provide them. *Id.* at 2859 (setting forth new § 791.2(c)). The Final Rule asserts that "[w]hether the employee is economically dependent on the potential joint employer is not relevant." *Id.*

91.     The Final Rule likewise prohibits any assessment of the potential joint employer's contracts that "require[e] an employer to set a wage floor, institute sexual harassment policies, establish workplace safety practices, require morality clauses, [or] adopt similar generalized

24

business practices"; the potential joint employer's provision of an "employee handbook" or "other forms"; or the potential joint employer's offer of an "association health plan or association retirement plan." *Id.*

92.    In a superficial change from the Proposed Rule, the Final Rule announces that evidence of an employer's right to control may be considered. *Id.* at 2832. However, the Final Rule provides that the "ability, power, or reserved right to act in relation to the employee may be relevant . . . but such ability, power, or right alone does not demonstrate joint employer status without some actual exercise of control." *Id.* at 2859.

93.    The Final Rule acknowledges that the changes to the joint employment framework may result in "transfers from employees to employers" because employees will be able to recover for FLSA violations less frequently but claims that the Department "lacks the data needed to calculate the potential amount or frequency of these transfers." *Id.* at 2821. DOL admits that, on the other hand, it expects that the Final Rule will "reduce burdens" for businesses, but again claims that it "does not believe there are data to accurately quantify the impact of this rule." *Id.* at 2853.

## IV.    The Final Rule Is Unlawful Under the Administrative Procedure Act.

### A.    The Final Rule Is Contrary to Long-Standing and Well-Settled Law.

94.    The Final Rule contravenes the plain language and purpose of the FLSA and directly contradicts controlling Supreme Court authority and federal appellate precedent.

#### 1.    *The Final Rule's Interpretation of "Employer" Is Contrary to the Plain Meaning of the Statutory Text.*

95.    The FLSA defines "employ" broadly to "include[]s to suffer and permit to work." 29 U.S.C. §203(g). Under the statute, any individual or entity that suffers or permits an employee to work enters into an employment relationship with that employee and constitutes an employer.

96.     Decades of judicial decisions interpreting the FLSA, including the Supreme Court's decision in *Rutherford*, consistently have held that a business that suffers or permits work is considered an "employer" under the statute's expansive definitions.

97.     DOL disregards this clear and fundamental premise of the FLSA and takes the extraordinary position that a business may suffer or permit an employee to work but still fall outside the definition of an "employer." When assessing the employment relationship between a business and an employee, the Final Rule provides that whether a business suffers or permits work is irrelevant. Under DOL's new formulation, a business that suffers or permits work may not be considered a joint employer unless it exercises formal control over employees.

98.     The Final Rule's interpretation of "employer" to exclude certain businesses that suffer or permit work cannot be reconciled with the statutory text, which requires every individual or entity that suffers or permits the work of employees to be liable under the FLSA.

99.     DOL further adopts an impermissible construction of 29 U.S.C. 203(d). DOL's claim that the provision provides an exhaustive definition of joint employment is incorrect as a matter of statutory interpretation and contrary to longstanding judicial interpretation.

100.    Section 203(d) states that that the term employer "*includes* any person acting directly or indirectly in the interest of an employer." 29 U.S.C. §203(d) (emphasis added). Congress' use of the term "include" plainly contemplates other scenarios where employer status exists. Nothing in the FLSA's text supports the interpretation that joint employment status only arises if one employer acts in the interest of another. Indeed, such a formulation would render the word "includes" extraneous and impermissibly render 203(g)'s "suffer or permit" language a nullity.

26

101.    Instead, courts have interpreted Section 203(d) to expand, not contract, the range of actors subject to FLSA liability. Courts have found the factor of whether a person acts "directly or indirectly in the interest of [another] employer" to be a sufficient but not necessary factor to determine joint employment status.

102.    The Department does not have authority to disregard whole portions of the FLSA and claim that Section 203(d) is the sole statutory source of determining employer liability when an employee is employed by multiple employers.

### 2.    The Final Rule Contravenes Congress' Intent to Expand Employer Liability Beyond the Common Law.

103.    The Final Rule's control test for determining joint employment status frustrates congressional intent to extend the definition of employer beyond the common law boundaries of the agency relationship.

104.    Against the background of a rigid definition of agency, which hinges on an employer's control or right to control an employee, Congress chose to define "employ" with the more expansive language of "suffer or permit."

105.    The definition of "employer" further expands, over and above the common law, the types of businesses and individuals that may be held liable for substandard working conditions.

106.    The Final Rule's control test plunges the definition of employer in the opposite direction. Not only does the new test focus solely on formal control over employees, but it also renders the joint employment standard narrower than the common law agency standard. While the agency relationship depends on whether an employer has the *right* to control an employee, the control test requires the *actual exercise* of one or more of the control factors.

27

107.    DOL's return to a narrow and rigid definition of employer in the joint employment context effectively exempts from FLSA liability businesses that outsource to intermediaries the responsibility to hire and supervise workers, while still exerting significant economic influence over the workers' pay, job structures, and working conditions. The test announced in the Final Rule undermines Congress' intent to carefully craft the FLSA's text in a manner which would prevent evasion of liability through creative means, such as through use of subcontracting, home work, or paying workers on a commission basis.

108.    The Final Rule's tortured reading of the statutory text subverts the broad and remedial purposes of the statute.

### 3.    *The Final Rule Is Contrary to Controlling Supreme Court and Judicial Authority.*

109.    The Final Rule is expressly contrary to the Supreme Court's seminal decision in *Rutherford* and to the overwhelming weight of three-quarters of a century of judicial authority.

110.    In *Rutherford*, the Supreme Court directed that an assessment of whether multiple entities are employers liable under the FLSA must examine "the circumstances of the whole activity," including the economic relationship between employees and the potential joint employer. In reaching its conclusion, the Supreme Court examined explicitly considered (1) whether the workers performed a specialty job, (2) whether the workers had the opportunity for profit or loss based on their skills, and (3) whether the slaughterhouse supplied the equipment necessary for the work.

111.    The Final Rule, however, specifically prohibits consideration of the very factors considered by the Supreme Court in *Rutherford*, and broadly prohibits any assessment whatsoever of economic dependence. DOL's attempt to overturn controlling Supreme Court authority through regulation is unlawful.

