# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK,
COMMONWEALTH OF
PENNSYLVANIA, STATE OF
CALIFORNIA, STATE OF COLORADO,
STATE OF DELAWARE, DISTRICT OF
COLUMBIA, STATE OF ILLINOIS,
STATE OF MARYLAND,
COMMONWEALTH OF
MASSACHUSETTS, STATE OF
MICHIGAN, STATE OF MINNESOTA,
STATE OF NEW JERSEY, STATE OF
NEW MEXICO, STATE OF OREGON,
STATE OF RHODE ISLAND, STATE OF
VERMONT, COMMONWEALTH OF
VIRGINIA, and STATE OF
WASHINGTON,

        Plaintiffs,

    v.

EUGENE SCALIA, *in his official capacity
as Secretary of the United States
Department of Labor*; UNITED STATES
DEPARTMENT OF LABOR; and
UNITED STATES OF AMERICA,

        Defendants.

Civil Action No. 20-cv-1689

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ....................................................................................................................... 1

I.  The Fair Labor Standards Act Expanded the Conception of Employment Relationships Beyond the Common Law. ................................................................ 1

II.  Courts Have Consistently Relied on the Interrelated Definitions of "Employer," "Employee," and "Employ" To Determine Joint Employment Under the FLSA. . 2

III.  The Agency Joint Employment Standard Has Consistently Relied on Judicial Interpretations. ........................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.  The States Have Standing Based on Economic Injuries to Their Proprietary Interests. ...................................................................................................................... 6

a.  The States Have Plausibly Alleged that the Final Rule Will Cause the States to Lose Tax Revenue. .......................................................................... 6

b.  The States Have Plausibly Alleged that the Final Rule Will Cause the States to Incur Administrative and Enforcement Costs. ............................ 13

c.  The States' APA Claims are within the Relevant Zone of Interests Regulated by the Fair Labor Standards Act. ............................................. 19

II.  The States Also Have Standing Based on Their *Parens Patriae* Interests. .......... 20

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Heckler,*
582 F. Supp. 1155 (S.D.N.Y. 1984)...........................................................21, 22, 23

*Air Alliance Houston v. EPA,*
906 F.3d 1049 (D.C. Cir. 2018) ...................................................................13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982)...................................................................................20, 21

*Bank of America v. City of Miami,*
137 S. Ct. 1296 (2017).................................................................................20

*Batalla Vidal v. Duke,*
295 F. Supp. 3d 127 (E.D.N.Y. 2017) .........................................................23

*Baystate Alternative Staffing, Inc. v. Herman,*
163 F.3d 668 (1st Cir. 1998)..........................................................................2

*Bennett v. Spear,*
520 U.S. 154 (1997)...................................................................................5, 18

*California v. Ross,*
358 F. Supp. 3d 965 (N.D. Cal. 2019) ...................................................11, 18, 19

*Carey v. Klutznick,*
637 F.2d 834 (2d Cir. 1980)..........................................................................22

*Carter v. HealthPort Techs., LLC,*
822 F.3d 47 (2d Cir. 2016)............................................................................4

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
868 F.3d 104 (2d Cir. 2017)..........................................................................5

*City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.,*
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ......................................................15

*City of N.Y. v. Heckler,*
578 F. Supp. 1109 (E.D.N.Y. 1984), *aff'd on other grounds*, 742 F.2d 729 (2d
Cir. 1984)......................................................................................................22

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).................................................................................5, 13

*Clarke v Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)................................................................................................20

*Conn. v. Physicians Health Servs. of Conn.*,
   287 F.3d 110 (2d Cir. 2002)...............................................................................24, 25

*Conn. v. Physicians Health Servs. of Conn., Inc.*,
   103 F. Supp. 2d 495 (D. Conn. 2000)......................................................................25

*Connecticut v. U.S. Dep't of Commerce*,
   204 F.3d 413 (2d Cir. 2000)......................................................................................23

*D.C. v. USDA*,
   --- F. Supp. 3d ----, 2020 WL 1236657 (D.D.C. Mar. 13, 2020).............................16

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)........................................................................................10, 18

*Dimond v. Darden Restaurants, Inc.*,
   No. 13 CIV. 5244 KPF, 2014 WL 3377105 (S.D.N.Y. July 9, 2014).........................7

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019)................................................................................................6

*Georgia v. Pennsylvania R.R. Co.*,
   324 U.S. 439 (1945)..................................................................................................22

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999)........................................................................................2

*John v. Whole Foods Mkt. Grp.*,
   858 F.3d 732 (2d Cir. 2017)........................................................................................5

*Jones v. Coughlin*,
   45 F.3d 677 (2d Cir. 1995)........................................................................................22

*Khodara Envtl., Inc. v. Blakely*,
   376 F.3d 187 (3d Cir. 2004)........................................................................................5

*Lexmark Int'l v. Static Control Components*,
   572 U.S. 118 (2014)....................................................................................................6

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................................4

*Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019)..................................................................................24

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)......................................................................................12, 20, 21, 22

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923).........................................................................................................21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)...................................................................................................19, 20

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) .........................................................................................11

*New York v. Mnuchin*,
    408 F. Supp. 3d 399 (S.D.N.Y. 2019).....................................................................6, 11, 12

*New York v. Schweiker*,
    557 F. Supp. 354 (S.D.N.Y. 1983).....................................................................................22

*New York v. Sebelius*,
    No. 07-cv-1003 (GLS), 2009 WL 1834599 (N.D.N.Y. June 22, 2009) ...............................22

*New York v. U.S. Dep't of Homeland Sec.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019), *preliminary injunction stayed pending*
    *appeal*, 140 S. Ct. 599 (2020) ...................................................................................12, 13

*New York v. U.S. Dep't of Labor*,
    363 F. Supp. 3d 109 (D.D.C. 2019) ..............................................................6, 13, 15, 18, 19

*New York v. United States*,
    65 F. Supp. 856 (N.D.N.Y. 1946), *aff'd*, 67 S. Ct. 1207 (1947)............................................22

*New York ex rel. Vacco v. Mid Hudson Med. Group, P.C.*,
    877 F. Supp. 143 (S.D.N.Y.1995)........................................................................................25

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013)....................................................................................................5

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018)...........................................................................................5, 8, 11

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976).............................................................................................................18

*Pyett v. Pennsylvania Bldg. Co.*,
    498 F.3d 88 (2d Cir. 2007), *rev'd on other grounds sub nom. 14 Penn Plaza*
    *LLC v. Pyett*, 556 U.S. 247 (2009)......................................................................................22

*Reyes v. Remington Hybrid Seed Co., Inc.*,
  495 F.3d 403 (7th Cir. 2007), *as amended* (Aug. 30, 2007)................................................7, 8

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
  907 F. Supp. 2d 310 (E.D.N.Y. 2019) ...................................................................................16

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)................................................................................5, 12, 18

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947)................................................................................1, 2, 3

*Salinas v. Commercial Interiors, Inc.*,
  848 F.3d 125 (4th Cir. 2017) ...............................................................................................2

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)................................................................................................4, 5

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)................................................................................................5

*Texas v. EEOC*,
  827 F.3d 372 (5th Cir. 2016) *opinion withdrawn & remanded on other
  grounds*, 838 F.3d 511 (5th Cir. 2016) ...........................................................................16

*Tony and Susan Alamo Foundation v. Sec'y of Labor*,
  471 U.S. 290 (1985)................................................................................................1

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ...............................................................................................15

*Vullo v. Office of the Comptroller of the Currency*,
  378 F. Supp. 3d 271 (S.D.N.Y. 2019).................................................................................23

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947)................................................................................................1

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)................................................................................................6

*Wyoming v U.S. Dep't of Interior*,
  674 F.3d 1220 (10th Cir. 2012) ...........................................................................................11

*Zheng v. Liberty Apparel Co. Inc.*,
  355 F.3d 61 (2d Cir. 2003)................................................................................................3

**FEDERAL STATUTES**

5 U.S.C.
    § 702.................................................................................................................25
    § 706...........................................................................................................20, 25

