Ex. 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON, | Civil Action No. 20-cv-1689 |
| Plaintiffs, | |
| v. | |
| EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF DR. UNIQUE MORRIS-HUGHES

I, Dr. Unique Morris-Hughes, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Director of the District of Columbia Department of Employment Services (DOES) located in Washington, D.C, the administrative agency responsible for processing unemployment claims, workers' compensation claims, and wage and hour disputes.  I have been employed as the Director since 2018.

1

2.      As Director of DOES, I serve in the role as the State Labor Commissioner and directly responsible for more than $150 million in local, federal and specific-purpose funds administered by the District of Columbia and the federal government for workforce development programs and training, unemployment compensation, universal paid leave administration and labor standards enforcement along with more than $80 million in active capital projects. Prior to my appointment as Director, I served as the Chief Strategy Officer for DOES.

3.      My educational background includes a Ph.D. from the University of Maryland Eastern Shore, an MBA from Trinity University, and a BA in English from Johnson C. Smith University.

4.      I submit this declaration in support of the District of Columbia's litigation against Eugene Scalia, in his official capacity as Secretary of the United States Department of Labor; the United States Department of Labor ("USDOL"); and the United States of America regarding the recently issued rule entitled "Joint Employer Status Under the Fair Labor Standards Act."

5.      I am familiar with the rule "Joint Employer Status Under the Fair Labor Standards Act" issued by the USDOL and published in the Federal Register on January 16, 2020. (hereinafter "Final Rule"). The Final Rule changes the longstanding definition of joint-employment and greatly narrows who the Fair Labor Standards Act ("FLSA") will cover.

6.      The Final Rule will impact the District of Columbia by reducing workers' wages and consequently lowering the District of Columbia's tax revenue base, while also increasing regulatory and administrative burdens, and enforcement costs.

7.      The Final Rule acknowledges that the enforcement of wage protections will be more difficult, conceding that it will "reduce the amount of back wages that employees are able

to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent." 85 Fed. Reg. at 2853.

8.      The District of Columbia will be harmed directly by the decreased ability to collect unpaid back wages. Workers in the District will see lower wages, increased wage theft, and fewer worker protections as a result of the Final Rule. Diminished recovery of back wages owed to the workers in the District will not only lead to direct harm to vulnerable, low wage workers and their families, but also lead to a reduced tax base to collect from, and a resulting decrease in local revenues.

9.      In addition, the Final Rule, by incentivizing businesses to decrease their labor costs through subcontracting, outsourcing, and using staffing agencies, will directly reduce employment taxes paid in the District of Columbia. The District's unemployment insurance ("UI") system and workers' compensation programs will lose important funding as a result of increased outsourcing and subcontracting.

10.     At DOES, we have found that subcontracted entities have lower rates of compliance with the legal requirements of such UI and workers' compensation systems, and detection and enforcement are made more difficult by the small, transient nature of such companies. The Final Rule incentivizes and increases outsourcing and subcontracting in workplaces, which will directly reduce employment taxes paid in the District and make it more difficult for DOES to administer UI and workers' compensation claims.

11.     The increase in subcontracting and outsourcing caused by the Final Rule will also lead to an increase in the prevalence of worker misclassification, also referred to as payroll fraud. As a result, the Final Rule will lead to more employers misclassifying their employees as independent contractors in the District of Columbia. Worker misclassification directly reduces

payroll taxes and income taxes payable to the District of Columbia and evades required payments to the District's workers' compensation system and UI fund. This has been a significant and increasing problem in the District of Columbia and will be exacerbated by the Final Rule.

12.     For example, in industries that have high rates of subcontracting and outsourcing, such as the heavily fissured construction industry in the District of Columbia, an employer can unlawfully reduce their labor costs through misclassifying workers as independent contractors. See Exhibit A. This includes at least a 5.2% reduction in labor costs that comes from evading District taxes related to unemployment insurance and payment into workers' compensation programs, resulting in losses to the District's workers' compensation system and unemployment insurance fund.[1]

13.     As the state agency responsible for processing workers' compensation and unemployment insurance claims, DOES will have increased enforcement costs to ensure compliance and collect monies owed. For example, the DOES Office of Workers' Compensation (OWC) processes claims and monitors the payment of benefits to injured private-sector employees in the District of Columbia. OWC mediates disputes between claimants and employers (or their insurance carriers) and monitors employers to ensure compliance with insurance coverage requirements.  OWC also administers the Special Fund, which provides benefits to District workers in cases of uninsured employers.  With the increase in subcontracting and outsourcing caused by the Final Rule, the OWC must intensify its investigation processes to ensure that every subcontractor has a workers' compensation policy, which will require

---

[1] *Illegal Worker Misclassification: Payroll Fraud in the District's Construction Industry* (September 2019 Issue Brief and Economic Report), at 13 https://oag.dc.gov/sites/default/files/2019-09/OAG-Illegal-Worker-Misclassification-Report.pdf

4

additional manpower and funding.  The Final Rule will also increase claims filed under the OWC Special Fund provision, which will cause a depletion of the Special Fund and result in a need for additional funding.

14.     In addition, because the Final Rule limits the scope of the FLSA, but does not alter District law that encompasses the traditionally broad joint employment analysis, the Final Rule will require the District of Columbia to retract current guidance that incorporates prior FLSA jurisprudence into discussions of District legal standards for determining joint employment.

