Ex. 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON, | Civil Action No. 20-cv-1689 |
| Plaintiffs, | |
| v. | |
| EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION of YOLANDA CARRILLO

I, Yolanda Carrillo, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

      1.      I am the Chief Legal Counsel at the Illinois Department of Labor located in Chicago, Illinois.  I have been employed as Chief Legal Counsel since June 2019. My responsibilities include advising the Illinois Department of Labor and its Director of best

practices, interpreting and consulting on legislation and regulations, coordinating legal strategy, and advising managers on enforcement efforts.

2.　　Previously, I managed the migrant farmworker program for Chicago Legal Aid and served as the Legal Director of a 501(c)(3) nonprofit organization that represented and advocated for low wage workers in northern Illinois.

3.　　My educational background includes a bachelor's degree from Davidson College and a Juris Doctorate from DePaul University College of Law.

4.　　I submit this declaration in support of Illinois' litigation against Eugene Scalia, in his official capacity as Secretary of the United States Department of Labor ("USDOL"); the USDOL; and the United States of America regarding the recently issued rule entitled Joint Employer Status Under the Fair Labor Standards Act ("Final Rule").

5.　　I have compiled the information in the statements set forth below through personal knowledge and through my consultations with staff at the Illinois Department of Labor, and with the Acting Assistant Deputy Director the Workers Compensation Fraud Unit  at the Illinois Department of Insurance.

6.　　As Chief Legal Counsel for the Illinois Department of Labor, I am familiar with the Final Rule issued by the USDOL and published in the Federal Register on January 16, 2020, and the ways in which the Final Rule will negatively impact Illinois state agencies and workers.

7.　　The Final Rule will impact Illinois by creating administrative burdens and increasing enforcement costs for state agencies dedicated to combating wage theft, administering unemployment insurance benefits, and administering injured workers' compensation benefits. Furthermore, the Final Rule will also lead to a loss of tax revenue and other funds used to enforce Illinois wage and hour laws.

8.    Illinois funds its unemployment insurance benefits program through the collection of payroll taxes.  The Final Rule incentivizes subcontracting and outsourcing, which IDOL has found leads to higher rates of misclassification of employees as independent contractors. Increased misclassification will directly result in a reduction of payroll taxes gathered by Illinois, and compromise Illinois' ability to fund its unemployment insurance benefits program.

9.    IDOL has also found that workers' compensation insurance fraud through misclassification and evasion of insurance premiums is more common in heavily subcontracted industries in Illinois. By incentivizing subcontracting and outsourcing, the Final Rule will increase the incidence of misclassification and insurance fraud which will increase enforcement costs and create additional burdens in the administration of Illinois' workers' compensation insurance system.

10.    Similarly, IDOL has found that heavily subcontracted industries also have higher than average rates of workplace injuries in Illinois.  Increasing the proclivity of subcontracting and outsourcing via the Final Rule will result in additional administrative burdens for the Illinois Workers' Compensation Commission.

11.    As described below, the Final Rule will also harm Illinois' ability to collect owed compensation for low wage workers. Not only will this harm Illinois by effectively reducing the amount of money in the hands of some of its most vulnerable residents, but it will also reduce the pool of taxable income for Illinois.

12.    The Final Rule will also reduce the funds available to Illinois to enforce its wage and hour laws.

13.    It is increasingly common for businesses to subcontract or outsource their labor needs to  entities that are undercapitalized or insolvent. Undercapitalized or insolvent entities

3

often fail to comply with Illinois wage and hour statutes, including by engaging in wage theft. Enforcement against such subcontracting entities is difficult because these businesses often file for bankruptcy and judgments obtained against these entities are often  uncollectable. Further, IDOL has found that subcontracted entities have lower rates of compliance with Illinois wage statutes. By incentivizing subcontracting and outsourcing, the Final Rule will ultimately lead to higher levels of wage theft in Illinois further burdening Illinois enforcements efforts.

14.     The Final Rule acknowledges that the enforcement of wage protections will become more difficult, conceding that it will "reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent." 85 Fed. Reg. at 2853. In addition to collecting wages that were unpaid in violation of Illinois law, Illinois also recovers penalties from employers that underpay their employees, including, in many instances, a penalty of 20% of the underlying wages owed to employees. These penalties are used to fund enforcement efforts pursuant to the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/14.

15.     The Final Rule will prevent Illinois from recovering owed wages and penalties from businesses that subcontracted their labor needs to insolvent entities, and which would have been liable as employers under prior version of the FLSA joint employer rule, but not under the Final Rule. In doing so, the Final Rule also directly harms Illinois by reducing its revenue and the funds dedicated to enforcement of its wage and hour laws.

16.     Illinois will also have to devote additional resources to implement a new administrative rule that corrects the problems created by the Final Rule's departure from the USDOL's prior joint employer analysis. Pursuant to Title 56, Section 210.120 of the Illinois Administrative Code,  Illinois currently looks to the federal regulations interpreting the FLSA for

guidance on interpreting the Illinois Minimum Wage Law, except where Illinois has its own rule on a given issue. To mitigate the negative impact of the Final Rule, Illinois will have to devote resources that are already spread thin in the midst of the COVID-19 pandemic to implement a new rule on joint employment as soon as possible.

17.     Proposing and finalizing an administrative rule requires a significant amount of state resources. In Illinois, administrative rules proposed by State agencies are first made available for public review and comment during the First Notice period, and then are reviewed and approved by a bipartisan legislative committee known as the Joint Committee on Administrative Rules ("JCAR") during the Second Notice period.  This process can take anywhere from 90 days to a year to complete.

18.     IDOL anticipates that a proposed rule on joint employment will result in a significant number of comments from the public. IDOL will have to dedicate a considerable amount of time to provide responses to public comments, and make any necessary changes to the proposed rule, before submitting the proposed rule for Second Notice.

19.     Additionally, IDOL may have to hold public hearings during the First Notice period. Holding public hearings at this time is particularly challenging due to limits on gatherings and other public health concerns related to the spread of COVID-19. This will require IDOL to research and implement alternative solutions to ensure compliance with state laws allowing for public participation in the rulemaking process, while also protecting the health and safety of IDOL's employees and members of the public.

20.     After the public comment period and once IDOL files with JCAR for Second Notice, each legislator who is a member of JCAR, JCAR's staff, and legislators' staff will also have to devote resources to reviewing and researching the rule. During this period, JCAR may

make recommendations for changes or object to the proposed rulemaking, which will then require a response from IDOL within 90 days. Lastly, if JCAR does not object to the proposed rule and IDOL adopts the final rule, IDOL will face further administrative burdens in issuing guidance on the rule and training its staff on implementation and application of the rule.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 19th day of May, 2020 at Chicago, Illinois.

Yolanda Carrillo
Chief Legal Counsel