112.    The Final Rule is also inconsistent with circuit court decisions, which have consistently followed *Rutherford*, establishing multi-factor tests which consider the economic realities of an employment relationship, taking into account economic dependence and indirect control in order to evaluate whether more than one employer suffers or permits employees to perform work.

**B.    The Final Rule Is Arbitrary, Capricious, and an Abuse of Discretion.**

*1.    The Department Failed to Justify Its Departure from the Well-Settled Meaning of Employer.*

113.    The agency's attempts to justify its change in position fail. First, as to the legal authority on which it purports to rely, the Ninth Circuit's decision in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), DOL misconstrues the case and mischaracterizes other courts' treatment of it. Second, DOL's other asserted justifications fail because, rather than provide clarity for businesses, the Final Rule only creates more confusion and uncertainty.

*a.    The Department's reliance on* Bonnette *does not justify the Final Rule.*

114.    DOL justifies the Final Rule by claiming that it is adopted from the Ninth Circuit's decision in *Bonnette.* The Final Rule characterizes *Bonnette* as a "seminal joint employer decision" from which "multiple circuit courts" have derived their multi-factor joint employment tests. 85 Fed. Reg. at 2822, 2831.

115.    However, this assertion is based on false premises. DOL misconstrues *Bonnette*'s holding and analysis, alters the *Bonnette* factors, and mischaracterizes other courts' treatment of *Bonnette*, including the Ninth Circuit itself.

116.    In *Bonnette*, the Ninth Circuit explained that the joint employer analysis was "based on 'a consideration of the total employment situation and the economic realities'" and

affirmed the district court's finding of joint employment based on the presence of four factors: "the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"

117.    *Bonnette* did not find these four factors to be an exhaustive list of considerations. Instead, the Ninth Circuit emphasized that they "provide a useful framework for analysis in this case," "this is not a mechanical determination" and the "ultimate determination must be based 'upon the circumstances of the whole activity.'" 704 F.2d 1465, 1470 (quoting *Rutherford*, 331 U.S. at 730).

118.    The Final Rule, by contrast, does not adopt a holistic analysis of the employment relationship. The Final Rule prohibits consideration of any additional factors outside the inquiry of whether the potential joint employer "is exercising significant control over the terms and conditions of the employee's work." 85 Fed. Reg. at 2836. DOL's joint employer framework ignores, without adequate explanation, a significant component of the Ninth Circuit's decision.

119.    Further, the Final Rule's control test narrows the first *Bonnette* factor from the "power to hire and fire employees" to only permitting consideration of whether the potential joint employer actually exercised control over hiring and firing of employees. While the Ninth Circuit considered a potential employer's authority or right to hire and fire an employee, under the Final Rule, such potential authority to hire and fire is insufficient to establish liability, absent evidence of the "actual exercise of control." *Id.* at 2859.

120.    Moreover, DOL failed to acknowledge that the vast majority of circuit courts, including the Ninth Circuit itself, have found the *Bonnette* factors insufficient to determine joint employment. Instead, circuit courts have adopted multi-factor tests and either outright rejected

30

*Bonnette* or held that the *Bonnette* factors are not exclusive and other factors must be considered when relevant.

121.    The Final Rule's reliance on *Bonnette* as justification and precedent for the adoption of the control test is thus arbitrary and capricious.

> **b.    *The Department's assertions about certainty and predictability fail to justify the Final Rule.***

122.    DOL also attempts to justify the Final Rule by claiming that it will provide "uniformity," "predictability," and "clarity" for stakeholders and, in particular, for businesses subject to potential joint employment claims. 85 Fed. Reg. at 2823, 2830, 2853-54. The Department states that the new control test is "simpler and easier to apply" than the current economic realities analysis. *Id.* at 2857.

123.    However, the Final Rule instead will subject employers to conflicting joint employment standards and will create confusion as to which entities may be held liable for compliance with FLSA.

124.    The Final Rule does not erase the controlling authority in the courts of appeals. Decades of Supreme Court and federal appellate court precedent have held that joint employment exists when a potential joint employer suffers or permits the work of an employee and that the suffer or permit standard requires an assessment of the economic realities of the employment relationship. Nearly every circuit court interprets the economic realities test to include an assessment of an employer's economic influence over an employee and reserved right to control.

125.    DOL has consistently relied on court decisions to provide guidance to the public about the joint employer analysis. While recognizing the slight variations of the economic realities test among circuits, however, DOL has previously explained that all the factors are

"probative of the core question" in the economic realities test of whether "the employee is economically dependent on the potential joint employer." Joint Employment AI at 11. DOL has distilled the factors in the economic realities test several times in the MSPA Regulations, the Home Care AI, and the Joint Employment AI. The factors set out in the Department's regulations and guidance have consistently mirrored the factors in *Rutherford*.

126.    The Final Rule now abandons this established framework and arbitrarily declares that the broad "suffer or permit" standard is no longer relevant. 85 Fed. Reg. at 2831, 2857. Specifically, the Final Rule prohibits an assessment of an employee's economic dependence on a potential employer, a crucial component at the heart of the economic realities test.

127.    Businesses would thus be faced with two irreconcilable sets of joint employment standards. A business in New York that relies on the Final Rule and acts in a way it believes will make it not liable under the FLSA would remain subject to suit in the Second Circuit, which interprets the FLSA to impose liability on any potential joint employer that suffers or permits work and applies the economic realities test under *Zheng*. 355 F.3d at 72. Thus, the Final Rule provides less, not more, certainty for businesses assessing their exposure under the FLSA.

128.    Furthermore, DOL's interpretation of joint employment under the FLSA conflicts with its interpretation under the MSPA, a parallel statute with the same definition of "employer." In stark contrast to the Final Rule, the MSPA Regulations require an assessment of economic dependence in the joint employment analysis. Likewise, DOL's Home Care AI, which continues to apply to employers in the homecare industry, also assesses economic dependence to determine joint employment.

129.     The Department's own inconsistent interpretation of joint employment provides the public with even less clarity and disrupts the uniform conclusion among DOL and courts that joint employment exists when a potential joint employer suffers or permits an employee to work.

### 2.     The Department Failed to Adequately Consider or Quantify the Final Rule's Impact on Workers.

130.     DOL's refusal to consider the overwhelming evidence that the Final Rule will depress wages and increase wage theft is arbitrary and capricious.