29 U.S.C.
    § 202...................................................................................................................1
    § 203...................................................................................................................2
    § 206...................................................................................................................1
    § 207...................................................................................................................1

**STATE STATUTES**

72 Pa. Cons. Stat.
    § 7302.................................................................................................................6

N.Y. Tax Law
    § 612(a)..............................................................................................................6

**FEDERAL REGULATIONS**

29 C.F.R. § 791 ...........................................................................................................3

*Joint Employer Status Under the Fair Labor Standards Act*, 85 Fed. Reg. 2820
    (Jan. 16, 2020).................................................................................... *passim*

*Joint Employer Status Under the Fair Labor Standards Act*, 84 Fed. Reg. 14,043
    (Apr. 9, 2019)....................................................................................................2

*Joint Employment Relationship Under Fair Labor Standards Act of 1938*, 23 Fed.
    Reg. 5905 (Aug. 5, 1938).................................................................................3

**MISCELLANEOUS AUTHORITIES**

Final Brief for the Petitioners in Consolidated Cases, *Massachusetts v. EPA*,
    No. 03-1361, 2005 WL 257460 (D.C. Cir. filed Jan. 24, 2005) ............................24

S. Rep. No. 75–884 (1937) .........................................................................................1

## INTRODUCTION

Plaintiff states and the District of Columbia (together, the "States") submit this opposition to Defendants' motion to dismiss on the grounds that the States lack standing to challenge the U.S. Department of Labor's rule, *Joint Employer Status Under the Fair Labor Standards Act*, 85 Fed. Reg. 2820 (Jan. 16, 2020) (to be codified at 29 C.F.R. §§ 791.1–791.3) (the "Final Rule"). The States have three independent bases for standing, any of which supports their challenge to the Final Rule. Accordingly, Defendants' motion should be denied.

## BACKGROUND

### I.    The Fair Labor Standards Act Expanded the Conception of Employment Relationships Beyond the Common Law.

Congress enacted the Fair Labor Standards Act ("FLSA") in 1938 to remedy poor labor conditions that were "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. The FLSA was meant to eradicate the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." S. Rep. No. 75–884, at 4 (1937). The statute requires employers to pay employees at least the federal minimum wage for each hour worked and overtime for each hour worked over 40 in a workweek. 29 U.S.C. §§ 206(a), 207(a). To accomplish those goals, Congress expanded the definitions of "employ," "employee," and "employer" to be "comprehensive enough to require [their] application to many persons and working relationships, which prior to th[e] Act, were not deemed to fall within an employer-employee category." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947)). The Supreme Court has construed the statute "liberally to apply to the furthest reaches consistent with congressional direction." *Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)

(quotation omitted).  The "remedial purposes of the FLSA require courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) (quotation omitted); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

## II.    Courts Have Consistently Relied on the Interrelated Definitions of "Employer," "Employee," and "Employ" To Determine Joint Employment Under the FLSA.

The FLSA's definitions of "employer," "employee," and "employ" "work in harmony." *Joint Employer Status Under the Fair Labor Standards Act*, Notice of Proposed Rulemaking, 84 Fed. Reg. 14,043, 14,050 (Apr. 9, 2019).  "Employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  An "employee means any individual employed by an employer."  *Id.* § 203(e)(1).  "Employ includes to suffer or permit to work."  *Id.* § 203(g).  "Congress repeatedly has reaffirmed that the FLSA's definitions of 'employ,' 'employee,' and 'employer' dictate that two or more entities can constitute 'joint employers' for purposes of the FLSA."  *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 135 (4th Cir. 2017) (citations omitted).

The definitions of "employer," "employee," and "employ" are interrelated, and courts have relied on all three to determine the scope of joint employment liability.  Indeed, in the Supreme Court's seminal decision in *Rutherford*, it observed that "there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the employer-employee relationship under the Act."  *Rutherford*, 331 U.S. at 728 (citing all three definitions).  The Court noted that the FLSA definition of "employ" "evidently derives from the child labor statutes" and relied not on "isolated factors but rather upon the circumstances of the whole activity" to determine workers employed by an intermediary were also employees of the slaughterhouse that contracted with the intermediary.  *Id.* at 728, 730.  Consistent with *Rutherford*, this Circuit has

held that the joint employer determination is "to be based on the circumstances of the whole

activity viewed in light of economic reality." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71

(2d Cir. 2003) (quotations omitted).  Accordingly, "an entity can be a joint employer under the

FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay

them." *Id.* at 70 (citing *Rutherford*, 331 U.S. at 726).

### III.  The Agency Joint Employment Standard Has Consistently Relied on Judicial Interpretations.

For more than 80 years, the U.S. Department of Labor's ("Department") interpretation

has remained consistent with court interpretations.  The Department codified the joint

employment standard at 29 C.F.R. §§ 791.1–791.2 in 1958, making clear that it relied on the

related definitions of "employee," "employer," and "employ."  *Joint Employment Relationship*

*Under Fair Labor Standards Act of 1938*, 23 Fed. Reg. 5905 (Aug. 5, 1938).  Section 791.2

begins: "A single individual may stand in the relation of an employee to two or more employers

at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act

which prevents an individual employed by one employer from also entering into an employment

relationship with a different employer."  The regulation provided that "determination of whether

the employment by the employers is to be considered joint employment or separate and distinct

employment for purposes of the act depends upon all the facts in the particular case."  *Id.* at

5906.

Following a notice and comment period, the Department issued the Final Rule challenged

in this case on January 16, 2020, with an effective date of March 16, 2020.  85 Fed. Reg. 2820.

Deviating from 80 years of precedent and the agency's own interpretations, the Final Rule

provides only four factors that the Department finds relevant to the joint employer inquiry—

whether the putative employer:

> (i) Hires or fires the employee;
> (ii) Supervises and controls the employee's work schedule or conditions of employment to a substantial degree;
> (iii) Determines the employee's rate and method of payment; and
> (iv) Maintains the employee's employment records.

*Id.* at 2859.  The Final Rule clarifies that the "potential joint employer must actually exercise—directly or indirectly—one or more of these indicia of control to be jointly liable under the Act." *Id.*  The Final Rule permits consideration of other factors "only if they are indicia of whether the potential joint employer exercises significant control over the terms and conditions of the employee's work."  *Id.*  The Final Rule also categorically excludes certain factors as irrelevant, including: any indicia of economic dependence; using a franchise or brand and supply model; certain contractual terms between businesses—such as mandating compliance with legal obligations, establishing policies, or requiring training; and several other business arrangements, such as providing a sample employee handbook, allowing a business to operate on the premises, and joint participation in a health or retirement plan.  *Id.*  Disguised as a flexible factor test, the Final Rule has made actual exercise of control an essential condition of the joint employer analysis in direct repudiation of federal court precedent and earlier agency interpretations.

## ARGUMENT

Under Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the Court has subject-matter jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff has standing at the pleading stage if it plausibly alleges facts, accepted as true and construed in its favor, showing that it has standing.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016).  To show standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).

To satisfy the injury-in-fact requirement, a plaintiff must plausibly allege either actual or imminent harm or a "concrete" risk of harm. *Spokeo*, 136 S. Ct. at 1548; *see also NRDC v. FDA*, 710 F.3d 71, 82 (2d Cir. 2013) (requiring a "credible threat" of harm). Allegations of a "future injury" qualify "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). The Second Circuit has emphasized that the injury requirement is "a low threshold" meant only to ensure that "the plaintiff has a personal stake in the outcome of the controversy." *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation omitted). To satisfy the causation requirement, a plaintiff must allege injuries that are "fairly traceable to the actions of the defendant." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). "[T]he 'fairly traceable standard is lower than that of proximate cause,'" *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), and does not require that the challenged conduct was the but-for cause of the alleged injury, *Khodara Envtl., Inc. v. Blakely*, 376 F.3d 187, 194–95 (3d Cir. 2004). A plaintiff "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of third parties[.]" *NRDC v. NHTSA*, 894 F.3d 95, 104 (2d Cir. 2018) (citation and quotations omitted).