15.     In the District of Columbia, courts have consistently extended the FLSA joint employer doctrine to District wage laws that define "employer" similarly to the FLSA; these include laws governing the payment of wages, minimum wages and overtime, and worker misclassification. *E.g.* D.C. Code § 32-1301, 32-1001, 32-1331.01. As the administrative agency responsible for processing unemployment claims, workers' compensation claims, and wage and hour disputes, DOES has interpreted the test for determining whether an entity or person is an employer under District law as the same test for analyzing employer status under the FLSA.

16.     In doing so, DOES has issued opinions applying the long-standing FLSA joint-employer test when interpreting District law, citing to the U.S. DOL Wage-Hour Division guidance. The Final Rule will require DOES to review and revise its analysis of joint employment that expressly relies on FLSA's historic test for identifying an employment relationship.

17.     Reviewing and revising its analysis and guidance of joint employment will impose increased costs, time and expense for researching, drafting, and the publication and roll out of new guidance, as well increased costs in training for enforcement efforts. The Final Rule

will also require DOES to undertake efforts to educate the public about the newly distinct analyses for joint employment under District law and federal law.

18.     Given the limited budget resources, especially now with the COVID-19 pandemic and resulting economic crisis, diverting DOES resources to address the Final Rule's unprecedented curtailment of the FLSA's scope would be a significant harm to DOES and ultimately, to the District residents we serve.


I declare that, to the best of my knowledge, the foregoing is true and correct.


Executed this ___15th___ day of May, 2020 at Washington, D.C.

_____
Dr. Unique Morris-Hughes
Director of the District of Columbia
Department of Employment Services

# Exhibit A



September 2019
Issue Brief and Economic Report

# Illegal Worker Misclassification: Payroll Fraud in the District's Construction Industry

**Karl A. Racine**
Attorney General
for the District of Columbia

oag.dc.gov

# ISSUE BRIEF

## Illegal Worker Misclassification:
## Payroll Fraud in the District's Construction Industry

*Misclassifying Workers as Independent Contractors Harms Workers, the Industry, and the District*

### INTRODUCTION

Illegal worker misclassification is a practice that seriously harms some of the District's workers, law-abiding businesses, and the public. Illegal worker misclassification is a form of payroll fraud where employers classify workers who should be considered direct employees as independent contractors. This practice allows the employer to avoid paying important taxes and following crucial employment laws. It is rampant in the District's construction industry, and it has serious consequences for the District and its residents:

- Misclassified workers lose basic employee protections like minimum wage, overtime, and paid sick leave. They are denied participation in important programs like unemployment insurance and workers' compensation. And they are left footing the bill for payroll taxes their employers fraudulently avoid. These burdens often fall heaviest on immigrant and low-wage workers who are least likely to be willing to risk complaining or enforcing their rights.

- Law-abiding construction contractors lose out on business opportunities when their competitors illegally undercut them. Employers who misclassify their employees evade labor costs, helping them squeeze legitimate contractors out.

- The public loses out on important payments that support social insurance programs like Social Security, Medicaid, unemployment insurance, and workers' compensation. These are programs designed to protect all of us, and contractors committing payroll fraud undermine them.

The Office of the Attorney General (OAG) commissioned a study to determine how much labor costs construction companies avoid—and how much everyone else loses out—when they commit payroll fraud by misclassifying their employees. We found that:

- **The cost evasion of illegally misclassifying workers in the District's construction industry begins at 16.7 percent**, which companies can use to underbid and undercut high-road employers.

- Moreover, payroll fraud is rarely committed alone; it is accompanied by wage theft and other practices to cheat workers out of what they are due. **Coupled with even a modest amount of**

**wage theft, the cost evasion of doing business illegally can reach 27 percent**, a massive amount in a competitive, bid-oriented industry.

- Further, employers committing payroll fraud rarely pass on the cost savings from misclassification, like the cost of providing employee healthcare, to their workers. **If employers keep all the money they did not pay in fringe benefits for themselves, the cost evasion of doing business illegally jumps from 16.7 to 48.1 percent.**

Those illegally gotten gains are accrued on the backs of some of the District's most vulnerable workers, of contractors trying to operate the right way, and of District taxpayers. That is why OAG is using its enforcement authority to sue companies committing this kind of payroll fraud and deter illegal behavior.

This Issue Brief describes what illegal worker misclassification is; what our study found about its significant, detrimental effect on the District and its residents; and what OAG is doing to combat it.

### *WHAT IS ILLEGAL WORKER MISCLASSIFICATION AND WHERE DOES IT HAPPEN?*

Illegal worker misclassification is a form of payroll fraud where employers classify workers who should be considered direct employees as independent contractors instead. Through unlawfully misclassifying employees, an employer avoids paying important taxes and following crucial employment laws.

By improperly classifying workers as independent contractors, businesses illegally reduce their labor costs in multiple ways:

- First, for each misclassified worker, the company evades mandatory payroll taxes that fund social welfare programs, such as Social Security, Medicare, and unemployment insurance.

- Second, because misclassification fraudulently keeps workers off a company's official payroll, employers can illegally reduce other payroll-related costs, such as workers' compensation insurance premiums.