131.     In response to the Proposed Rule, commenters raised concerns that DOL's proposed joint employment test would drastically decrease the number of businesses found to be joint employers, at a time when workers need robust enforcement of joint employer liability.

132.     Commenters cautioned that the trend of fissuring continues to be on the rise. The Economic Policy Institute ("EPI") estimates that there are 38.8 million workers in highly fissured industries.[14] Studies show that the number of temporary and contracted workers is set to increase dramatically and that these work arrangements account for a significant amount of employment growth. A Coalition of State Attorneys General, including many of the Plaintiffs, commented that independent contractors, freelancers, on-call workers, contract workers, and workers employed by temporary staffing agencies accounted altogether for 94 percent of employment growth from 2005 to 2015.[15] During that same period, this group of workers grew from 10.7 percent to 15.8 percent of the national workforce.[16]

---

[14] EPI Letter, 5-6.

[15] Coalition of State Attorneys General, Comment Letter on Proposed Rule: Joint Employer Status Under the Fair Labor Standards Act, 4 (June 25, 2019) https://www.regulations.gov/contentStreamer?documentId=WHD-2019-0003-12749&attachmentNumber=1&contentType=pdf (the "AG Letter").

[16] *Id.*

133.     This trend is especially troubling because workers in fissured workplaces are paid

less than direct hires. Commenters explained that due to increased fissuring in the past few

decades, workers have suffered lower pay and less job security. For example, the National

Employment Law Project ("NELP") observed that, according to DOL's own data, workers in

heavily subcontracted industries, such as janitorial, cable installation, construction, home care,

and distribution and logistics, experience wage and hour violations the most frequently.[17] These

subcontracted workers suffer violations of their right to earned wages and overtime, experiencing

wage losses, on average, of three to four weeks' earnings.[18] NELP also observed that full-time

staffing and temporary help agency workers earn 41 percent less than workers in standard work

arrangements.[19] EPI likewise observed that outsourced workers earn around 10 percent less

relative to direct hires.[20]

134.     Rather than attempting to address this crisis, the Final Rule adds fuel to the fire

and incentivizes further fissuring. The Final Rule provides a de facto exemption from FLSA

liability for businesses that outsource the hiring and supervision of employees. The businesses

best placed to ensure compliance with wage and hour laws—those with the resources to track

and pay employees properly and that benefit the most from employees' work—may avoid FLSA

liability by simply offloading direct control over employees to intermediaries.

135.     For example, an office building that hires janitorial services through a staffing

agency would not be considered an employer of the janitors even if the building's management

company sets the list of tasks that the janitors perform, observes the janitors' work daily, and

---

[17] NELP Letter, 20-21.

[18] *Id*.

[19] *Id*.

[20] EPI Letter, 6 (citation omitted).

requires the janitors to comply with building-wide standards of conduct. This is true even if the building managers could, but have not yet exercised the authority to, change the janitors' schedules or fire the janitors at will. The Final Rule defines the staffing agency—the third-party entity that nominally hires, pays, and sets the clock-in and clock-out time for the janitors—as the only employer legally responsible for properly compensating the janitors. If the staffing agency, due to undercapitalization or outright wage theft, refuses to pay the janitors in full, the janitors are left without recourse. Despite their integral role in offering daily on-site services to the building's tenants from which the office building benefits, the janitors may not seek relief from the building management company.

136.    Likewise, under the Final Rule, a general contractor in the construction industry may evade liability for unpaid wages simply by outsourcing the work on a jobsite to a small and unsophisticated subcontractor. If the general contractor fails to pay the subcontractor after the job, and, as a result, the subcontractor goes out of business, the workers may not turn to the general contractor for recovery. This is true even if the general contractor was on site every day, provided all the equipment, and the workers performed all of the work under the general contractor's construction contract.

137.    The Final Rule thus eviscerates workers' ability to collect their full wages from the businesses that exercise the most influence over, and profit the most, from their labor.

138.    EPI estimates that the Final Rule will cost workers over $1 billion. EPI explained that the Final Rule will lead to increased outsourcing, subcontracting, and use of staffing agencies. That increase will result in workers earning lower wages, which EPI estimates will be

at least $954.4 million per year.[21] EPI also estimates that the Final Rule will similarly lead to an additional $138.6 million annual loss to workers due to wage theft.[22]

139.    DOL does not dispute that the Final Rule will injure workers to the benefit of employers. The Final Rule concedes that the changes to the joint employment analysis will result in "transfers from employees to employers," 85 Fed. Reg. at 2821, and in particular, "may reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent," 85 Fed. Reg. at 2853.

140.    Despite acknowledging this significant negative impact on workers, DOL makes no attempt to quantify the extent of this impact. The Final Rule does not meaningfully respond to the commenters' concerns about the magnitude of the harms that the Final Rule will cause.

141.    DOL fails to provide any range or estimate of decreased wages for workers. DOL admits that it "lacks data on the current number of businesses that are in a joint employment relationship, or to estimate the financial capabilities (or lack thereof) of these businesses." 85 Fed. Reg. at 2853. The Department also "lacks the data needed to calculate the potential amount or frequency of . . . transfers [from employers to employees]." 85 Fed. Reg. at 2821. DOL does not describe any attempt to gather additional evidence about the effect that the Final Rule will have on the labor market.

142.    Nevertheless, DOL summarily dismisses without reasoned explanation EPI's finding that the Final Rule would decrease workers' earnings by $1 billion. The Final Rule states, without refuting any of the evidence or methodology of the studies that EPI cited, that

---

[21] EPI Letter, 4, 6, 10.

[22] EPI Letter, 10.

DOL "does not believe there are data to accurately quantify the impact of this rule." 85 Fed. Reg. at 2853.

143.    DOL's indifference to the harm the Final Rule will cause to workers is arbitrary and capricious and undermines the Department's purpose to "foster, promote, and develop the welfare of the wage earners." 29 U.S.C. § 551.

## V.      The Final Rule Harms Plaintiffs.

144.    The Final Rule harms Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests, including by directly diminishing Plaintiffs' tax revenue and inflicting substantial and burdensome administrative and enforcement costs on Plaintiffs' state agencies.