The States have met all of the standing requirements.[1] The States plausibly allege three independent injuries traceable to the narrowed joint employer standard in the Final Rule and redressable by the invalidation of that standard: (1) the States will lose tax revenue because the narrowed standard will adversely affect workers' wages as well as workers' compensation and

---

[1] All of the States have standing here. However, only one plaintiff need have standing to satisfy Article III. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017).

unemployment insurance systems; (2) the States will incur administrative and enforcement costs due to the narrowed standard; and (3) the narrowed standard harms the States' *parens patriae* interests in the well-being of workers.

While the States must also demonstrate that the complaint "fall[s] within the zone of interests protected by the law invoked," the test is not "especially demanding," particularly where, as here, the States sue "under the generous review provisions of the APA." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 126, 130 (2014) (quotation marks omitted).

## I.   The States Have Standing Based on Economic Injuries to Their Proprietary Interests.

### a.   The States Have Plausibly Alleged that the Final Rule Will Cause the States to Lose Tax Revenue.

A party can show standing by identifying "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447–48 (1992). Anticipated "financial loss can constitute the sort of concrete and particularized injury that is capable of supporting standing." *New York v. Mnuchin*, 408 F. Supp. 3d 399, 409 (S.D.N.Y. 2019) (citing *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019)); *see also New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 125 (D.D.C. 2019) ("Lost tax revenues may serve as a cognizable injury-in-fact for standing purposes where an action caused a direct injury in the form of specific tax revenues, and the state articulates a fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged.").

*First*, the States collect taxes on wages paid to employees in their states. *See, e.g.*, N.Y. Tax Law § 612(a); 72 Pa. Cons. Stat. § 7302. The States have sufficiently alleged that they will suffer a reduction in tax revenue because of the limits that the Final Rule places on holding parties liable for violations of federal minimum wage and overtime laws, thereby increasing the number of uncollectable judgments involving wage theft. *See* Compl. ¶¶ 154–155, 157. The

Department acknowledges this point, noting that the Final Rule "may reduce the number of businesses currently found to be joint employers" and "may reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent."  Compl. ¶¶ 139, 156; 85 Fed. Reg. at 2853.[2] Because of the restrictions that the Final Rule places on joint employer liability, fewer claimants will be able to recover damages because the only liable party may be insolvent.  *See id.* ¶¶ 150, 155; *see also* Shierholz Decl. ¶ 6 (Ex. 1).[3]  Defendants' suggestion that the Final Rule is "not certain" to result in a loss of collectable wages is hard to credit after the Department's own recognition of this harm in the Final Rule.  Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") 22–23.  Joint employer liability "matter[s] most" in the instances when one employer is "thinly capitalized," so limiting the instances in which a claimant can avail themselves of this protection will logically limit many claimants' ability to collect a judgment.  *Reyes v. Remington Hybrid Seed Co., Inc*., 495 F.3d 403, 409 (7th Cir. 2007), *as amended* (Aug. 30, 2007).

Furthermore, the Final Rule will result in the increased occurrence of wage theft. Outsourced businesses are statistically more undercapitalized and more transient than franchisors and lead businesses, making it a challenge in some instances for workers to even identify their employer and often making it impossible to enforce a judgment against them.  *See* Compl. ¶¶ 150, 152; Shierholz Decl. ¶ 6 (Ex. 1).  It is a matter of "common sense and basic economics," that "the increased cost of unlawful conduct will make the conduct less common," and where the

---

[2] The Department also points to increased franchising by businesses as an anticipated outcome of the Final Rule, if not a goal.  *See, e.g.*, 85 Fed. Reg. at 2853.

[3] Consideration of the declarations submitted in support of the States' opposition, as well as materials cited in the Complaint, is appropriate on a motion to dismiss for lack of standing. *Dimond v. Darden Restaurants, Inc.*, No. 13 CIV. 5244 KPF, 2014 WL 3377105, at *11 (S.D.N.Y. July 9, 2014).

converse is true, as here, it is a direct and predictable consequence that employers will more often fail to follow legal requirements. *NRDC v. NHTSA*, 894 F.3d at 105 (citation and quotations omitted); *see also Reyes*, 495 F.3d at 409 ("[W]hen a contractor has no business or personal wealth at risk, he may be tempted to stiff the workers [], and then treating the principal firm as a separate employer is essential to ensure that the workers' rights are honored."). Increased wage theft caused by the Final Rule will result in at least $2.6 million in lost tax revenue for the States per year.  Shierholz Decl. ¶ 18 (Ex. 1).

*Second*, the States have also sufficiently alleged that the Final Rule will increase fissuring of workplaces, resulting in a decrease in wages and an increase in wage theft—both of which will further depress the tax revenue base. *See* Compl. ¶¶ 154, 157–170.  These losses are neither theoretical nor overly attenuated.  Rather, they are predictable outcomes of the Final Rule based on historical data of wage declines as a result of outsourcing of employment. *See id.* ¶ 78; Shierholz Decl. ¶ 15 (Ex. 1).  The Department's own data demonstrates a specific and substantial amount of existing wage theft in each of the States. *See* Compl. ¶ 157.  Subcontracting and franchised businesses more frequently violate state and federal minimum wage and overtime laws and are statistically more likely to commit wage theft. *See id.* ¶ 149; Shierholz Decl. ¶ 11 n.13 (Ex. 1).  The Final Rule's restriction on joint employer liability will exacerbate this problem, as more contractors compete for contracts by proposing labor costs so low that they can only be fulfilled if they underpay their workers. *See* Compl. ¶ 150; Shierholz Decl. ¶ 6 (Ex. 1). Absent liability from being a joint employer, the lead business will not be liable for workers' wages if the contractor goes out of business. *See id.*  Because the Final Rule encourages employers to outsource more employment to subcontractors and franchisees who are statistically more likely to commit wage theft and less likely to be solvent enough for employees to collect

back wages, this will lead to higher amounts of wage theft in the aggregate—further reducing the States' tax revenue bases.[4]  Increased fissuring caused by the Final Rule will result in an annual loss of at least $17.9 million in tax revenue for the States.  Shierholz Decl. ¶ 19 (Ex. 1).

*Third*, the States have plausibly alleged financial losses from decreased contributions to the States' workers' compensation carriers and unemployment insurance funds caused by the Final Rule.  Fissured workplaces are more likely to misclassify workers and evade required payments to workers' compensation and unemployment insurance funds.  *See* Compl. ¶¶ 151, 158–70; Shierholz Decl. ¶ 20 (Ex. 1).  The predictable effect of government action on the decisions of third parties can support standing, regardless of whether third parties' decisions are

---

[4] *See also* Davenport Decl. ¶ 5 (Ex. 15) ("To the extent that the Final Rule incentivizes fissuring, it follows that the incidence of misclassification will also rise as a result of the rule, which will result in additional lost tax revenue [for Virginia]."); Blissenbach Decl. ¶ 11 (Ex. 9) (Minnesota "expects that number [$11.9 million in wage theft] to rise if the Final Rule is allowed to stand because workers who are harmed by wage theft will be unable to collect unpaid wages from employers who are now insulated from liability by the Final Rule.  In addition, additional employers may change their practices to take advantage of the Final Rule.  All of this unpaid income would be subject to Minnesota taxes were it properly paid to employees."); Hirsch Decl. ¶ 16 (Ex. 10) ("Increased wage theft in [fissured] industries will result in a reduction in this tax revenue [in New Jersey]."); Moss Decl. ¶ 7 (Ex. 2) ("[B]y limiting recourse for workers hired through intermediary entities such as subcontractors or staffing agencies, the Final Rule will increase the prevalence of worker misclassification and wage theft, and thereby decrease (1) Colorado workers' wages and benefits, (2) tax revenue and premiums Colorado receives when workers are properly classified, and (3) Division and Department ability to succeed at its mission of helping workers prosper in jobs with positive features such as benefits, stability, upward mobility, and recourse for labor violations."); Degnan Decl. ¶ 8 (Ex. 13) ("Reduced wage protections will also increase worker misclassification and payroll fraud, further shrinking Rhode Island's tax revenue base."); Dworak-Fisher Decl. 12 (Ex. 6) ("[T]he Final Rule would likely depress wages as more Marylanders become employed in fissured lower-wage industries . . . which would shrink the pool of taxable income.  Compounding the impact, these same workers would be more likely to need public assistance, as victims of wage theft often are."); Leland Decl. ¶ 8 (Ex. 16) ("The perception of cost savings when combined with the reduced liability under the Final Rule will encourage more employers to adopt" fissuring; "[a]ssuming a conservative growth rate of 2% related to the Final Rule," Washington "would anticipate additional 6,703 jobs each year in alternative arrangements following the adoption of the Final Rule.").