- Third, because independent contractors are not subject to overtime laws, employers can unlawfully avoid providing overtime pay to workers.

By evading these costs, employers can illegally increase profits and also gain an unlawful advantage in the market.

Misclassification is disturbingly common. While there has not been a District-specific study of the prevalence of misclassification, the last nationwide study by the Internal Revenue Service found that 15 percent of employers engaged in misclassification, affecting 3.4 million workers and robbing the federal fisc of $1.6 billion annually (in 1984 dollars).[1]

---

[1] Treasury Inspector General for Tax Inspection 2013, Employers Do Not Always Follow Internal Revenue Service Worker Determination Rulings, at 1, available at https://www.treasury.gov/tigta/auditreports/2013reports/201330058fr.pdf.

Unsurprisingly, illegal worker misclassification is most common in industries where committing payroll fraud gives the most significant undue advantage. For example, industries where work is awarded by bid, thereby creating significant pressure to keep labor costs down, are ripe for misclassification. Likewise, misclassification is common in industries with high injury rates, which drive up workers' compensation insurance premiums. The construction industry fits both descriptions well and is known for rampant misclassification. One study found that as many as one third of construction workers in southern states are misclassified.[2] Even in California, with its robust worker protections and enforcement, one in six construction workers is misclassified.[3]


### HOW DOES MISCLASSIFICATION HARM WORKERS?

Crucially, misclassification strips workers of key protections to which they are entitled.

- **Misclassified workers lose the guarantees of federal and state employment and labor laws.** These include basic protections such as minimum wage, overtime, and paid sick leave; they also include labor law protections, such as those allowing for organizing and collective bargaining.

- **Misclassified workers miss out on important safety net programs and benefits.** Those who find themselves unemployed or injured on the job lose the protection of unemployment insurance and workers' compensation—important safety net programs that are especially crucial in high risk and unstable industries such as construction. When one carpenter was asked if he received anything for an on-the-job injury, such as medical attention or compensation, he explained that the only thing he ever got was "more work." Misclassified workers are also ineligible for important benefits like paid leave, health insurance, and retirement plans that companies otherwise provide to employees.

- **Misclassified workers are left footing their employers' tax bill.** In a typical employer-employee relationship, both employer and employee pay an equal portion of the employee's wages in Social Security and Medicare taxes. When a worker is misclassified as an independent contractor, they are responsible for paying both the employee *and* employer share of Social Security and Medicare taxes. This imposes additional unexpected tax liability on misclassified workers, who are often low-wage earners least able to shoulder an

> "If the job doesn't cover it, you have to pay full taxes.  Because they're not even doing the taxes. You gotta eat and save money at the end of the day to pay taxes."
>
> **– Padison Alberto Vargas, carpenter who experienced misclassification and wage theft**

---

[2] Ordonez, Franco, and Many Locke. 2014a. "Immigrants are Most Susceptible to Worker Misclassification." McClatchy Washington Bureau, September 5, available at https://www.charlotteobserver.com/news/business/article9160514.html.

[3] Yvonne Yen Liu, Daniel Flaming, Patrick Burns, Economic Roundtable 2014, Sinking Underground: The Growing Informal Economy in California Construction, at 1, available at https://economicrt.org/wp-content/uploads/2014/09/Sinking_Underground_2014.pdf

extra cost. In addition, workers may not understand their tax responsibilities, especially where employers refuse to provide them with the appropriate tax forms. In such circumstances, workers may later become ineligible for Social Security and Medicare, both of which require regular tax contributions over time.

## HOW DOES MISCLASSIFICATION HARM THE INDUSTRY?

Misclassification also takes a toll on businesses who attempt to operate legally. This is especially so in industries like construction, where work is procured through a bidding process. By unlawfully misclassifying workers and avoiding labor costs, a business can underbid lawfully operating companies, squeezing them out of potential business opportunities.  Misclassification can also prompt other companies to improperly cut corners and avoid costs themselves. For example, because costs for materials and permits are more fixed, contractors may consider cutting safety measures or depressing worker pay and benefits. On-the-fence contractors may start misclassifying their own workers. In this way, misclassification can spread from a few bad apples, creating the risk of forming an industry standard practice.

## HOW DOES MISCLASSIFICATION HARM THE PUBLIC?

Finally, misclassification cheats the public out of resources for important social insurance programs.

- **Social Security and Medicaid lose significant resources**. By committing payroll fraud, a would-be employer shirks their responsibility to pay into Social Security and Medicare, putting the burden of paying their portion on workers who may be ill-equipped to do so. If workers don't take up this unfair burden, then taxpayers are cheated out of the benefits of these programs.

- **State-run unemployment insurance programs go underfunded**. Employers also avoid paying contributions to unemployment insurance programs, which protect workers who become unemployed through no fault of their own.

- **Workers' compensation premiums go unpaid.** Since employers avoid covering misclassified workers under their workers' compensation insurance, the public may end up footing the bill for medical care and disability for low-income, uninsured workers.