145.    The increase in workplace fissuring caused by the Final Rule will directly harm Plaintiff States in at least four ways. First, the Final Rule will lower wages and decrease compliance with worker protection laws, harming workers in Plaintiffs' States. Second, this contraction of the wage base within Plaintiffs' jurisdictions will directly reduce Plaintiffs' tax revenue. Third, the Final Rule will impose administrative and regulatory costs on Plaintiffs and their state agencies. Fourth, the Final Rule will cause Plaintiffs to incur increased costs from the investigation and enforcement of minimum wage, overtime, and other labor law violations affecting workers in their jurisdictions.

### A.      The Final Rule Will Harm Workers in Plaintiffs' States.

146.    The Final Rule causes quasi-sovereign harms to Plaintiffs by harming workers in Plaintiffs' jurisdictions in several ways.

147.    The Final Rule will increase the prevalence of outsourcing, subcontracting, and other sorts of fissuring in Plaintiffs' jurisdictions by permitting companies to shed their legal liabilities under the FLSA through these sorts of arrangements.

148.    Outsourced and subcontracted employees on average are paid less than directly-employed workers.[23]

149.    Such reductions in wages and corresponding reductions in revenue are compounded by the prevalence of wage theft within fissured industries. Employers in heavily fissured industries are much more likely to violate state and federal minimum wage and overtime laws.[24]

150.    Further, workers who experience wage theft in fissured workplaces are much less likely to be able to recover those lost wages, even where they seek legal redress or assistance from government agencies. Studies demonstrate that smaller entities further down the chain of fissured relationships—that are more likely to be the sole employers under the Final Rule—are more transient and undercapitalized, and more likely to go out of business for lack of funds or otherwise to elude regulators.[25]

151.    Furthermore, research shows that fissured workplaces are much more likely to engage in the practice of misclassifying their employees as independent contractors (known as "payroll fraud").[26] Misclassified workers are generally excluded from unemployment and

---

[23] *See supra* note 9.

[24] David Weil, *Enforcing Labour Standards in Fissured Workplaces: the US Experience*, 22 The Economic and Labour Relations Review 33, 34-35 (2011) ("*Enforcing Labour Standards*"), https://web.law.columbia.edu/sites/default/files/microsites/career-services/David%20Weil%20Enforcing%20Labour%20Standards%20in%20Fissured%20Workplaces.pdf; Catherine Ruckelshaus et al., Catherine Ruckelshaus et al., *Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work*, 1 (2014), https://s27147.pcdn.co/wp-content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf.

[25] *See* Weil, *The Fissured Workplace*, *supra* note 5, at 141 (describing high turnover rate of franchisees); David Weil, *Enforcing Labour Standards*, *supra* note 24, at 41 (describing higher competition and lower margins among smaller employers as a result of fissuring); Annette Bernhardt, et al., *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities*, 31, 34, 37 (2009), https://www.nelp.org/wp-content/uploads/2015/03/BrokenLawsReport2009.pdf (describing violation rates by industry and occupation).

[26] Ruckelshaus et al., *Who's the Boss*, *supra* note 24, at 27-29 (describing misclassification in highly fissured

workers' compensation programs, left unprotected by wage and hour laws and anti-discrimination laws, and not protected when they attempt to organize and unionize.[27]

152.     Finally, the Final Rule will cause non-monetary harms, such as increased rates of workplace injuries. Temporary and contingent workers frequently cannot identify the responsible party to report safety problems and have lower rates of reporting workplace injuries.[28] The rate of injury or death due to workplace accidents is higher for workers in fissured workplaces.[29]

**B.     The Final Rule Will Directly Reduce Plaintiffs' Tax Revenue.**

153.     The Final Rule causes direct economic injury to Plaintiffs in several ways. First, lower compensation in fissured workplaces yields a smaller tax base for Plaintiffs, both because fissured workplaces pay lower wages than direct employers and because such workplaces have dramatically higher rates of wage theft and noncompliance with minimum wage and overtime laws. Second, subcontractors, staffing agencies, and other intermediary employers are less likely to comply with obligations to pay workers' compensation premiums or unemployment insurance contributions, thereby reducing these vital contributions to state worker protection systems.[30]

---

industries); Catherine Ruckelsaus & Ceilidh Gao, *Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries* (2017), https://www.nelp.org/publication/independent-contractor-misclassification-imposes-huge-costs-on-workers-and-federal-and-state-treasuries-update-2017 ("*Misclassification Costs*").

[27] U.S. Gov't Accountability Office, GAO-09-717, *Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention*, 40 (2009); 29 U.S.C. § 152(3) (excluding "independent contractor" from definition of employee).

[28] *Hearing on the Future of Work Preserving Worker Protections in the Modern Economy Before the Subcomm. on Workforce Protections and the Subcomm. on Health, Employment, Labor and Pensions of the H. Comm. on Education and Labor* (statement of Honorable David Weil, Dean and Professor Heller School for Social Policy and Management, Brandeis University), https://edlabor.house.gov/download/david-weil-testimony&download=1 ("Weil Testimony").

[29] Stephen Pegula & Matt Gunter, *Fatal Occupational Injuries to Independent Workers* 8 Workplace Injuries No. 10 (2019), https://www.bls.gov/opub/btn/volume-8/fatal-occupational-injuries-to-independent-workers.htm?view_full.

[30] *See, e.g.,* Ruckelsaus & Gao, *Misclassification Costs*, *supra* note 26, at 1.

154.    The lower compensation received by outsourced and subcontracted employees directly reduces Plaintiffs' tax revenue base.[31] Further, the lower rates of compliance with state and federal minimum wage and overtime laws further depresses the revenue base for Plaintiffs.[32]

155.    These problems are compounded by employees' and regulators' decreased ability to collect unpaid back wages from more transient and undercapitalized entities further down the chain of fissured relationships.[33] The challenges in enforcing labor and employment laws against such entities further reduces the tax base available to Plaintiffs.

156.    The Final Rule acknowledges that the enforcement of wage protections will be more difficult, conceding that it will "reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent." 85 Fed. Reg. at 2853.