lawful or even rational.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Additionally, outsourcing allows lead companies to take advantage of third-party staffing

agencies' and subcontractors' lower taxable rates for unemployment insurance and workers'

compensation.  *See* Compl. ¶ 159.  Because the Final Rule will increase fissuring, it will make

misclassification more prevalent and encourage lead companies to exploit these loopholes.  The

resulting losses to workers' compensation systems and unemployment insurance funds further

supports the States' argument for standing.  The increased wage theft caused by the Final Rule

will amount to an annual loss of at least $879,000 in workers' compensation premiums and

$176,000 in unemployment insurance taxes for the States.  Shierholz Decl. ¶¶ 23, 27 (Ex. 1).

The increased workplace fissuring caused by the Final Rule will result in an annual loss of at

least $6.1 million in workers' compensation premiums and $1.2 million in unemployment

insurance taxes for the States.  *Id.*[5]

Defendants suggest that the States' allegations are insufficient because they have not

identified losses to a specific revenue stream attributable to the Final Rule, Mem. 21-22, but as

---

[5] *See also* Boone Decl. ¶ 13 (Ex. 3) ("The Final Rule, by facilitating the act of misclassification" leads to a loss of funds to Delaware because "[w]hen workers are not provided workers' compensation insurance by their employers, this results in less taxable revenue for the Division of Industrial Affairs."); Egan Decl. ¶ 6 (Ex. 8) ("[T]he Final Rule will reduce Michigan workers' ability to recover unpaid wages, and consequently lower Michigan's tax revenue base that is necessary to provide essential governmental services to all Michigan residents."); Hirsch Decl. ¶ 18 (Ex. 10) ("With the Final Rule's narrowed definition of joint employer, entities that should be deemed joint employers under [New Jersey] law may fail to pay payroll taxes and/or deduct employee contributions. . . . State Unemployment Insurance accounts may be underfunded and employees may be ineligible for benefits."); Anderson Decl. ¶ 15 (Ex. 14) ("An increase in misclassification of employees for purposes of unemployment insurance created by the Final Rule would result in a decrease in this tax revenue for Vermont and less available funding to pay out unemployment claims to Vermonters."); Leland Decl. ¶ 14 (Ex. 16) ("[T]he Final Rule will result in significant increases in lost [worker's compensation] premiums [in Washington] due to an increase in insolvent employers.").

Defendants acknowledge, the States point to losses to income tax and funding of workers' compensation and unemployment insurance. The States have plausibly alleged a direct causal link between those losses and the Final Rule based on the predictable behavior of employers whose liability is now limited by the Final Rule. This more than meets the standard in the Second Circuit, which holds that parties "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of third parties[.]" *NRDC v. NHTSA*, 894 F.3d at 104 (quotations omitted).[6]

Defendants also argue that the States improperly rely on layers of conjecture, Mem. 23, but the fact that the causal chain contains multiple steps does not render the States' allegations insufficient. "When harm is caused by multiple actions, 'what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain.'" *California v. Ross*, 358 F. Supp. 3d 965, 1006 (N.D. Cal. 2019) (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1012–13 (9th Cir. 2014)). The States have plausibly alleged each link in the chain here. The links are analogous to those held sufficient for standing in *Mnuchin*, 408 F. Supp. 3d 399, the only in-Circuit case Defendants cite. The district court there held that the States had "staked out

---

[6] Defendants attempt to compare the States' allegations to those dismissed in *Wyoming v U.S. Dep't of Interior*, 674 F.3d 1220 (10th Cir. 2012). Defs.' Mem. 22. However, *Dep't of Interior* is easily distinguished. In that case, the claimants alleged a generalized harm based on loss of tax revenue due to restrictions on snowmobile access to Yellowstone National Park. *Id.* at 1232. Plaintiffs in *Dep't of Interior* failed to provide supporting evidence beyond an affiant's conclusory statements alleging a reduction in revenue and an outdated study regarding sales tax revenue gained by snowmobiles 15 years prior. *Id.* This stands in stark contrast to the States' allegations and supporting declarations here. The States have outlined the anticipated harm to their tax bases due to the transfers from employees to employers and the increase in outsourcing stimulated by the Final Rule. This is based on the Department's own admission regarding the effects of the Final Rule as well as data demonstrating that outsourcing leads to lower wages and therefore tax revenue losses. *See supra* 6-9.

an entirely plausible theory of injury with the requisite specificity: by effectively raising

state property taxes, the SALT cap reduces the value of a homeowner's property, thereby

discouraging home sales and decreasing the revenues the States are able to collect by taxing such

sales."  408 F. Supp. 3d at 409–10.  Here, the States have alleged that the Final Rule effectively

reduces workers' ability to collect back wages and increases fissuring, thereby lowering wages

and decreasing the revenues the States are able to collect by taxing such income.  *See also New

York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 343–44 (S.D.N.Y. 2019), *preliminary

injunction stayed pending appeal*, 140 S. Ct. 599 (2020) ("[E]conomic ripple effects . . . are

fairly traceable to Defendants' promulgation of the Rule.") (quotation omitted).

Nor does the fact that the alleged harms may have already been occurring before the

Final Rule's issuance warrant dismissal of the States' claims.  Defs.' Mem. 23–24.  Plaintiffs

plausibly allege that the Final Rule exacerbates such harms (*e.g.*, fissuring and worker

misclassification), and it is sufficient for the States to plead that the agency's action will

contribute to the alleged harms.  *Massachusetts v. EPA*, 549 U.S. 497, 523–25 (2007)

("*Massachusetts*") (finding standing where challenged conduct was one of several causes of

plaintiffs' injuries); *Rothstein*, 708 F.3d at 93 (finding standing where challenged conduct was

one of many sources of funding supporting terrorist activity, which had injured plaintiffs).[7]

---

[7] Defendants also argue that it is "difficult to square" the States' allegations of harm with the more stringent state statutory schemes, which would "presumably deter" employers from undertaking illegal actions.  Defs.' Mem. 24.  But that deterrence will only work if States enforce those schemes; therefore, Defendants effectively acknowledge that the States will incur increased enforcement costs as a result of the Final Rule.  Moreover, this ignores reductions in the recovery of taxable wages stemming from the Department's investigations conducted in the States.  Defendants' contention is difficult to square with the Final Rule's concession that it "may reduce the amount of back wages that employees are able to collect."  *See* 85 Fed. Reg. at 2853.  The conflict between the new federal regulatory standard and the States' statutes also belies Defendants' assertion that the Final Rule will lead to more clarity and certainty for businesses regarding what actions will result in joint employer liability.  Defs.' Mem 2, 6.

### b. The States Have Plausibly Alleged that the Final Rule Will Cause the States to Incur Administrative and Enforcement Costs.