> **"It's ironic, you know, that you got these contractors making profit from taxpayers' money, but they don't contribute to the system."**
>
> **– Raul Castro, Organizer, Keystone Mountain Lakes Regional Council of Carpenters**

## WHAT WE FOUND: THE EFFECT OF ILLEGAL MISCLASSIFICATION ON DISTRICT WORKERS, BUSINESSES, AND THE PUBLIC

OAG commissioned a research report to determine the costs a construction contractor in the District can evade by illegally misclassifying its workers. Importantly, this report primarily considers only the costs of misclassification, not the full range of illegal practices that typically accompany misclassification (and that are discussed in more detail below).

Our main finding is that **a construction contractor in the District can reduce their labor costs by 16.7 percent through the act of unlawfully misclassifying workers as an independent contractors alone.** This comes from foregone payments to workers and avoiding tax and social insurance payments. For every $100 a misclassifying employer pays in labor costs, it saves $11.50 in payments to the worker by not paying overtime and shifting the burden of payroll taxes to the worker. The misclassifying employer avoids an additional $5.20 by not paying unemployment insurance taxes and reducing its workers' compensation premium.

In an industry where every dollar counts, a 16.7 percent premium on doing business legally is significant. Holding all else equal, this gives law-breaking contractors a marked advantage over high-road employers who play by the rules. And it generally puts substantial pressure on industry players to cut corners in safety or labor costs or, worse, to likewise misclassify their workers.

Stunningly, the 16.7 percent advantage contractors gain from illegally misclassifying their workers is just the beginning of the costs they can evade—and the harm they can do—by skirting workplace laws. The report makes conservative assumptions to measure the impact of misclassification in isolation. But rarely is misclassification committed by itself: It is often accompanied by other practices like wage theft (failing to pay owed wages, overtime, or minimum wage) and failing to offer fringe benefits that would otherwise be provided to employees. These practices quickly change the economics of the construction business even further. For example, our report makes the following findings:

- **If illegally misclassified workers experience even a modest amount of wage theft,** receiving only 90 percent of the average hourly wage of legally classified workers, **then the cost reduction for doing business illegally jumps from 16.7 to 27 percent.** To put this in context, misclassified workers in the carpentry business have found themselves working for less than one third of the advertised hourly wage.

- Legally classified workers often receive several employer-provided benefits, such as paid leave, health insurance, and retirement benefits. The report assumes that the misclassified worker receives the full value of these benefits in the form of additional wages. Making a more realistic (but still very conservative) assumption, **if misclassified workers receive only half the value of the fringe benefits to which they ought to be entitled, the cost reduction of doing business illegally jumps from 16.7 to 48.1 percent.**

These quickly mounting numbers demonstrate the strong incentive for contractors to combine the practice of illegally misclassifying their workers with other practices that further diminish worker pay and protections. The more low-road businesses engage in these practices, the more they undermine the market, making it difficult for high-road businesses to operate legally in the District. And the more construction companies make misclassification a regular business practice, the more District and federal

social safety net programs get drained, and the more workers lose out on pay, benefits, and protections owed to them.

### HOW IS OAG FIGHTING ILLEGAL WORKER MISCLASSIFICATION?

Given the substantial incentives to misclassify workers, enforcement agencies must create a significant deterrent effect to ensure compliance with the law. Unfortunately, although the federal repercussions of misclassification are felt in the tax system, the Internal Revenue Service has very little power to address it. Under the "Safe Harbor Rule," Section 530 of the Revenue Act of 1978, to avoid any tax consequences from misclassification, a company must only show a reasonable basis for classifying workers as independent contractors, including that it has always structured its work this way or that it is a practice that is widespread in the industry. If it does so effectively, it can freely avoid any penalties.



"We're all immigrants, they know that we need the work and that we won't say anything."

– Anonymous electrician who experienced misclassification, wage theft, and unsafe working conditions

Meanwhile, private lawsuits to enforce misclassification laws are important but can have limited effectiveness. It can be hard for workers, particularly immigrant workers concerned about their immigration status, to come forward and fight a company. Those who do often need the pay that they have been denied for so long, creating pressure to settle with the company and compromise the value of their claim. These infrequent and low-dollar settlements can be written off by companies as the cost of doing business illegally.

In the face of these challenges, the District government has filled the void. In 2013, the Council of the District of Columbia passed the Workplace Fraud Amendment Act to combat this very problem in the construction industry. This law provides that in most circumstances, construction workers are considered employees. And should an employer seek to classify a worker as an independent contractor, the employer must show that the worker is free from the employer's control, is economically independent, and performs work outside the scope of the employer's core business. OAG has the authority to take construction companies to court for illegally misclassifying their workers, and recover penalties and restitution to enforce the law.

OAG currently has two attorneys in its Housing and Community Justice Section focused on workplace justice and who are actively pursuing enforcement actions against companies who appear to be illegally classifying their workers. In August 2018, OAG sued Power Design, Inc.—a national electrical subcontractor that does extensive business in the District—and related companies for misclassifying over 500 electrical workers, as well as for related violations of the minimum wage, overtime, sick leave, and unemployment insurance laws. Power Design used a labor structure found throughout the District's construction industry. Instead of hiring employees to do electrical work, it contracted with third-party subcontractors, who in turn hired hundreds of workers—all classified as "independent contractors" —to complete projects at Power Design worksites. These workers functioned in every way like employees of Power Design and should have been treated accordingly, with all the protections employee status provides. OAG's suit seeks statutory penalties under the Workplace Fraud Act as well as damages,

liquidated damages, and penalties for violations of an array of other employment law violations. In addition to this lawsuit, OAG is actively investigating similar misclassification schemes in the construction industry that illegally keep workers off the books and unprotected.