157.    Data from DOL demonstrates that Plaintiffs are directly harmed by the decreased ability to collect unpaid back wages. From 2016 to 2018, employers agreed to pay or were assessed with civil monetary penalties under the FLSA these amounts in the following jurisdictions: California, over $31 million; Colorado, over $2.3 million; Delaware, over $600,000; District of Columbia, over $410,000; Illinois, over $14 million; Maryland, over $3.6 million; Massachusetts, over $8.2 million; Michigan, over $9.4 million; Minnesota, over $4.7 million; New Jersey, over $14 million; New Mexico, over $2.1 million; New York, over $29

---

[31] *See, e.g.,* NELP, *Subcontracted Workers: The Outsourcing of Rights and Responsibilities*, (2004).

[32] Weil, *Enforcing Labour Standards*, *supra* note 24, at 34, 36 (describing growing industries with high levels of noncompliance); Ruckelshaus et al., *Who's the Boss*, *supra* note 24, at 1.

[33] *See* Weil, *The Fissured Workplace*, *supra* note 5; Weil, *Enforcing Labour Standards*, *supra* note 24, 33–54 (2011); Bernhardt, et al., *Broken Laws*, *supra* note 25, at 31, 34, 37.

million; Oregon, over $730,000; Pennsylvania, over $12 million; Rhode Island, over $2.4

million; Vermont, over $700,000; and Virginia, over $10 million.[34] Thus, diminished recovery of

back wages owed to the workers in Plaintiffs' jurisdictions will lead to a reduced tax base for

Plaintiffs to collect from, and a concomitant decrease in state revenues. In addition, the Final

Rule, by incentivizing and increasing fissured workplaces, will directly reduce employment taxes

paid to many of the Plaintiff. Plaintiffs' unemployment insurance ("UI") systems and workers'

compensation programs will lose important funding as a result of increased outsourcing and

subcontracting.

158.    Subcontracted entities have lower rates of compliance with the legal requirements

of such UI and workers' compensation systems, and detection and enforcement are made more

difficult by the small, transient nature of such companies.

159.    Moreover, even law-abiding companies have found ways, through outsourcing, to

take advantage of technical loopholes in UI and workers' compensation systems. For example,

UI and workers' compensation programs often base the amount of an employer's contributions

on its employees' use of the programs. While lead companies often have higher rates of usage –

for example, UI for seasonal employers, or workers' compensation for dangerous work – these

lead companies take advantage of staffing companies' lower experience ratings to pay lower

rates.[35]

---

[34] Enforcement data available from the U.S. Department of Labor
https://enforcedata.dol.gov/views/searchChooser.php (information retrieved from "WHD Cases"; select each state;
search by "Year"; select from "2016" to "2018"; click "Search") (data accessed Feb. 14, 2020).
[35] Ruckelshaus et al., *Who's the Boss*, *supra* note 24, at 28-29.

160.    Worker misclassification directly evades required payments to state workers' compensation carriers and unemployment insurance funds. This has been a significant and increasing problem for Plaintiffs and will be exacerbated by the Final Rule.

161.    California, for example, assessed over $250 million in payroll taxes and identified more than 138,000 unreported employees as part of its efforts to combat tax evasion in the underground economy.[36] The worst offending industries identified by California included the heavily-fissured construction industry.[37]

162.    In Colorado, audits performed by the Unemployment Insurance Division of the Colorado Department of Labor and Employment identified over 11,000 misclassified workers in 2018. A 2014 analysis estimated that underreporting of wages results in approximately $5 million in lost contributions to Colorado's unemployment insurance fund.[38]

163.    In the District of Columbia's construction industry, an employer can unlawfully reduce its labor costs through misclassifying workers as independent contractors. This includes at least a 5.2 percent reduction in labor costs that comes from evading District taxes related to unemployment insurance and payment into workers' compensation programs.[39]

---

[36] Cal. Employment Dev. Dept., *Annual Report: Fraud Deterrence and Detection Activities, report to the California Legislature*, 26, 29 (2019), https://edd.ca.gov/about_edd/pdf/Fraud_Deterrence_and_Detection_Activities_2019.pdf.

[37] Cal. Employment Dev. Dept., *Joint Enforcement Strike Force: On the Underground Economy, report to the California Legislature*, 7 (2018), https://www.edd.ca.gov/Payroll_Taxes/pdf/JESFReport2018.pdf (targeting the construction industry in California's multiagency enforcement operations due to its high levels of noncompliance with payroll tax and labor laws). *See also* California Labor Commissioner's Office, 2017-2018 Fiscal Year Report on the Effectiveness of the Bureau of Field Enforcement, 5 (2018) https://www.dir.ca.gov/dlse/BOFE_LegReport2018.pdf (report by a state labor bureau to the California Legislature showing high amounts of wages assessed in the construction, agricultural, garment, and janitorial industries).

[38] Chris Stiffler, *Wage Nonpayment in Colorado* (2014), https://www.coloradofiscal.org/wp-content/uploads/2014/03/Wage-Nonpayment-in-Colorado-Final-1.pdf.

[39] Karl A. Racine, Attorney General for the District of Columbia, *Illegal Worker Misclassification: Payroll Fraud in the District's Construction Industry*, 13 (2019) https://oag.dc.gov/sites/default/files/2019-09/OAG-Illegal-Worker-Misclassification-Report.pdf.

164.    In Illinois, the state's Department of Employment Security audited 5,700 employers during 2018 and 2019 and identified 26,598 misclassified employees. Illinois employers who misclassify their employees evade their unemployment contribution and other tax obligations. Similarly, approximately 10 percent of the investigations into fraud in the workers compensation system conducted by the Illinois Workers' Compensation Fraud Unit ("WCFU") involve employers that have evaded their insurance premium payments through misclassification and payroll fraud. This includes employers in the manufacturing, landscaping, seasonal, and temporary staffing industries (some of which have among the highest rates of injuries in Illinois).[40]

165.    In Maryland, in 2018, audits of a limited number of businesses performed by the Division of Unemployment Insurance within the Maryland Department of Labor, Licensing and Regulations revealed over 9,300 misclassified workers, representing over $42 million in unreported taxable wages.[41] Further, an estimated $22 million is lost to Maryland's unemployment insurance fund annually.[42]

166.    In Massachusetts, in 2015, the state's Department of Unemployment Assistance ("DUA") reported recovering $13,060,560 in unemployment insurance contributions from employers due to payroll fraud. Between 2008 and 2015, the DUA recovered a total of $63,879,636 in revenue based on underreported or unreported wages on the part of employers.[43]

---

[40] *State of Ill. Workers' Comp. Comm'n Fiscal Year 2018 Annual Report*, 9, https://www2.illinois.gov/sites/iwcc/about/Documents/FY2018AnnualReport.pdf.