The States also plausibly allege that the Final Rule imposes economic injuries on them because they will be forced to increase administrative and enforcement expenses to avoid and mitigate the substantial harms that result from the Final Rule. The increased administrative and enforcement burdens on the States are neither incidental nor self-inflicted, as Defendants contend. Defs.' Mem. 17–18. Defendants argue that the Final Rule imposes no obligations on the States nor prohibits the States from taking any action. *Id.* These arguments fail. "Monetary expenditures to mitigate and recover from harms that could have been prevented absent [an agency action] are precisely the kind of 'pocketbook' injury that constitute an injury to a proprietary interest for standing purposes." *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d at 126 (quoting *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018)); *see also New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d at 343–44. Plaintiffs may base their standing on "reasonably incur[red] costs to avoid" a substantial risk of harm. *Clapper*, 568 U.S. at 414 n.5.[8]

_____

[8] Defendants rely on *Clapper* to argue that the States "cannot manufacture standing by inflicting harm on themselves." Defs.' Mem. 17 (citing 568 U.S. at 416). But that case is distinguishable. In *Clapper*, plaintiffs challenged a provision of the Foreign Intelligence Surveillance Act as unconstitutional. The Court held that the costs plaintiffs had incurred to avoid surveillance were not traceable to the provision at issue; instead, they were the "product of their fear of surveillance." *Id.* at 417. The Court noted that plaintiffs had a "similar incentive to engage in many of the countermeasures they are now taking" prior to the FISA provision being enacted. *Id.* Here, by contrast, the Department has unlawfully changed its joint employer analysis—interpretations that had already been incorporated into state standards. The costs to update state law and related guidance are not self-inflicted. And there was no similar incentive in the past to revise guidance because, as the Final Rule notes, the agency's joint employer rule had remained largely consistent for decades. *See* 85 Fed. Reg. at 2820 ("Until this final rule, the Department had not meaningfully revised part 791 since its promulgation over 60 years ago.").

*First*, the States have sufficiently asserted concrete, particularized, and actual or imminent administrative burdens and expenses.  To mitigate and recover from the harms flowing from the Final Rule, the States have plausibly alleged that they will incur administrative costs by reviewing current guidance on joint employment liability and either retracting or issuing new or revised guidance and developing and disseminating public education campaigns.  Compl. ¶¶ 171–180.[9]  For example, Michigan has already incurred administrative burdens with respect to public education efforts, including providing updates and training on Michigan's standard on joint employment.  Egan Decl. ¶¶ 21–22 (Ex. 8).  Colorado estimates that administrative burdens that the Final Rule has already imposed and will continue to impose several hundred hours of staff time for (1) temporary and permanent rulemaking (both already underway); (2) additional analysis and investigations of joint employment matters; (3) new guidance for employers and employees; and (4) new training of staff members on the Final Rule.  Moss Decl. ¶ 8 (Ex. 2).  Minnesota estimates that it would cost $130,000 to fund a rulemaking process.  Blissenbach Decl. ¶¶ 17–18 (Ex. 9); *see also id.* ¶¶ 15–16 (explaining that Minnesota will incur costs to develop guidance and conduct an outreach and education campaign); Carrillo Decl. ¶¶ 16–20 (Ex. 5) (explaining that Illinois will have to devote resources to implement a new rule and describing rulemaking process required); Morris-Hughes Decl. ¶¶ 16–17 (Ex. 4) (explaining that the Final Rule "impose[s] increased costs, time, and expense" on the District of Columbia to "review[] and revis[e] its analysis of joint employment," research, draft, publicize and rollout new guidance, engage in training on enforcement efforts, and "undertake efforts to educate the

---

[9] Defendants imply that burdens on the States to retract guidance are insufficient to confer standing because such exercise would have to be undertaken every time the Department issues or amends an FLSA regulation. Defs.' Mem. 18 n.5.  But Defendants fail to cite to any authority that prohibits this burden from conferring standing.  Nevertheless, the States meet standing requirements because they plausibly allege that the unlawful Final Rule is causing this harm.

public about the newly distinct analyses for joint employment under the District law and federal law."); Davenport Decl. ¶ 14 (Ex. 15) (stating that Virginia will incur expenses to disseminate new guidance); Degnan Decl. ¶¶ 15-17 (Ex. 13) (stating that Rhode Island will need to update its guidance, which "will impose costs-time and expense for researching, drafting, approving, and publishing new guidance."); Leland Decl. ¶ 20 (Ex. 16) (describing need to prioritize new guidance due to the Final Rule and estimating costs, including $62,500 to hire new personnel).[10]

Just as in *City & County of San Francisco*, "[t]hese costs that the States…have identified are predictable, likely, and imminent." *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019). Defendants try to distinguish *City & County of San Francisco* from the present challenge to argue that any costs incurred are not imposed by the Final Rule, Defs.' Mem 18–19, but that case supports the States' standing argument. It held that the alleged burdens of hours spent educating the public about the agency rule at issue, which expanded the definition of "public charge" under the Immigration and Nationality Act, and analyzing the impact of the rule on their services sufficed as "evidence of cognizable, irreparable costs" for standing. *Id.*; *see also New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d at 126 (holding that plaintiffs had standing "based on the Final Rule's direct imposition of an increased regulatory burden on them," which included expending regulatory resources to

---

[10] Defendants cite *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268–269 (4th Cir. 2011), for the proposition that states do not have standing when pressured to change their own laws in response to federal action. Defs.' Mem. 17. That case is inapposite. The court held that Virginia did not have standing because the newly-enacted statute did "nothing more than announce an unenforceable policy goal of protecting Virginia's residents" from the insurance requirements of the Patient Protection and Affordable Care Act. 656 F.3d at 268. Here, the States do not allege injury based only on a conflict between their laws and the Final Rule—the injury also stems from the Department's change to the joint employer standard, which, *inter alia*, imposes on States increased administrative burdens and expenses because their state laws are intertwined with longstanding FLSA standards, from which the Final Rule unlawfully departs.

answer inquiries relating to the challenged rule and anticipated expenses for consumer education initiatives); *cf. D.C. v. USDA*, --- F. Supp. 3d ----, 2020 WL 1236657, at \*23–27 (D.D.C. Mar. 13, 2020) (states showed irreparable injury for preliminary injunction based on administrative costs they would incur to adjust to new federal regulation).  Similarly, here, the States must invest resources to disentangle existing guidance from the federal standard and clarify for the public that the Final Rule does not change more protective state law.[11]

*Second*, the States have plausibly alleged direct and concrete injuries to state labor agencies in the form of increased enforcement costs.  Defendants effectively acknowledge that the Final Rule, and the Department's enforcement of it, will lead to fewer workers collecting the amount of money owed to them by their employers.  Defs.' Mem. 22 n.7.  The Final Rule states that "[t]he Administrator of the Wage and Hour Division will use these interpretations to guide the performance of his or her duties under the Act, and intends the interpretations to be used by employers, employees, and courts to understand employers' obligations and employees' rights under the Act."  85 Fed. Reg. at 2858; *see also* Defs.' Mem. 17 ("The Joint Employer Rule sets forth a four-factor balancing test for the Department to use in investigations and litigation to evaluate joint employer status under the FLSA, and encourages courts to apply the same analysis.").  At the same time, as discussed above, the Department has acknowledged that the Final Rule "may reduce the number of businesses currently found to be joint employers," and accordingly, "reduce the amount of back wages that employees are able to collect when their

---

[11] Defendants attempt to contrast this case with *Texas v. EEOC*, 827 F.3d 372 (5th Cir. 2016) *opinion withdrawn & remanded on other grounds*, 838 F.3d 511 (5th Cir. 2016); and *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310 (E.D.N.Y. 2019).  Defs.' Mem. at 18.  But those decisions address plaintiffs in their roles as employers, and therefore, are of no moment to the present challenge.

employer does not comply with the Act and, for example, their employer is or becomes insolvent."  Compl. ¶ 156; 85 Fed. Reg. at 2853.