OAG seeks to continue affirmatively protecting the rights of workers in the District of Columbia. Workers who believe that they have been illegally misclassified or experienced other forms of wage theft can contact OAG's Housing and Community Justice Section by phone at (202) 442-9854. Workers can also learn about their rights under District of Columbia law and how they can get help if their rights are being violated at https://oag.dc.gov/workers-rights.

**ECONOMIC ANALYSIS**

**ECONOMIC ANALYSIS**

## Economic Analysis of Incentives to Fraudulently Misclassify Employees in District of Columbia Construction

Dale Belman and Aaron Sojourner*
May 22, 2019

*EXECUTIVE SUMMARY*

This Report analyzes the cost savings to construction companies generated by worker misclassification prohibited by the District of Columbia's Workplace Fraud Act (WFA), D.C. Code § 32-1331.01, *et seq*. We develop estimates of how much higher a typical D.C. construction company's labor costs would be if they pay their employees legally compared to their costs if they fraudulently misclassify employees as independent contractors. We assume that the cost of basic hourly labor compensation paid in either case is equal. Cost differences are generated by evading or shifting overtime pay, taxes, and legally-required social-insurance contributions under fraudulent misclassification. Under these conservative assumptions, a company employing workers legally would incur 16.7% higher costs than if the company fraudulently misclassified its employees. The total impact is split as 11.5% in reduced worker take-home compensation and the other 5.2% from evaded publically-mandated payments toward Social Security, Medicare, unemployment insurance, and workers' compensation systems. These estimates likely understate the economic differences between operating legally and fraudulently. Less-conservative but realistic assumptions result in larger savings to companies and greater losses to misclassified employees and the public. For instance, if the company does not pass through any of the value of typical employee benefits to misclassified employees, then operating legally costs 48% more per worker-hour than operating fraudulently. If fraudulently-misclassified workers experience some wage theft and receive only 90 percent of the average hourly wage of legally-classified workers, then this single change from the baseline scenario increases the estimated legal-cost premium to 27%. General contractors and developers can share in the gains from the company's fraudulent misclassification. This kind of fraud undermines the ability of law-abiding companies to survive.

*\* Belman is a professor at the School of Human Resources and Labor Relations at Michigan State University. Sojourner is an associate professor at the Carlson School of Management at the University of Minnesota.*

## INTRODUCTION

This Report provides a generalized analysis and valuation of (i) the cost savings to construction companies generated by worker misclassification prohibited by the District of Columbia's Workplace Fraud Act (WFA), D.C. Code § 32-1331.01, *et seq.*; (ii) economic loss to the District of Columbia resulting from WFA violations; and (iii) economic loss to misclassified workers resulting from WFA violations. To accomplish this, we evaluated general payroll costs associated with operating in the construction industry in the District of Columbia and analyzed general cost savings generated by failing to comply with the WFA. Our findings and conclusions are summarized in this Report.

Our analysis is designed to inform assessment of savings derived from fraudulent misclassification in cases of WFA violations with limited financial information available. The Report answers the question: for each dollar paid to a construction company that is fraudulently misclassifying employees, how would the division of economic value between the company, its workers, the general contractor and developer, and the public treasury differ if the company were legally classifying its workers as employees? We use public information sources to estimate the company savings realized through misclassification of employees.

## MODEL

The core of our economic analysis takes the perspective of a typical construction company operating in D.C. and deciding whether to legally classify an hourly worker as an employee or to fraudulently misclassify the employee as an independent contractor. First, we model the key economic parameters and how they affect the flow of resources to different parties. We build an example.  This yields conclusions about the economic impacts of fraudulent misclassification per hour of work. Second, we reframe the example so the impacts are posed per dollar of a fraudulent labor contract. Third, we consider how to incorporate additional factors into the analysis.

### Typical impacts per hour of work

Consider the typical flow of resources if the company classifies its employee legally (*see* Table 1: "Legally" column). Based on the best-available data, we make the following assumptions, which are reflected in Table 1.

- **Hourly Pay (Post-SS&M).** Construction employees earn $24.92 per hour in wage and salary income on average in the Washington, D.C. area.[1] The employee will have $1.96

---

[1] U.S. Bureau of Labor Statistics. Occupational Employment Statistics for workers in construction and extraction occupations in the Washington-Alexandria-Arlington metropolitan area in May 2018. https://www.bls.gov/oes/current/oes_47894.htm#47-0000

(7.65 percent of regular and overtime pay) deducted towards Social Security and Medicare taxes (SS&M), making the employee's post-deduction hourly wage $23.01. The company will pay another $1.96 (7.65 percent) to Social Security and Medicare as the employer contribution without it showing up on the employee's pay stub.