[41] *Annual Report of the Joint Enforcement Task Force on Workplace Fraud* (February 2019), https://www.dllr.state.md.us/workplacefraudtaskforce/wpftfannrep2018.pdf.

[42] Ruckelshaus & Gao, *Misclassification Costs*, at 4.

[43] *Council on the Underground Economy 2015 Annual Report*, 4 (2015), https://www.mass.gov/doc/cue-annual-report-2015/download (see chart "Recovered Funds", row "DUA-UI Taxes").

The industries most cited for misclassification by Massachusetts from 2015 to 2019 included construction and cleaning.

167.    In 2018, New Jersey's audits of employer accounts found 12,315 misclassified workers, $462,058,602 in underreported wages, and $13,911,968 in underreported contributions to unemployment, disability, family leave insurance and workforce assessment funds. Because audits are required of just 1 percent of registered employers annually, the true costs of misclassification are likely much greater.[44] Analyses suggest that underreported wages result in significant income tax losses for New Jersey.[45]

168.    In New York, payroll fraud results in losses to the workers' compensation system of $1.1 million annually, losses to the unemployment insurance fund of $198 million annually, and unpaid state income taxes of $170 million annually.[46]

169.    In Pennsylvania, the Department of Labor & Industry estimated that more than 500,000 workers, about nine percent of the workforce, are misclassified, resulting in more than $200 million in lost unemployment compensation tax revenue and more than $80 million in workers' compensation contributions. Field audits alone discovered more than 20,000 misclassified workers and more than $9,800,000 in underreported unemployment taxes on average from 2016 to 2019. Because employers and employees must both contribute UI taxes

---

[44] *Report of Gov. Murphy's Task Force on Employee Misclassification*, 6 (2019), https://www.nj.gov/labor/assets/PDFs/Misclassification%20Report%202019.pdf.

[45] *See e.g.* Ruckelshaus & Gao, *Misclassification Costs*, *supra* note 26 (citing *Assembly Budget Committee Follow-Up Questions*, New Jersey State Legislature, Apr. 24, 2015, http://www.njleg.state.nj.us/legislativepub/budget_2016/LPS_follow_up_response_ABU.pdf).

[46] Ruckelshaus & Gao, *Misclassification Costs*, *supra* note 26, at 5.

based on wages, an increase in misclassification and decrease in wages as a result of the Final Rule will directly affect the finances of Pennsylvania by lowering tax revenue received.[47]

170.    The Virginia Employment Commission estimates that between 2017 and 2020, Virginia lost $103 million in unemployment insurance due to misclassification. A 2012 Virginia legislative study found that worker misclassification has resulted in an estimated $28 million annual loss in state income tax collection in 2010. The study also noted that, through misclassification, employers avoided paying between $0.6 million and $25 million in unemployment insurance taxes in 2010; the study estimated that between $3 million and $50 million in workers' compensation premiums were unpaid by such employers.[48]

## C.    The Final Rule Will Require Plaintiffs to Undertake Significant Administrative and Regulatory Expenses.

171.    Many of the Plaintiffs, including Colorado, the District of Columbia, Illinois, Maryland, Minnesota, New Jersey, New York, and Washington have statutory requirements regarding minimum wage and overtime pay that are textually identical or similar to the FLSA.[49]

172.    Some Plaintiffs, including the District of Columbia, Illinois, and New York, have, consistent with the long-standing interpretation of the FLSA, treated judicial interpretation of federal law and state law more-or-less interchangeably in their regulatory and enforcement activities.

---

[47] *Hearing on Misclassification of Employees as Independent Contractors, H. Bill 2400, Before H. Lab. Rel. Comm.* (statement of Patrick T. Beaty, Deputy Secretary for Unemployment Compensation Programs, Dep't of Lab. and Indus.) (Apr. 23, 2008).

[48] Joint Legislative Audit and Review Commission Report to the Governor and the General Assembly of Virginia, *Review of Employee Misclassification in Virginia*, 18, 32 (2012) http://www.dpor.virginia.gov/uploadedFiles/MainSite/Content/Licensees/JLARC_Employee%20Misclassification%20Report%20(2012).pdf.

[49] *See* D.C. Code §§ 32-1301, 32-1002, 32-1331.01; 820 ILCS 115/1 et seq.; Minn. Stat. § 177.23; New York Labor Law § 2(6) and (7).

173.    Because the Final Rule limits the scope of the FLSA, but does not alter remedial state statutes that encompass the traditionally broad joint employment analysis, the Final Rule will require some Plaintiffs to retract current guidance that incorporates prior FLSA jurisprudence into discussions of state law standards for determining joint employment.

174.    The Final Rule will require some Plaintiffs to incur costs by issuing new or revised guidance and regulations clarifying distinct state standards and specifying that state law standards governing joint employment continue to apply despite the Final Rule's unprecedented curtailment of the FLSA's scope.

175.    The Final Rule will also require some Plaintiffs to undertake efforts to educate the public about the newly-distinct analyses for joint employment under state law and federal law and to promulgate state regulation or other formal guidance to clarify that the standard for joint employment status under their state laws remains the economic realities test and not the Final Rule's narrowed test.

176.    If the Final Rule takes effect, the Director of the Division of Labor Standards and Statistics ("DLSS") within the Colorado Department of Labor and Employment intends to engage in rulemaking about joint employment under state law. DLSS is already beginning its pre-rulemaking processes to consider its response to the Final Rule. Adopting a new rule is a resource-intensive process that typically spans three to six months and involves extensive research, hearings, and review of public comments.

177.    Following the completion of the rulemaking process, DLSS will need to rewrite non-binding guidance and re-train staff in accordance with its new rules. DLSS will also perform additional education and outreach efforts to ensure the new rule is understood by Colorado employees, employers, and other stakeholders. These efforts will require DLSS to expend

resources that would otherwise be devoted towards other priorities, including investigations and enforcement.