Thus, the Final Rule curtails federal enforcement of joint employer liability and simultaneously causes increased wage theft, which will force the States to fill in the gaps of enforcement and wage collection.  Compl. ¶¶ 181–186.  *See, e.g.*, Boone Decl. ¶¶ 13, 16 (Ex. 3) ("The Final Rule, by facilitating the act of misclassification, will cost the DDOL [Delaware Department of Labor] money while also causing the DDOL to incur additional administrative and regulatory costs in investigating and enforcing misclassification and fraud cases. . . . Delaware will effectively have to fill in the gap in federal enforcement created by the Final Rule."); Rowe Decl. ¶ 18 (Ex. 7) ("With the relaxing of federal joint employer standards and less federal enforcement in these types of cases, [Massachusetts] anticipate[s] that an influx of similar 'joint employer' cases will challenge resources required for other enforcement priorities, such as investigating the several thousand employee wage complaints we receive each year across all industries.  The [Massachusetts Attorney General's Office's Fair Labor] Division will be further harmed where the federal government will not be assisting in the investigation and resolution of such cases, allowing employers to avoid liability for wage theft in the fissuring workplace in violation of both state and federal law.").[12]

---

[12] *See also* Egan Decl. ¶ 23 (Ex. 8) ("Michigan will have to fill in the gap in federal enforcement created by the Final Rule if it is to ensure the current level of protections."); Anderson Decl. ¶ 8 (Ex. 14) ("[T]he Final Rule will substantially widen the gap between federal and state wage and hour protections and thus increase the enforcement burden upon Vermont."); Ramirez Decl. ¶ 16 (Ex. 11) ("The Final Rule will require Oregon to increase its own enforcement efforts."); Degnan Decl. ¶ 14 (Ex. 13) ("The increased wage theft, worker misclassification, and payroll fraud flowing from the Final Rule will require increased enforcement efforts from RIDLT [Rhode Island Department of Labor and Training] and impose significant additional costs on RIDLT to investigate alleged violations."); Oleksiak Decl. ¶ 14 (Ex. 12) ("Because the Final Rule will result in higher rates of violation, Pennsylvania will incur higher enforcement costs."); Leland

Defendants argue that the increased enforcement actions imposed by the Final Rule are, instead, being independently undertaken by the States.  Defs.' Mem. 19.  But the States have satisfied the "relatively modest" burden of alleging traceability at the pleading stage.  *Rothstein*, 708 F.3d at 92–93 (quoting *Bennett*, 520 U.S. at 171).  The States' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."  *Dep't of Commerce*, 139 S. Ct. at 2566.  The States have sufficiently alleged that the Final Rule incentivizes employers to subcontract and outsource their business functions, resulting in the loss of wages to workers.  The Final Rule reduces the number of businesses from which workers can recover wages.  Those wage losses and wage theft subsequently increase burdens on the States to fill in the gaps of enforcement to collect wages owed to their workers.

Defendants attempt to liken the instant case to *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), and distinguish it from *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, and *California v. Ross*, 358 F. Supp. 3d 965.  Defs.' Mem. 19.  But the States' challenge parallels the latter two, while *Pennsylvania* is inapposite.  In *Pennsylvania*, the Supreme Court reviewed actions brought by states against other states over income taxes assessed on their residents; the plaintiff states lost revenue because they granted their residents tax credits for income taxed by the foreign state.  The injuries were self-inflicted because the states had chosen to give their residents tax credits and could have eliminated the credits to redress the harm.  Here, the States

---

Decl. ¶¶ 21-22 (Ex. 16) (anticipating additional complaints and investigations that Washington will have to undertake because of the Final Rule and estimating $460,000-575,000 in hiring costs to address); Carrillo Decl. ¶ 7 (Ex. 5) ("The Final Rule will impact Illinois by . . . increasing enforcement costs for state agencies[.]"); Morris-Hughes Decl. ¶ 13 (Ex. 4) (District of Columbia "will have increased enforcement costs to ensure compliance and collect monies owed.").

face increased enforcement burdens and costs because of the Department's curtailment of joint employer enforcement; if the States do not increase enforcement the harm will not be redressed.

By contrast, in *New York v. U.S. Dep't of Labor*, the plaintiff states had standing to sue the Department regarding a final rule expanding a certain type of health plan because plaintiffs expected to incur enforcement costs to hire staff and designate staff time to police the health plans and to enforce state laws.  363 F. Supp. 3d at 125–127.  The States have plausibly alleged similar costs here.  *See supra* 16–17 & n.12.  And in *California v. Ross*, the court held that the State of California had standing because it "reasonably increased its expenditures on census outreach to attempt to mitigate the decline in self-response rates and the resulting differential undercount of Plaintiffs' residents caused by the citizenship question," which would cause California to lose federal funding and political representation.  358 F. Supp. 3d at 1004–1005. Similarly, here, the States have plausibly alleged that they will increase expenditures to mitigate the effects of increased wage theft caused by the Final Rule, which will otherwise decrease the States' tax revenue bases, *see supra* 6–10, 16–17 & n.12.

### c.  The States' APA Claims are within the Relevant Zone of Interests Regulated by the Fair Labor Standards Act.

Defendants also contend that the States lack prudential standing because the "purported injury falls outside the zone of interests to be protected or regulated by the FLSA."  Defs.' Mem 25 (quotation omitted).  This argument fails.  The "zone of interest" test is "not meant to be especially demanding . . . in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotation omitted).  Defendants assert that the "taxation of workers' wages is hardly consistent with the protection of workers' wages."  Defs.' Mem 25.  But the States' interests lie in expanding the tax revenue base, *i.e.*, an

increase in workers' wages, which is in keeping with the FLSA's purpose.  Regardless, a plaintiff can satisfy the zone of interest test by alleging secondary economic injuries—even those that were not the type the statute intended to protect against.  *See Bank of America v. City of Miami*, 137 S. Ct. 1296, 1304–05 (2017); *Clarke v Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987).  And "the benefit of any doubt goes to the plaintiff."  *Patchak*, 567 U.S. at 225 (2012).

The States have alleged that the Final Rule will depress wages, lead to increased wage theft, and reduce the number of instances in which employees who are victims of wage theft can recover their pay.  Compl. ¶¶ 153–57.  Congress enacted the FLSA to improve workers' living standards and to prevent unfair competition in commerce—the exact harms that will flow from the Final Rule as alleged by States.  *See supra* 1–2 (discussing FLSA & its legislative history).  The States' allegations that this behavior will, by extension, lead to decreased tax revenue easily meets the secondary harms standard under the zone of interest test, to say nothing of the States' *parens patriae* argument on this same basis.

## II.      The States Also Have Standing Based on Their *Parens Patriae* Interests.

To assert standing as *parens patriae*, a state must articulate a quasi-sovereign interest in the well-being of its residents.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).  States may invoke *parens patriae* standing against federal agencies to enforce federal law.  *Massachusetts*, 549 U.S. at 520 n.17.  Because the APA broadly authorizes suit by a "person" who is "adversely affected or aggrieved by agency action," 5 U.S.C. § 706, and considering the special solicitude in the standing inquiry to which states are entitled, the States' claims against Defendants may proceed.

The States plausibly allege that the Final Rule harms the economic well-being of their residents in several ways.  First, as the Department admits, the Final Rule will result in transfers from employees, who are owed wages but unable to collect, to the violating employers.  Compl.

¶ 139 (citing 85 Fed. Reg. at 2821).  The Final Rule will result in at least a $138.6 million

decline in workers' wages due to such transfers per year, including $66.9 million in the States.

Shierholz Decl. ¶¶ 12–13 (Ex. 1).  Second, the States have plausibly alleged that by lessening the

scope of liability, the Final Rule further encourages fissuring arrangements, which result in lower

wages and benefits.  *See* Compl. ¶¶ 133–34, 148.  This increased workplace fissuring will cause

at least a $954.4 million decline annually in workers' wages, including $460.8 million in the

States.  Shierholz Decl. ¶¶ 16–17 (Ex. 1).  Third, the States have also sufficiently alleged that the

Final Rule will result in lower rates of compliance with labor standards, further injuring workers

in the States.  *See* Compl. ¶¶ 149–52.  These harms constitute quasi-sovereign interests in the

economic well-being of the States' residents.  *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607;

*see also, e.g.*, *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984).

 Defendants insist that states may not sue federal agencies under a *parens patriae* theory

due to a prudential bar announced in *Massachusetts v. Mellon*, 262 U.S. 447 (1923) ("*Mellon*").

But that prudential bar does not apply where states seek to enforce federal law on behalf of their

residents, as they do here.  The "special position and interest" as "sovereign State[s]" entitles the

States to "special solicitude" in the standing analysis.  *Massachusetts*, 549 U.S. at 518, 520.