- **Hourly Overtime Pay (Post-SS&M).** A typical construction worker earns an average of $0.76 per hour in overtime pay. Of this amount, $0.70 goes to the worker and $0.06 goes to the employee share toward Social Security & Medicare taxes.[2]

- **Hourly Tax-Exempt Benefit Costs.** A typical construction worker earns an additional $7.48 in benefits that include overtime pay, paid leave, supplemental pay, health insurance, and employment-based retirement benefits.[3] After separating out overtime pay as set out above, the balance, excluding overtime pay, equals $6.72. We will refer to this balance as "*benefits.*" Benefits are exempt from taxes and social insurance contributions.

- **Social Insurance Costs.** As discussed above, the employer and employee each pay taxes of 7.65 percent of the employee's hourly pay (including overtime) toward SS&M. In addition, the employer will pay for two legally-required forms of social insurance: workers' compensation and unemployment insurance. We estimate each contribution at 5 percent of gross hourly wage costs, including overtime ($1.28 per hour each).[4,5]

If a company bids on a contract assuming that workers will be paid as legally classified employees, this implies a typical hourly labor cost totaling $36.91. The worker takes home

---

[2] Construction workers employed full time typically work 42.6 hours per week, implying a 50-percent overtime pay increase required on 6.1 percent of hours (2.6/42.6), according to the U.S. Bureau of Labor Statistics Current Population Survey (https://www.bls.gov/cps/cpsaat21.htm).

[3] The total of these four types of benefits equal 30 percent of wage and salary compensation for construction workers nationally according to the U.S. Bureau of Labor Statistics Employer Costs of Employee Compensation data (https://www.bls.gov/news.release/archives/ecec_12142018.htm). This share is similar between the U.S. and the Washington metro area among all workers (https://www.bls.gov/opub/mlr/cwc/bls-introduces-new-employer-costs-for-employee-compensation-data-for-private-industry-workers-in-15-metropolitan-areas.pdf).

[4] Although workers compensation insurance is frequently purchased from private insurers, it is usually considered social insurance because, similar to unemployment insurance or Social Security, it is required by state or federal statute, addresses a failing of the private market, and is intended to improve social welfare broadly defined.  In some states, state agencies are the workers' compensation provider of last resort. Workers' compensation premiums in construction are higher than for the average employer due to the higher risk of occupational injury and experience rating of employers. A premium quote site, workerscompensationshop.com, provides hourly premium ranges for D.C. employers of construction labor. The midpoint of the range for employees doing electrical wiring is 3.74%, tile installation is 4.40%, flooring is 4.49%, HVAC installation is 4.51%, painting is 5.55%, carpentry is 5.58%, plumbing is 5.64%, and concrete construction is 7.07%. We assume a 5 percent workers' compensation premium, which is in the middle of these estimates.

[5] Unemployment insurance taxes for construction are higher than average. The average is 2.7 percent (District of Columbia Department of Employment Services Unemployment Insurance Handbook for Employers, April 11, 2016, page 15). We assume a 5 percent rate, just below twice the average rate.

$30.43 per hour in pay and benefits after accounting for the employee's Social Security and Medicare contribution. The balance, $6.48, goes toward costs of legally-mandated social insurance.

*Table 1: Typical flow of resources per hour of work by legal status of employment*

| Company classifying employee: | Legally | Fraudulently |
|---|---|---|
| *Total: Value to Worker* | *$30.43* | *$26.80* |
| Hourly Pay (post-SS&M) | $23.01 | $26.80 |
| Hourly Overtime pay (post-SS&M) | $0.70 | $0 |
| Hourly Tax-Exempt Benefit Costs | $6.72 | $0 |
| *Total: Value to Social Insurance Contributions* | *$6.48* | *$4.84* |
| SS&M Tax – Employee Share | $1.96 | $4.84 |
| SS&M Tax – Employer Share | $1.96 | $0 |
| Unemployment insurance tax | $1.28 | $0 |
| Workers' compensation cost | $1.28 | $0 |
| ***Total: Employer hourly labor cost*** | ***$36.91*** | ***$31.64*** |

Note: SS&M is Social Security and Medicare tax.

How would these flows differ if the company were to hire the hour of labor through fraudulent misclassification of the employee as an independent contractor? Our analysis rests on two primary, conservative assumptions.

1. Worker hourly pay under fraudulent misclassification equals the value of a legally-employed worker's hourly wage and salary income plus full benefit costs. This conservative assumption isolates the difference caused by fraudulent misclassification *per se*. Later in the Report, we consider the case where the worker does not receive the full costs of benefits as wages, which magnifies the company's advantage from fraudulent misclassification.

2. The company's savings from misclassification would come from:
   a. avoiding paying overtime,
   b. shifting employer's Social Security and Medicare contribution to the worker, and
   c. evading workers' compensation and unemployment insurance costs.

In this case, the worker is paid a pre-tax wage of $31.64, equal to the employee's pre-tax hourly wage ($24.92) plus the full value of benefits ($6.72). However, under fraudulent misclassification, the employer evades its SS&M tax payment.  The employee must cover both the employee and employer payment to Social Security and Medicare on this whole amount,

totaling $4.84.[6] This leaves a post-SS&M wage of $26.80 per hour for the employee fraudulently misclassified as an independent contractor (*see* Table 1: "Fraudulently" column).