178.    Similarly, the Final Rule's restrictive approach to joint employment makes continued Illinois reliance on the federal standard untenable. Accordingly, the Illinois Department of Labor ("IDOL") is considering its own rule to analyze joint employment issues in a manner consistent with legal precedent and the realities of the modern workplace. Illinois will have to invest significant resources to research, draft, propose, and implement an appropriate joint employer rule in compliance with the Illinois Administrative Procedure Act. In order to issue a regulation, IDOL must publish the proposed rule in the Illinois Register, solicit and review public comment, hold a public hearing, and obtain approval from the Joint Committee on Administrative Rule, a bipartisan legislative oversight committee which conducts systematic reviews of administrative rules proposed by Illinois agencies. Adopting a new rule is a resource-intensive process that will require Illinois to incur significant regulatory and administrative expense.

179.    Likewise, if the Final Rule goes into effect, the Commissioner of the Minnesota Department of Labor and Industry ("MNDLI") would consider engaging in a rule-making process[50] to clarify that the Final Rule—which is contrary to the language and purpose of the MNFLSA—does not apply to state law interpretations and to set forth the appropriate standard that would apply to determine if a joint employment relationship exists under the MNFLSA. In order to make a rule, the Commissioner must go through the administrative process required by

---

[50] The Commissioner of MNDLI has authority to make rules to effectuate the purpose of the MNFLSA. Minn. Stat. § 177.28.

the Minnesota Administrative Procedure Act, Minnesota Statutes chapter 14, which can be costly and time consuming for an agency.

180.    For example, if the Final Rule goes into effect, MNDLI would have to undertake an outreach and education campaign to inform workers and businesses that the test for joint employment status under Minnesota law is not affected by the Final Rule. MNDLI would also incur costs to develop educational materials and increase outreach to workers and employers to educate them about joint employer situations. Such an undertaking would diminish MNDLI's ability to devote resources to other priorities.

   **D.    Plaintiffs Will Incur Increased Enforcement Costs and Burdens.**

181.    In addition, the Final Rule will injure Plaintiffs by causing them to incur additional costs through investigation and enforcement of labor law violations.

182.    In most Plaintiff States, including California, Colorado, Delaware, the District of Columbia, Illinois, Maryland, Massachusetts, Minnesota,[51] New Jersey, New York, Pennsylvania, Virginia, and Washington, state labor enforcement agencies are the primary enforcers of state labor standards laws, such as minimum wage and overtime laws.

183.    In this role, state labor enforcement agencies typically receive complaints from the public and investigate the facts giving rise to the complaint through various investigative tools. The state labor enforcement agencies then have some mechanism for issuing findings or determinations of violations, resolving employer challenges through an administrative adjudicative process, enforcing determinations and orders, and collecting back wages and other applicable damages and penalties owed to workers and the state.

---

[51] In Minnesota, the Minnesota Attorney General's Office also has concurrent authority with MNDLI to enforce many of Minnesota's employment laws, including all laws within chapters 177 and 181. Minn. Stat. §§ 177.45 and 181.1721.

184.    The Final Rule will thus burden Plaintiffs with increased enforcement costs. First, as detailed above, the Final Rule will directly increase the prevalence of wage theft in Plaintiffs' jurisdictions. Plaintiffs and their labor enforcement agencies will bear the burden of this increased wage theft, as their enforcement resources will be called upon to enforce wage standards in their jurisdictions and help workers in their attempts to collect back wages.

185.    Second, this enforcement burden will be compounded by the diversion of joint employer complaints from the federal to state enforcement agencies. Given the Final Rule's sharp curtailment of joint employer liability, and in light of the well-documented difficulties in enforcing wage protections against undercapitalized third-party employers like staffing agencies and contractors, workers will turn to state labor enforcement agencies for redress.

186.    State labor enforcement agencies will be forced to shift enforcement priorities in order to manage their already-limited resources or incur costs by hiring additional investigators, counsel, data analysts, and other staff to properly combat wage theft and enforce state labor standards laws. State labor enforcement agencies will expend greater enforcement resources to recoup fewer wages and taxes under the Final Rule.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**(Administrative Procedure Act–-Not in Accordance with Law)**

187.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

188.    Under the APA, a court must "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

189.    The Final Rule conflicts with the statutory text, the statutory purposes, and judicial interpretation of the FLSA.

49

190.    The Final Rule, therefore, is "not in accordance with law" as required by the

APA. 5 U.S.C. § 706(2)(A).

191.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### SECOND CLAIM FOR RELIEF
### (Administrative Procedure Act—Arbitrary and Capricious)

192.    Plaintiffs incorporate by reference the allegations set forth in each of the

preceding paragraphs of this Complaint.

193.    The APA provides that courts must "hold unlawful and set aside" agency action

that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

194.    The Final Rule is arbitrary and capricious because Defendants' justification for

their decision runs counter to the evidence before the agency, relies on factors Congress did not

intend the agency to consider, and disregards material facts and evidence.

195.    The Final Rule is arbitrary and capricious because it fails to consider important

aspects of the issue, expressly acknowledging that the Department "lack[ed] information about

how many individuals or entities would be affected and to what degree."

196.    The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in

violation of the APA. 5 U.S.C. § 706(2)(A).

197.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2.    Vacate and set aside the Final Rule;

3.      Enjoin the Department and all its officers, employees, and agents, and anyone

acting in concert with them, from implementing, applying, or taking any action whatsoever under

the Final Rule;

4.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

5.      Grant other such relief as this Court may deem proper.


DATED: February 26, 2020                    Respectfully submitted,


JOSH SHAPIRO                                LETITIA JAMES
*Attorney General of the Commonwealth of*   *Attorney General of the State of New York*
*Pennsylvania*

                                            By: */s/ Julie R. Ulmet*
By: */s/ Nancy A. Walker*                   Matthew Colangelo
Michael J. Fischer                               *Chief Counsel for Federal Initiatives*
    *Chief Deputy Attorney General for Impact*   Julie R. Ulmet
    *Litigation*                                     *Deputy Bureau Chief, Labor Bureau*
Nancy A. Walker                             Ming-Qi Chu
    *Chief Deputy Attorney General, Fair*    Seth Kupferberg
    *Labor Section*                              *Section Chiefs, Labor Bureau*
Ryan B. Smith                               Jessica Agarwal
    *Deputy Attorney General*                Michael O'Keefe Cowles
                                            Fiona Kaye
Pennsylvania Office of Attorney General          *Assistant Attorneys General*
1600 Arch Street, Suite 300
Philadelphia, PA 19103                      Office of the New York State Attorney General
(215) 560-2704                              28 Liberty Street
nwalker@attorneygeneral.gov                 New York, NY 10005
                                            (212) 416-8681
*Attorneys for the Commonwealth of*         Julie.Ulmet@ag.ny.gov
*Pennsylvania*                              Jessica.Agarwal@ag.ny.gov