 While a state may not insulate its citizens from federal law, it may sue under federal law

to assert its rights.  In *Mellon*, the Court specifically determined that Massachusetts did *not* assert

"quasi[-]sovereign rights actually invaded or threatened, but abstract questions of political

power, of sovereignty, of government."  *Mellon*, 262 U.S. at 484–85.  The Court explained that

Massachusetts may not sue as *parens patriae* to "protect citizens of the United States from the

operation of the statutes thereof."  *Id.* at 485.  The Court has since recognized the "critical

difference between allowing a State 'to protect her citizens from the operation of federal statutes'

(which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts*, 549 U.S. at 520 n.17 (quoting *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 447 (1945)).

In the Second Circuit, states have regularly been found to have *parens patriae* standing to sue federal agencies. *See, e.g.*, *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (holding that state "has standing in its capacity as *parens patriae*" to sue the Census Bureau); *Abrams*, 582 F. Supp. at 1159 (holding that state may bring a suit under *parens patriae* standing "to enforce a federal statute"); *City of N.Y. v. Heckler*, 578 F. Supp. 1109, 1122–23 (E.D.N.Y. 1984) (holding that state may bring APA claims against a federal agency under *parens patriae* authority to enforce APA and social security statute), *aff'd on other grounds*, 742 F.2d 729 (2d Cir. 1984).[13]  In *Carey*, the Second Circuit held that New York had standing both due to its allegations of direct injury and as *parens patriae*. *Carey*, 637 F.2d at 838. While Defendants contend in a footnote that *Carey* "erroneously cited" two *parens patriae* cases that did not involve the federal government, Defs.' Mem. 13 n.2, it is binding precedent unless the Second Circuit revisits the issue *en banc*. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995). Moreover, contrary to Defendants' assertion that *Carey*'s holding was "arguably dictum," Defs.' Mem 13–14 n.2, "[a]n alternative conclusion in an earlier case that is directly relevant to a later case is not *dicta*; it is an entirely appropriate basis for a holding in the later case." *Pyett v. Pennsylvania Bldg. Co.*, 498 F.3d 88, 92–93 (2d Cir. 2007), *rev'd on other grounds sub nom. 14*

---

[13] *See also New York v. Sebelius*, No. 07-cv-1003 (GLS), 2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) ("[A] *parens patriae* claim seeking to compel federal compliance with federal law is permissible where a State's independent quasi-sovereign interest is implicated."); *New York v. Schweiker*, 557 F. Supp. 354, 358, 362 (S.D.N.Y. 1983) (state had *parens patriae* standing); *New York v. United States*, 65 F. Supp. 856, 872 (N.D.N.Y. 1946) (same), *aff'd*, 67 S. Ct. 1207 (1947).

*Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009).  Finally, Defendants' contention that the Second

Circuit noted "that it had never been directly faced with the issue of whether a State has *parens*

*patriae* standing to sue the federal government" is incorrect.  Defs.' Mem. 13–14 n.2.  In

*Connecticut v. U.S. Dep't of Commerce*, 204 F.3d 413, 414 n.2 (2d Cir. 2000), the appellate

court explained that Connecticut had standing based on "lost revenue" and did not "consider

whether it would also have standing as *parens patriae*."

In a recent New York challenge to federal agency action, a court in this District held that

"without implicating the concerns in *Mellon*, states possess standing to 'prevent[] an

administrative agency from violating a federal statute' in order to 'vindicate the [c]ongressional

will.'"  *Vullo v. Office of the Comptroller of the Currency*, 378 F. Supp. 3d 271, 284 (S.D.N.Y.

2019) (quoting *Abrams*, 582 F. Supp. at 1159).[14]  In *Vullo*, the New York Department of

Financial Services (an arm of the State) challenged the decision of the Office of the Comptroller

of the Currency to accept certain special-purpose national bank charter applications.  The court

held that the suit fell "within the *parens patriae* framework of standing . . . permitting states to

vindicate the congressional will when it comes to federal agencies violating statutes."  *Vullo*, 378

F. Supp. 3d at 287.  Here, the States seek to vindicate the congressional will because the

Department has violated the FLSA and the APA.  Accordingly, the States may invoke their

*parens patriae* interests to sue Defendants.

---

[14] Defendants' suggestion that *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 162 (E.D.N.Y. 2017), read *Massachusetts* narrowly (Defs.' Mem. 12–13 n.1), is incorrect.  There, the court recognized precisely the distinction *Massachusetts* described between allowable *parens patriae* suits to enforce federal law, and prohibited suits to protect against the operation of federal law, and concluded that the state plaintiffs lacked standing to pursue certain of their claims because those claims fell on the prohibited side of the line.  295 F. Supp. 3d at 161 (explaining that "*Massachusetts v. EPA* permits states to bring *parens patriae*" suits to "enforce compliance with federal statutory law," but concluding that the plaintiffs "plainly seek to invalidate federal action as unconstitutional").

Defendants attempt to rely on *Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019), in which the D.C. Circuit expressed the opposing view. Defs.' Mem. 12 n.1 & 14. However, that decision does not square with *Massachusetts* or binding Second Circuit precedent. The *Manitoba* court concluded that the "the Supreme Court had no need to carve out an exception to the *Mellon* bar in *Massachusetts v. EPA* because Massachusetts did not sue in its *parens patriae* capacity," and instead "sued to remedy its own injury [as a landowner] rather than that of its citizens." *Manitoba*, 923 F.3d at 182. But the *Massachusetts* record does not support that characterization: in addition to harms as property owners, the state petitioners alleged that they "have been, and will continue to be, injured in a variety of ways" through "demonstrated harms" that included not just injuries as landowners, but also "increased health effects" and "increased health care related costs." *See* Final Brief for the Petitioners in Consolidated Cases, *Massachusetts v. EPA*, No. 03-1361, 2005 WL 257460, at *2–3 (D.C. Cir. filed Jan. 24, 2005).

Defendants also invoke *Conn. v. Physicians Health Servs. of Conn.*, 287 F.3d 110, 120 (2d Cir. 2002) ("*PHS*"), but that case supports the States' standing here. In *PHS*, the Second Circuit distinguished between statutes that "strictly limit[] the universe of plaintiffs who may bring certain civil actions," such as ERISA, and those that do not, such as the APA, in evaluating *parens patriae* standing. *PHS*, 287 F.3d at 121 (quotation omitted). Because Congress specifically provided states with a right of action elsewhere in ERISA, the court determined Connecticut lacked standing under the "participant, beneficiary, or fiduciary" provision of the statute at issue. *Id.* at 120–21. However, the court explained that a specific right of action for the state is not required; instead, "the federal statutes under which states have been granted *parens patriae* standing all contain broad civil enforcement provisions" that "permit suit by any 'person' that is 'injured' or ['] aggrieved.'" *Id.* (quotation omitted). The APA provides a right of

action to any "person" that is "aggrieved" by agency action, 5 U.S.C. § 702—exactly the sort of

broad right of action the *PHS* court described.  *Id.* at 121.[15]

Finally, Defendants cite *PHS*, 287 F.3d at 120, to argue that the "Second Circuit

recognized the need for express statutory intent to establish *parens patriae* standing."  Defs.'

Mem. 13.  However, the Second Circuit explained that no express authorization is necessary:

> By holding that the State lacks *parens patriae* standing because § 1132(a)(3) does
> not expressly provide for such standing, we do not of course intend to imply that
> states may only sue in their *parens patriae* capacity when a statute specifically
> provides for suits by states.  "[S]tates have frequently been allowed to sue in
> parens patriae to . . . enforce federal statutes that . . . do not specifically provide
> standing for state attorney generals."

*PHS*, 287 F.3d at 121 (alteration in original) (quoting *New York ex rel. Vacco v. Mid Hudson*

*Med. Group, P.C.*, 877 F. Supp. 143, 146 (S.D.N.Y.1995)).  The substantive and procedural

protections of the APA are enforceable by any aggrieved person, designed to ensure agency

compliance with existing law and congressional mandate.  *See* 5 U.S.C. § 706.

The States invoke *parens patriae* standing here not to insulate their residents from the

FLSA or the APA but to enforce federal rights.  Thus, the States may invoke *parens patriae*

standing based on their quasi-sovereign interests in the health and well-being of their residents.