### Typical impacts per dollar of fraudulent labor cost

Comparing the total hourly labor costs between legal and fraudulent classification of the employee implies the employer's hourly costs are 16.7 percent higher ($5.27 per hour) when operating legally.[7] The $5.27 per hour in fraudulent cost saving comes from a combination of $3.63 lower worker earnings and $1.64 in lower tax and social insurance payments (*see* Table 2: Impacts per dollar of fraudulent labor costs).

*Table 2: Impacts per dollar of fraudulent labor cost*

| Company classifying employee | Legally | Fraudulently | Legally - Fraudulently Difference | |
| --- | --- | --- | --- | --- |
| | | | Dollars | Percent of Total Fraudulent Cost |
| Total: Worker | $30.43 | $26.80 | $3.63 | 11.5% |
| Total: Public | $6.48 | $4.84 | $1.64 | 5.2% |
| Total labor cost | $36.91 | $31.64 | $5.27 | 16.7% |

Put another way, for every $100 in labor cost for a fraudulently-misclassifying company, the company saves $16.70 in costs relative to what it would have to pay if it operated legally or relative to what a similarly-productive, law-abiding competitor would pay. This implies an estimated 16.7 percent *legal-cost premium*, the percentage increase in costs for operating legally over fraudulently. Of this 16.7 percent, 11.5 percent comes from lost worker take-home earnings and 5.2 percent comes from lost tax and social-insurance payments.

This difference creates a strong incentive for companies to operate fraudulently. Companies operating fraudulently can easily underbid those operating legally. It also creates a strong incentive for general contractors and developers to turn a blind eye to fraud.

### Distribution of the gains from fraudulent misclassification

Where do these fraudulently-saved dollars go? We assume a workflow involving three parties: the fraudulently-misclassifying company, the general contractor who hired the company, and

---

[6] Note that the SS&M contributions for a misclassified worker are higher than the SS&M contributions for a worker legally classified as an employee. This is because we assume that a properly classified employee's tax-exempt benefits are fully passed through in the form of taxable wages should that worker be misclassified as an independent contractor—thus increasing the compensation subject to SS&M taxes. We make this assumption to isolate the *per se* effect of misclassification. As discussed below, incomplete pass-through of such benefits would increase the savings associated with misclassifying workers.

[7] Legal/Fraudulent hourly cost = $36.91/$31.64 = 1.167 = 16.7 percent higher.

the developer who hired the general contractor. Through the bidding and negotiation process, these parties implicitly divide the gains from these evaded costs between themselves. For every $100 in fraudulent labor cost, the legal cost is estimated at $116.70. This $16.70 difference (L-F) can be shared in any combination between the company, general contractor, and developer.

$\underline{L}$egal cost - $\underline{F}$raudulent cost = $\underline{C}$ompany Gain + $\underline{G}$eneral Contractor Gain + $\underline{D}$eveloper Gain

$$L - F = C + G + D$$

$$1 = C/(L-F) + G/(L-F) + D/(L-F) = \text{Company share} + \text{General Contractor share} + \text{Developer share}$$

For instance, suppose the company bid $105.00, then its gain is $5.00 and its share of the gain is 29.9 percent.[8] The general contractor gets $11.70 in savings relative to the cost of hiring a legally-operating company and can share this value with the developer by underbidding any competing general contractors who would hire competing, law-abiding companies at cost $116.70. The general contractor can win and cover its costs with any bid between $116.70 and $105.00, so it has $11.70 to divide between itself and the developer. If they divided it equally, the general contractor would bid $110.85, claiming $5.85 in general-contractor gain and yielding $5.85 in gain from cost saving to the developer. The general contractor and developer shares of gain from the fraudulent operations of the misclassifying company would each be 35 percent.

If a fraudulently-operating company is observed to have a labor subcontract worth $B, this is the sum of F + C. Auditing the company's books may reveal evidence about the difference between the amount paid to the company from the general contractor (B=F+C) and the amount spent on misclassified labor (F). This difference would be the company's gain (C).

With an estimate of a company's fraudulent labor cost (F) in hand, applying the estimated 16.7 percent legality premium gives a basis for estimating economic impacts of fraudulent misclassification.

If fraud goes undetected and unpunished, standards in the industry can unravel and force law-abiding companies out of business. Just as the company has an incentive to use fraudulent misclassification to lower its labor costs so as to win bids, the general contractor has an incentive to accept the lower bid and pass some of that value to the developer through its bid. This will disadvantage general contractors who only use law-abiding subcontractors. The developer, in turn, has an incentive to accept the lower bid from the general contractor who hires the fraudulently-misclassifying company.

---

[8] $5.00/$16.70 = 0.299.

*Incorporating additional factors*

Our approach has been developed with specific, simplified assumptions about how the construction labor market functions and estimates depend on these assumptions.  This section discusses how to incorporate additional factors into the analysis.

- *Incomplete pass through of benefit value***:** We assumed that misclassified workers would receive the full value of benefits that would have been earned had that worker been properly classified.  If less than full pass-through occurs, the fraudulent labor cost will be reduced by lowering both payments to workers and to the public. The difference in labor cost between legal and fraudulent operations will be larger. For instance, in the typical case considered above, if only half the value of benefits (half of $6.72) passes through, then the legal-cost premium almost doubles, from 16.7 percent to 30.5 percent. If none of the benefit value passes through, then the legal-cost premium rises to 48.1 percent.