                                            *Attorneys for the State of New York*

XAVIER BECERRA
*Attorney General of the State of California*

By: */s/ Jennifer C. Bonilla*
Satoshi Yanai
   *Supervising Deputy Attorney General*
Jennifer C. Bonilla*
   *Deputy Attorney General*

California Department of Justice
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9145
jennifer.bonilla@doj.ca.gov

*Attorneys for the State of California*

PHILIP J. WEISER
*Attorney General of the State of Colorado*

By: */s/ Eric R. Olson*
Eric R. Olson*
   *Solicitor General*

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov

*Attorneys for the State of Colorado*

KATHLEEN JENNINGS
*Attorney General of the State of Delaware*

By: */s/ Christian Douglas Wright*
Christian Douglas Wright*
   *Director of Impact Litigation*
Oliver J. Cleary
   *Deputy Attorney General*

Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8600
christian.wright@delaware.gov
oliver.cleary@delaware.gov

*Attorneys for the State of Delaware*

KARL A. RACINE
*Attorney General for the District of Columbia*

By: /s/ *Kathleen Konopka*
Kathleen Konopka
   *Deputy Attorney General, Public Advocacy Division*
Alacoque Hinga Nevitt
   *Assistant Attorney General*

Office of the Attorney General for the District of Columbia
441 4th Street, N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
kathleen.konopka@dc.gov
alacoque.nevitt@dc.gov

*Attorneys for the District of Columbia*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: */s/ Alvar Ayala*
Alvar Ayala*
   *Bureau Chief, Workplace Rights Bureau*

Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 793-3895
aayala@atg.state.il.us

*Attorneys for the State of Illinois*

BRIAN E. FROSH
*Attorney General of the State of Maryland*

By: */s/ Jeffrey P. Dunlap*
Steven M. Sullivan
   *Solicitor General*
Jeffrey P. Dunlap*
   *Assistant Attorney General*

Maryland Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-7906
jdunlap@oag.state.md.us

*Attorneys for the State of Maryland*

MAURA HEALEY
*Attorney General of the Commonwealth of Massachusetts*

By: */s/ Andrew H. Cahill*
Andrew H. Cahill*
   *Assistant Attorney General, Fair Labor Division*

Office of Attorney General Maura Healey
1 Ashburton Place
Boston, MA 02108
(617) 727-2200, extension 2330
Drew.H.Cahill@MassMail.State.MA.US

*Attorneys for the Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General of the State of Michigan*

By: */s/ Zachary A. Risk*
Fadwa A. Hammoud
   *Solicitor General*
Zachary A. Risk*
Matthew L. Walker*
Debbie K. Taylor
   *Assistant Attorneys General*

Michigan Attorney General
Labor Division – Payroll Fraud Enforcement Unit
PO Box 30736
Lansing, MI 48909
(517) 335-1950
RiskZ1@michigan.gov
WalkerM30@michigan.gov
TaylorD8@michigan.gov

*Attorneys for the State of Michigan*

KEITH ELLISON
*Attorney General of the State of Minnesota*

By: */s/ Jonathan D. Moler*
Jonathan D. Moler*
   *Assistant Attorney General*

Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101
(651) 757-1330
jonathan.moler@ag.state.mn.us

*Attorneys for the State of Minnesota*


GURBIR S. GREWAL
*Attorney General of the State of New Jersey*

By: */s/ Estelle Bronstein*
Glenn Moramarco
   *Assistant Attorney General*
Estelle Bronstein*
   *Deputy Attorney General*

New Jersey Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-9643
Glenn.Moramarco@law.njoag.gov
Estelle.Bronstein@law.njoag.gov

*Attorneys for the State of New Jersey*


HECTOR BALDERAS
*Attorney General of the State of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas*
   *Chief Deputy Attorney General*

New Mexico Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
(505) 490-4060
tmaestas@nmag.gov

*Attorneys for the State of New Mexico*


ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

By: */s/ Marc Abrams*
Fay Stetz-Waters
   *Director of Civil Rights*
Marc Abrams
   *Assistant Attorney-in-Charge, Civil Litigation Section*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Fay.Statz-Waters@doj.state.or.us
Marc.Abrams@doj.state.or.us

*Attorneys for the State of Oregon*

PETER F. NERONHA
*Attorney General of the State of Rhode Island*

By: */s/ Justin J. Sullivan*
Justin J. Sullivan*
   *Special Assistant Attorney General*

Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2007
jsullivan@riag.ri.gov

*Attorneys for State of Rhode Island*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Jill Abrams*
Julio Thompson, *Assistant Attorney General*
Joshua R. Diamond, *Deputy Attorney General*
Jill Abrams, *Assistant Attorney General*

Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
jill.abrams@vermont.gov
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

MARK R. HERRING
*Attorney General of the Commonwealth of Virginia*

By: */s/ Mamoona H. Siddiqui*
Samuel T. Towell
   *Deputy Attorney General*
R. Thomas Payne II
   *Senior Assistant Attorney General*
Mamoona H. Siddiqui*
   *Assistant Attorney General*

Office of the Attorney General
202 N. Ninth Street
Richmond, Virginia 23219
(804) 786-1068
stowell@oag.state.va.us
rpayne@oag.state.va.us
msiddiqui@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

ROBERT W. FERGUSON
*Attorney General of Washington*

By: */s/ Jeffrey T. Sprung*
Jeffrey T. Sprung*
   *Assistant Attorney General*
Jeffrey G. Rupert
   *Division Chief, Complex Litigation Division*
James P. Mills
   *Senior Trial Counsel*

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 326-5492
Jeff.Sprung@atg.wa.gov
Jeffrey.Rupert@atg.wa.gov
James.Mills@atg.wa.gov

*Attorneys for the State of Washington*

*\*Application for admission pro hac vice forthcoming*