## CONCLUSION

The States respectfully request that the Court deny Defendants' motion to dismiss.

---

[15] Defendants assert that the APA's judicial review provision is "not analogous in function" to
those of other civil enforcement statutes.  Defs.' Mem. 15.  However, the district court,
collecting examples of broad enforcement provisions, found them distinguishable from ERISA's
narrow review provision, explaining that "[e]ach of these statutes, however, differs from ERISA
in one significant respect: unlike ERISA, which expressly *limits* the class of persons entitled to
bring suit, the federal statutes under which states have been granted *parens patriae* standing all
contain broad civil enforcement provisions.  Indeed, they all permit suit by any 'person' that is
'injured' or 'aggrieved.'"  *Conn. v. Physicians Health Servs. of Conn., Inc.*, 103 F. Supp. 2d 495,
509 (D. Conn. 2000) (citations omitted).  The "function" of the provisions discussed by the
district court *is* analogous to that of the APA—to permit suit by any injured person.

DATED: May 21, 2020                      Respectfully submitted,


JOSH SHAPIRO                             LETITIA JAMES
*Attorney General of the Commonwealth of*   *Attorney General of the State of New York*
*Pennsylvania*

By: */s/ Nancy A. Walker*                 By: */s/ Fiona J. Kaye*
Nancy A. Walker                          Fiona J. Kaye
   *Chief Deputy Attorney General, Fair*          *Assistant Attorney General*
   *Labor Section*                           Matthew Colangelo
Michael J. Fischer                          *Chief Counsel for Federal Initiatives*
   *Chief Deputy Attorney General for Impact*   Jessica Agarwal
   *Litigation*                                 *Assistant Attorney General*
Ryan B. Smith                            Michael O'Keefe Cowles
   *Deputy Attorney General*                    *Assistant Attorney General*

Pennsylvania Office of Attorney General   Office of the New York State Attorney General
1600 Arch Street, Suite 300              28 Liberty Street
Philadelphia, PA 19103                   New York, NY 10005
(215) 560-2704                           (212) 416-8036
nwalker@attorneygeneral.gov              fiona.kaye@ag.ny.gov

*Attorneys for the Commonwealth of*       *Attorneys for the State of New York*
*Pennsylvania*

XAVIER BECERRA
*Attorney General of the State of California*

By: */s/ Jennifer C. Bonilla*
Satoshi Yanai
  *Supervising Deputy Attorney General*
Jennifer C. Bonilla*
  *Deputy Attorney General*

California Department of Justice
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9145
jennifer.bonilla@doj.ca.gov

*Attorneys for the State of California*


KATHLEEN JENNINGS
*Attorney General of the State of Delaware*

By: */s/ Christian Wright*
Christian Douglas Wright*
  *Director of Impact Litigation*
Oliver J. Cleary
  *Deputy Attorney General*

Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8600
christian.wright@delaware.gov
oliver.cleary@delaware.gov

*Attorneys for the State of Delaware*

PHILIP J. WEISER
*Attorney General of the State of Colorado*

By: */s/ Eric R. Olson*
Eric R. Olson*
  *Solicitor General*
Adam T. Rice
  *Counsel to the Attorney General*

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov
adam.rice@coag.gov

*Attorneys for the State of Colorado*


KARL A. RACINE
*Attorney General for the District of Columbia*

By:  */s/ Kathleen Konopka*
Kathleen Konopka
  *Deputy Attorney General, Public Advocacy
Division*
Alacoque Hinga Nevitt
  *Assistant Attorney General*

Office of the Attorney General for the District
of Columbia
441 4th Street, N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
kathleen.konopka@dc.gov
alacoque.nevitt@dc.gov

*Attorneys for the District of Columbia*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: */s/ Alvar Ayala*
Alvar Ayala*
   *Bureau Chief, Workplace Rights Bureau*

Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 793-3895
aayala@atg.state.il.us

*Attorney for the State of Illinois*

BRIAN E. FROSH
*Attorney General of the State of Maryland*

By: */s/ Jeffrey P. Dunlap*
Steven M. Sullivan
   *Solicitor General*
Jeffrey P. Dunlap*
   *Assistant Attorney General*

Maryland Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-7906
jdunlap@oag.state.md.us

*Attorneys for the State of Maryland*

MAURA HEALEY
*Attorney General of the Commonwealth of Massachusetts*

By: */s/ Andrew H. Cahill*
Andrew H. Cahill*
   *Assistant Attorney General, Fair Labor Division*

Office of Attorney General Maura Healey
1 Ashburton Place
Boston, MA 02108
(617) 727-2200, extension 2330
Drew.H.Cahill@MassMail.State.MA.US

*Attorney for the Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General of the State of Michigan*

By: */s/ Zachary A. Risk*
Fadwa A. Hammoud
   *Solicitor General*
Zachary A. Risk*
Matthew L. Walker*
Debbie K. Taylor
   *Assistant Attorneys General*

Michigan Attorney General
Labor Division – Payroll Fraud Enforcement Unit
PO Box 30736
Lansing, MI  48909
(517) 335-1950
RiskZ1@michigan.gov
WalkerM30@michigan.gov
TaylorD8@michigan.gov

*Attorneys for the State of Michigan*

KEITH ELLISON
*Attorney General of the State of Minnesota*

By: */s/ Jonathan D. Moler*
Jonathan D. Moler*
   *Assistant Attorney General*

Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101
(651) 757-1330
jonathan.moler@ag.state.mn.us

*Attorney for the State of Minnesota*

GURBIR S. GREWAL
*Attorney General of the State of New Jersey*

By: */s/ Estelle Bronstein*
Estelle Bronstein*
   *Deputy Attorney General*
Mayur Saxena
   *Assistant Attorney General*

New Jersey Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-9643
estelle.bronstein@law.njoag.gov
mayur.saxena@law.njoag.gov

*Attorneys for the State of New Jersey*

HECTOR BALDERAS
*Attorney General of the State of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas*
   *Chief Deputy Attorney General*

New Mexico Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
(505) 490-4060
tmaestas@nmag.gov

*Attorney for the State of New Mexico*

ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

By: */s/ Fay Stetz-Waters*
Fay Stetz-Waters
   *Director of Civil Rights*
Marc Abrams*
   *Assistant Attorney-in-Charge, Civil Litigation Section*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Fay.Statz-Waters@doj.state.or.us
Marc.Abrams@doj.state.or.us

*Attorneys for the State of Oregon*

PETER F. NERONHA
*Attorney General of the State of Rhode Island*

By: */s/ Justin J. Sullivan*
Justin J. Sullivan*
  *Special Assistant Attorney General*

Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2007
jsullivan@riag.ri.gov

*Attorneys for State of Rhode Island*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Julio A. Thompson*
Julio A. Thompson*
  *Assistant Attorney General*
Joshua R. Diamond, *Deputy Attorney General*
Jill Abrams, *Assistant Attorney General*

Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
jill.abrams@vermont.gov
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

MARK R. HERRING
*Attorney General of the Commonwealth of Virginia*

By: */s/ Mamoona H. Siddiqui*
Samuel T. Towell
  *Deputy Attorney General*
R. Thomas Payne II
  *Senior Assistant Attorney General*
Mamoona H. Siddiqui*
  *Assistant Attorney General*

Office of the Attorney General
202 N. Ninth Street
Richmond, Virginia 23219
(804) 786-1068
stowell@oag.state.va.us
rpayne@oag.state.va.us
msiddiqui@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

ROBERT W. FERGUSON
*Attorney General of Washington*

By: */s/ James P. Mills*
Jeffrey T. Sprung*
  *Assistant Attorney General*
Jeffrey G. Rupert
  *Division Chief, Complex Litigation Division*
James P. Mills*
  *Senior Trial Counsel*

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 326-5492
Jeff.Sprung@atg.wa.gov
Jeffrey.Rupert@atg.wa.gov
James.Mills@atg.wa.gov

*Attorneys for the State of Washington*

*\*Appearing pro hac vice or application for admission pro hac vice forthcoming*