- *Wage theft:* If workers are not paid what they are owed or promised so that the effective hourly wage when operating fraudulently is below the hourly wage when operating legally, the fraudulent labor cost decreases by that amount, raising the labor-cost difference between legal and fraudulent operations.  For instance, if a worker classified fraudulently would receive only 90 percent of the hourly wage that the worker would if classified legally (90 percent of $24.92), then this one change from the baseline scenario increases the legal-cost premium to 26.7 percent.

- *Materials:* If the contract includes nonlabor inputs, then their cost should be deducted from the value of the bid (B) before estimating labor costs because these material costs should be similar whether operating legally or fraudulently. In general, the legal-cost premium will be maximized when the labor share of costs is maximized. Contracts including material costs will shrink the total-cost difference. Our information suggests that this rarely occurs, because higher-level contractors usually provide materials to the companies they hire to avoid paying markups.

- *Value of missing insurance*: The lack of coverage by workers' compensation and unemployment insurance is a significant but difficult to quantify loss to the employee and to society. The cost of workers' compensation and unemployment insurance capture the expected value of the benefit stream triggered by the loss. The absence of these benefits can impose heavy collateral costs on specific individuals, on their families, and public institutions. The possible absence of health insurance given incomplete pass-through of benefits exacerbates this. For example, consider a misclassified worker lacking workers' compensation insurance and medical insurance coverage and unable to pay the cost of medical care after a workplace injury. They will not have income during

their convalescence. The individual and family will bear these costs along with health care institutions, social welfare organizations, and public benefit systems (like food stamps or public housing) that absorb the costs of unreimbursed care and family support in the face of loss of income. Misclassified employees may also have more difficulty exercising and enforcing other employee rights, such as those involving minimum wage, occupational safety and health, concerted activity and organizing, and protection from discrimination.

- *Unfair competition for law-abiding companies:* The increase in the proportion of construction workers who are misclassified as independent contractors impacts how business is done in the construction industry.  Companies that fraudulently misclassify gain the advantage of reduced labor costs.  They are in a position to submit lower bids than competitors who follow the law.  As the number of companies that misclassify increases, law-abiding companies win fewer bids, and have less work.  Over time, misclassification progresses from a method used by unscrupulous companies to earn additional profits to the price of survival in the industry.  Reducing the use of misclassified workers provides a level playing field for law-abiding companies.

- *Tax payments and off-the-books payments*: our model assumes that Social Security and Medicare taxes are paid in both scenarios. We also implicitly assume that the worker will pay income taxes out of their earnings in either case. A factor that may contribute to the violation of these assumptions is if workers are paid completely off the books, rather than as fraudulently-misclassified independent contractors issued a 1099. With a 1099, the tax authorities have a paper trail and so the audit risk is higher. Without any documentation, audit risks are lower and incentives to evade taxes are stronger. If misclassified workers do not pay these taxes, then that value stays with the worker rather than going to the public. This does not affect the legal-cost premium but does affect the distribution of value between worker and public. Off-the-books payment may also indicate legal vulnerability of workers and be associated with increased risk of wage theft and incomplete benefit cost pass-through.

## ABOUT THE AUTHORS

### Dale Belman

Belman is a labor economist and professor at Michigan State University in the School of Human Resources and Labor Relations.  He has published in *Industrial and Labor Relations Review, Industrial Relations (Berkeley), Review of Economics and Statistics, Labour, Journal of Business and Economic Statistics, and Oxford Economic Papers.*  Along with Paul Wolfson, he was recognized by Princeton University with the Bowen Prize for the book, *What Does the Minimum Wage Do?* (Upjohn, 2014).

Belman completed his Ph.D. in Economics at the University of Wisconsin, Madison in 1986.  His undergraduate work was completed at Bowdoin College.  Prior to working at MSU, he was a professor at the University of Wisconsin, Milwaukee.  He has served as president of the Institute for Construction Economics Research, a non-profit foundation which provides non-partisan research on topics of concern to construction industry stakeholders.

### Aaron Sojourner

Sojourner is a labor economist and associate professor at the University of Minnesota's Carlson School of Management in the Department of Work and Organizations. The *Economic Journal*, *Journal of Human Resources*, *Journal of Public Economics*, *Industrial and Labor Relations Review (ILRR)*, *Management Science, Early Childhood Research Quarterly,* and *Industrial Relations* have published his work and he serves on the ILRR international editorial board. He received the John T. Dunlop Scholar Award from the U.S. Labor and Employment Relations Association in 2016, which recognizes emerging scholars for outstanding research contributions to issues of national significance.

Sojourner has a wide range of policy experience and community service. He spent the 2016-'17 academic year in Washington, D.C. serving as senior economist for labor for the U.S. President's Council of Economic Advisers, established in 1946 to offer the president objective economic advice on the formulation of economic policy.  Previously, he has served on Minneapolis Mayor Betsy Hodges's Cradle-to-K Cabinet, advising the city on how to reduce racial disparities through policies affecting children's first 3 years, as a director of Spring Bank, a community bank in the Bronx and Harlem, N.Y, and as a fellow in the U.S. Senate's Labor Policy Office.

Sojourner completed his Ph.D. in economics at Northwestern University in 2009. He has a masters in public policy analysis from the University of Chicago and a bachelors in history from Yale University.