UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

<table>
<tr><td>STATE OF NEW YORK, COMMONWEALTH<br>OF PENNSYLVANIA, STATE OF<br>CALIFORNIA, STATE OF COLORADO,<br>STATE OF DELAWARE, DISTRICT OF<br>COLUMBIA, STATE OF ILLINOIS, STATE<br>OF MARYLAND, COMMONWEALTH OF<br>MASSACHUSETTS, STATE OF MICHIGAN,<br>STATE OF MINNESOTA, STATE OF NEW<br>JERSEY, STATE OF NEW MEXICO, STATE<br>OF OREGON, STATE OF RHODE ISLAND,<br>STATE OF WASHINGTON, STATE OF<br>VERMONT, and COMMONWEALTH OF<br>VIRGINIA,<br><br>         Plaintiffs,<br><br>   -against-<br><br>EUGENE SCALIA, Secretary of the United States<br>Department Of Labor, UNITED STATES<br>DEPARTMENT OF LABOR, and UNITED<br>STATES OF AMERICA,<br><br>         Defendants.</td><td>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:</td><td>1:20-cv-01689-GHW<br><br><u>MEMORANDUM OPINION<br>AND ORDER</u></td></tr>
</table>

------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

  Imagine that you work for a temp agency, Temp. Co., that hires you out to a large company,

Large Corp. Although you get paid by Temp. Co., you go to work every day at Large Corp. and

Large Corp. employees tell you what to do. Also imagine that you work sixty hours a week but get

paid for forty. That's illegal under the Fair Labor Standards Act (the "FLSA"). You sue for the

overtime wages you're owed—but Temp. Co. goes bankrupt. Can you also sue Large Corp.?

Maybe. It depends on whether Temp. Co. and Large Corp. are a "joint employer" under the FLSA.

  This case is about the FLSA's definition of a joint employer. After a notice-and-comment

period, the Department of Labor (the "Department") issued a final rule (the "Final Rule") that

narrows that definition. Eighteen States sued. The States argue that the Final Rule's promulgation

USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: 6/1/2020

violated the Administrative Procedure Act.  Defendants—the Secretary of the Department, the

Department, and the United States—moved to dismiss for lack of both constitutional and prudential

standing.  The States have plausibly alleged that the Final Rule will reduce their tax revenue and

increase their administrative and enforcement costs for state-law analogues of the FLSA, so

Defendants' motion to dismiss is DENIED.

## I. BACKGROUND

### A. Statutory and Regulatory Background

"The principal congressional purpose in enacting the FLSA was to protect all covered

workers from substandard wages and oppressive working hours, labor conditions that are

detrimental to the maintenance of the minimum standard of living necessary for health, efficiency

and general well-being of workers."  *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 402 (2d Cir.

2019) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)) (brackets

omitted); *see also Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 132 (4th Cir. 2017) ("Congress

enacted the FLSA in 1938—in the midst of the Great Depression—to combat the pervasive 'evils

and dangers resulting from wages too low to buy the bare necessities of life and from long hours of

work injurious to health.'" (quoting S. Rep. No. 75-884, at 4 (1937)).  Congress intended the FLSA

"to free commerce from the interferences arising from production of goods under conditions that

were detrimental to the health and well-being of workers."  *Rutherford Food Corp. v. McComb*, 331 U.S.

722, 727 (1947).  So "[t]he FLSA contains two primary worker protections:  first, it guarantees

covered employees a federal minimum wage; and second, it provides covered employees the right to

overtime pay at a rate of one-and-a-half their regular rate for hours worked above forty hours a

week."  *Mei Xing Yu*, 944 F.3d at 402 (citing 29 U.S.C. §§ 206-07).

"Consistent with the FLSA's 'remedial and humanitarian' purpose, Congress adopted

definitions of 'employ,' 'employee,' and 'employer' that brought a broad swath of workers within the

statute's protection."  *Salinas*, 848 F.3d at 133 (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local*

*No. 123*, 321 U.S. 590, 597 (1944)).  The FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  The Supreme Court described this as the "broadest . . . ever" statutory definition.  *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)).

"Congress defined 'employer' in a similarly expansive fashion."  *Salinas*, 848 F.3d at 133.  The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Again, "[t]he Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).  And the FLSA also defines the term "employ" broadly, as "to suffer or permit to work."  29 U.S.C. § 203(g).[1]

"Above and beyond the plain language" of the FLSA, "the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy."  *Herman*, 172 F.3d at 139 (quotation omitted).  The Supreme Court has "consistently construed the Act 'liberally to apply to the furthest reaches consistent with congressional direction'" because "broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959) and citing *Powell v. United States Cartridge Co.*, 339 U.S. 497, 516 (1950)).

The Department has recognized that two employers may be so interconnected that they function as a single, joint employer since 1939.  That year, the Department's Wage and Hour Division issued an interpretative bulletin, which addressed whether multiple employers could be

---

[1] "This definition derived from state child-labor laws, which imposed liability not only on businesses that directly employed children but also on 'businesses that used middlemen to illegally hire and supervise children.'"  *Salinas*, 848 F.3d at 133 (quoting *Antenor v. D & S Farms, Inc.*, 88 F.3d 925, 929 n.5 (11th Cir. 1996) and citing *Rutherford Food*, 331 U.S. at 728 & n.7 and *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 29-30 (1918)).

held jointly and severally liable under the FLSA.  *See* Interpretative Bulletin No. 13, "Hours Worked: Determination of Hours for Which Employees are Entitled to Compensation under the Fair Labor Standards Act of 1938," at 16-17 (U.S. Dep't of Labor July 1939).  Although it did not use the words "joint employer," this interpretive bulletin was a precursor to the modern joint employer doctrine. *Id.*

The Supreme Court has also "long recognized that two or more entities may constitute joint employers for purposes of the FLSA."  *Salinas*, 848 F.3d at 134.  "For example, in *Rutherford Food*— which [was decided in 1947 and] predated the Department of Labor regulations setting forth the circumstances in which joint employment generally exists—the Court observed that the plaintiff meat boners could be employed both by the subcontractor that directly employed them and by a slaughterhouse operator who supervised and controlled their daily work."  *Id.* (citing 331 U.S. at 724-25, 730); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 70 (2d Cir. 2003) ("*Rutherford* was a joint employment case, as it is apparent from the Supreme Court's opinion that the boners were, first and foremost, employed by the [independent contractor] who had entered into a contract with the slaughterhouse.").

In 1958, the Department first codified the joint employment standard.  *See* 23 Fed. Reg. 5905 (Aug. 5, 1958).  "Although the FLSA does not expressly reference 'joint employment,' the Department of Labor's first set of regulations implementing the statute . . . recognize[d] that '[a] single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938[.]'"  *Salinas*, 848 F.3d at 133 (quoting former 29 C.F.R. § 791.2(a).  That was because "there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer."  *Id.* (quoting former 29 C.F.R. § 791.2(a)); *see also* 23 Fed. Reg. at 5906.

The Department's 1958 regulations "distinguish[ed] 'separate and distinct employment' and 'joint employment.'"  *Salinas*, 848 F.3d at 133 (quoting former 29 C.F.R. § 791.2(a)).  Those

regulations provided that "[s]eparate employment exists when 'all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the' individual's employment." *Id.* at 133-34 (quoting former 29 C.F.R. § 791.2(a)) (emphases omitted). "By contrast, joint employment exists when 'the facts establish that employment by one employer is not completely disassociated from employment by the other employer.'" *Id.* (quoting former 29 C.F.R. § 791.2(a)) (alterations and emphasis omitted).[2]  The former regulation noted that "determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 23 Fed. Reg. at 5906.

The distinction between "separate and distinct employment" and "joint employment" is important because "[j]oint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions[.]" *Salinas*, 848 F.3d at 134 (quoting former 29 C.F.R. § 791.2(a)).  But "[s]eparate employers may 'disregard all work performed by the employee for the other employer' when determining their obligations under the FLSA." *Id.* (quoting former 29 C.F.R. § 791.2(a)).  So "the hours an individual works for each joint employer"—but not for separate employers—"must be aggregated to determine whether and to what extent the individual must be paid overtime to comply with the FLSA." *Id.* (citing *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 916-18 (9th Cir. 2003); *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207-08 (7th Cir. 1986)).  The joint employment doctrine thus: "(1) treats a worker's employment by joint employers as 'one employment'" to determine "compliance with the FLSA's wage and hour requirements and (2) holds joint employers jointly and severally liable for any violations of the FLSA." *Id.* (citing *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305, 307, 310 (4th Cir. 2006)).

---

[2] In 1961, the Department amended a footnote to the regulation to clarify that a joint employer is also jointly and severally liable for overtime pay.  *See* 26 Fed. Reg. 7730, 7732 (Aug. 18, 1961).

The Supreme Court reaffirmed its interpretation of the FLSA as regulating "joint employers" after the Department published the 1958 regulations. *See, e.g.*, *Falk*, 414 U.S. at 195 (holding that owners of apartment complexes and private contractor were joint employer because both maintained "substantial control" over the conditions of workers' employment). Likewise, "Congress repeatedly has reaffirmed that the FLSA's definitions of 'employ,' 'employee,' and 'employer' dictate that two or more entities can constitute 'joint employers' for purposes of the FLSA." *Salinas*, 848 F.3d at 135.[3]

Although the joint employer doctrine is well established, "courts have had difficulty developing a coherent test distinguishing 'separate employment' from 'joint employment.'" *Id.* Prior to the Department's promulgation of the Final Rule, "courts' attempts to distinguish separate employment from joint employment have spawned numerous multifactor balancing tests, none of which has achieved consensus support." *Id.*

The Ninth Circuit's decision in *Bonnette v. California Health and Welfare Agency* has played an outsize role in the development of joint employer doctrine. 704 F.2d 1465 (9th Cir. 1983).

> Emphasizing that courts must consider "the circumstances of the whole activity" and that no set of factors was "etched in stone," the *Bonnette* Court concluded that four, nonexclusive factors "provide a useful framework" for determining whether an entity constitutes a joint employer: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."

*Salinas*, 848 F.3d at 135 (quoting *Bonnette*, 704 F.2d at 1469-70). "These factors reflect the common-law test for determining whether an agency relationship exists, which focuses on the putative principal's 'formal right to control the physical performance of another's work.'" *Id.* (quoting *Zheng*,

---

[3] For example, Congress amended the FLSA in 1988 and "recognized the 'FLSA joint employment rule,' explaining that 'there are some situations in which an employee who works for two separate employers or in two separate jobs for the same employer has all of the hours worked credited to one employer for purposes of determining overtime liability.'" *Id.* (quoting S. Rep. No. 99-159, at 12 (1985); H.R. Rep. No. 99-331, at 23 (1985)). "Congress also endorsed the FLSA's joint employment doctrine in enacting the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §§ 1801 *et seq.* . . . which uses the same definition of 'employ' as the FLSA." *Id.* (citing 128 Cong. Rec. S11,749 (daily ed. Sept. 17, 1982)).

355 F.3d at 69). Some courts apply the *Bonnette* factors to determine whether multiple employers are a joint employer under the FLSA. *See, e.g.*, *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012); *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675-76 (1st Cir. 1998).

But some courts go beyond the *Bonnette* factors. The Second Circuit has reasoned that "the four-factor test cannot be reconciled with the 'suffer or permit' language in the [FLSA], which necessarily reaches beyond traditional agency law." *Zheng*, 355 F.3d at 69; *see also In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 468-70 (3d Cir. 2012). And "Congress intended for the FLSA to 'stretch the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles[.]'" *Salinas*, 848 F.3d at 136 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)) (brackets omitted). These courts "supplement the four *Bonnette* factors with additional factors intended to" account for "the FLSA's more expansive definition of 'employee.'" *Id.* For example, "*Zheng* identified six additional factors that speak to whether, as a matter of 'economic reality,' a putative employer 'has functional control over workers even in the absence of formal control.'" *Id.* (quoting *Zheng*, 355 F.3d at 72) (ellipsis omitted); *see also Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1176-77 (11th Cir. 2012) (applying an eight-factor test); *Torres-Lopez v. May*, 111 F.3d 633, 639-41 (9th Cir. 1997) (applying a nonexclusive thirteen-factor test).

### B. The Final Rule

Against this backdrop, the Department published a Notice of Proposed Rulemaking ("NPRM") setting forth proposed revisions to the "joint employer" regulation. *See* 84 Fed. Reg. 14,043-02 (Apr. 9, 2019). The NPRM noted that "[t]he Department has not meaningfully revised [the prior regulation] since its promulgation." *See id.* at 14,044. The Department was concerned that the former regulation did "not adequately explain what it means" for two employers to be "completely disassociated" when an employee works for an employer, "and that work simultaneously benefits another person." *Id.* "In that scenario," the Department explained, the

putative employers "are almost never 'completely disassociated[.]'"  So "the real question is not whether they are associated but whether the other person's actions in relation to the employee merit joint and several liability under the Act."  *Id.*

Given those concerns, the Department proposed a new definition of "joint employer" under the FLSA.  Under the new definition, if an employee works for an employer and "another person simultaneously benefits from that work, the other person is the employee's joint employer under" the FLSA "only if that person is acting directly or indirectly in the interest of the employer in relation to the employee."  *Id.*  "To make that determination simpler and more consistent, the Department propose[d] to adopt a four-factor balancing test derived . . . from *Bonnette*[.]"  *Id.*  Those factors are:  whether the other person (1) hires or fires the employee; (2) supervises and controls the employee's work schedule or conditions of employment to a substantial degree; (3) determines the employee's rate and method of payment; and (4) maintains the employee's employment records.  *See id.*[4]

The Department issued the Final Rule after the receipt and review of thousands of comments.  *See* 85 Fed. Reg. 2820 (Jan. 16, 2020).  The Final Rule explains the Department's view that "[a]pplication of the four factors should determine joint employer status in most cases."  *Id.* at 2821.  "For example, to be a joint employer under the Act, the other person must actually exercise— directly or indirectly—one or more of the four control factors."  *Id.*  The Final Rule permits consideration of other factors "but only if they are indicia of whether the potential joint employer exercises significant control over the terms and conditions of the employee's work."  *Id.*  The Final Rule also categorically excludes certain factors as irrelevant, such as any indicia of whether the

---

[4] The Department also "propose[d] to modify the first *Bonnette* factor to explain that a person's ability, power, or reserved contractual right to act with respect to the employee's terms and conditions of employment would not be relevant to that person's joint employer status under the Act."  *Id.*  Yet the Department ultimately recognized that— "having reviewed and considered the comments received"—"the reserved right to act can play some role in determining joint employer status, though there still must be some actual exercise of control."  85 Fed. Reg. 2820, 2821 (Jan. 16, 2020).

employee is economically dependent on the employer. *Id.* And under the Final Rule, "maintenance of employment records . . . alone"—the fourth *Bonnette* factor—"does not demonstrate joint employer status." *Id.* The Final Rule reiterates that "[n]o single factor is dispositive in determining joint employer status, and the appropriate weight to give each factor will vary depending on the circumstances." *Id.*

### C. Facts and Procedural History[5]

Plaintiffs sued "to vacate the Final Rule and enjoin its implementation" because the Final Rule's promulgation violates the Administrative Procedure Act ("APA"). Compl. ¶ 9. The complaint alleges that "[t]he Final Rule harms Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests, including by directly diminishing Plaintiffs' tax revenue and inflicting substantial and burdensome administrative and enforcement costs on Plaintiffs' state agencies." *Id.* ¶ 144.

Plaintiffs allege three theories of harm. *See id.* ¶ 145. First, the Final Rule allegedly "will lower wages and decrease compliance with worker protection laws, harming workers in Plaintiffs' States." *Id.* Second, the alleged contraction of the wage base within Plaintiffs' jurisdictions "will directly reduce Plaintiffs' tax revenue." *Id.* Third, the Final Rule will allegedly "impose administrative and regulatory costs on Plaintiffs and their state agencies" and "cause Plaintiffs to incur increased costs from the investigation and enforcement of minimum wage, overtime, and other labor law violations affecting workers in their jurisdictions." *Id.*

The States first allege that the Final Rule will "cause[] quasi-sovereign harms to Plaintiffs by harming workers in Plaintiffs' jurisdictions in several way." *Id.* ¶ 146. The complaint alleges that

---

[5] The Court draws the facts from Plaintiffs' complaint ("Compl."), Dkt No. 1. "A district court has discretion to hold a hearing to resolve factual disputes that bear on the court's jurisdiction, but where, as here, the case is at the pleading stage and no evidentiary hearings have been held," the Court must "accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (citations omitted). "And yet, on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"[t]he Final Rule will increase the prevalence of outsourcing, subcontracting, and other sorts of fissuring in Plaintiffs' jurisdictions by permitting companies to shed their legal liabilities under the FLSA through these sorts of arrangements." *Id.* ¶ 147.  Plaintiffs allege that workplace fissuring harms workers directly because "[o]utsourced and subcontracted employees on average are paid less than directly-employed workers." *Id.* ¶ 148 (citations omitted).  And "[e]mployers in heavily fissured industries are much more likely to violate state and federal minimum wage and overtime laws," increasing the prevalence of wage theft. *Id.* ¶ 149.  Plaintiffs also allege that "smaller entities further down the chain of fissured relationship—that are more likely to be the sole employers under the Final Rule—are more transient and undercapitalized, and more likely to go out of business for lack of funds or otherwise to elude regulators." *Id.* ¶ 150.  So "workers who experience wage theft in fissured workplaces are much less likely to be able to recover those lost wages, even where they seek legal redress or assistance from government agencies."  The complaint also alleges "that fissured workplaces are much more likely to engage in the practice of misclassifying their employees as independent contractors (known as 'payroll fraud')." *Id.* ¶ 151.  Plaintiffs finally allege that "the Final Rule will cause non-monetary harms, such as increased rates of workplace injuries." *Id.* ¶ 152.

The States' second theory is that the Final Rule will reduce their tax revenue.  The complaint alleges that "lower compensation in fissured workplaces yields a smaller tax base for Plaintiffs." *Id.* ¶ 153.  That is "both because fissured workplaces pay lower wages than direct employers and because such workplaces have dramatically higher rates of wage theft and noncompliance with minimum wage and overtime laws." *Id.*  Plaintiffs also allege that "employees' and regulators' decreased ability to collect unpaid back wages from more transient and undercapitalized entities further down the chain of fissured relationships" compounds these problems. *Id.* ¶ 155 (citation omitted).  Indeed, Plaintiffs argue that "[t]he Final Rule acknowledges that the enforcement of wage protections will be more difficult[.]" *Id.* ¶ 156.  The Department concedes that the Final Rule will "reduce the amount of back wages that employees are able to collect when their employer does not

10

comply with the Act and, for example, their employer is or becomes insolvent." *Id.* (quoting 85 Fed.

Reg. at 2853).  Plaintiffs also allege that "subcontractors, staffing agencies, and other intermediary

employers are less likely to comply with obligations to pay workers' compensation premiums or

unemployment insurance contributions[.]" *Id.* ¶ 153.  And "the small, transient nature of such

companies" allegedly stymies "detection and enforcement."  *Id.* ¶ 158.

The States' last theory is that the Final Rule will increase their administrative and

enforcement costs for state-law analogues of the FLSA.  The complaint alleges that certain Plaintiffs

"have statutory requirements" for "minimum wage and overtime pay that are" like "the FLSA."  *Id.*

¶ 171.  "Because the Final Rule limits the scope of the FLSA[] but does not alter remedial state

statutes," the Final Rule allegedly "will require some Plaintiffs to retract current guidance that

incorporates prior FLSA jurisprudence into discussions of state law standards for determining joint

employment."  *Id.* ¶ 173.  So Plaintiffs allege that "[t]he Final Rule will require some Plaintiffs to

incur costs" to "issu[e] new or revised guidance and regulations clarifying distinct state standards and

specifying that state law standards governing joint employment continue to apply[.]"  *Id.* ¶ 174.  The

complaint alleges that "[t]he Final Rule will also require some Plaintiffs to undertake efforts to

educate the public about the newly-distinct analyses for joint employment under state law and

federal law."  *Id.* ¶ 175.  Plaintiffs will also be forced "to promulgate state regulation or other formal

guidance to clarify that the standard for joint employment status under their state laws" no longer

mirrors the joint employment analysis under the FLSA.  *Id.*

The States also allege that the Final Rule will require increased "investigation and

enforcement of [state] labor law violations[.]"  *Id.* ¶ 181.  The Final Rule will allegedly "increase the

prevalence of wage theft in Plaintiffs' jurisdictions[.]"  *Id.* ¶ 184.  That increase will require Plaintiffs

to expend enforcement resources "to enforce wage standards in their jurisdictions and help

workers" to "collect back wages."  *Id.*  Plaintiffs also allege that because the States will continue to

use a broader standard for joint employer liability, workers will divert more of their complaints to

state agencies. *Id.* ¶ 185. This "diversion of joint employer complaints from" federal "to state enforcement agencies" will compound the increased enforcement burden. *Id.* The complaint also alleges that the Final Rule will force the States "to shift enforcement priorities" to "combat wage theft and enforce state" labor law. *Id.* ¶ 186.

In sum, the Final Rule will allegedly require the States to "expend greater enforcement resources to recoup fewer wages and taxes under the Final Rule." *Id.*

Defendants moved to dismiss for lack of subject-matter jurisdiction. Dkt Nos. 62-63. Plaintiffs opposed that motion, Dkt No. 67, and Defendants replied, Dkt No. 71. Plaintiffs also filed a declaration in opposition to Defendants' motion. Dkt No. 68. But when, as here, "the Rule 12(b)(1) motion is facial," that is, "based solely on the allegations of the complaint . . . the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation omitted). Although "a defendant is permitted to make a fact-based Rule 12(b)(1) motion," by "proffering evidence" that goes beyond the complaint, Defendants have chosen not to do so here. *Id.* So it was unnecessary to consider the States' declaration to resolve this motion, and the Court did not do so.

## II. DISCUSSION

### A. Constitutional Standing

#### 1. Legal Standard

A district court must dismiss a claim under Federal Rule of Civil Procedure 12(b)(1) if a plaintiff fails to allege adequate facts to establish constitutional standing. *See Cortlandt St. Recovery Corp. v. Hellas Telecomm.*, 790 F.3d 411, 416-17 (2d Cir. 2015); *see also* Fed. R. Civ. P. 12(b)(1) ("[A] party may assert the following defense[] by motion:  lack of subject-matter jurisdiction."). "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" *Dep't of Commerce v. New York* (*Census*), 139 S. Ct. 2551, 2565 (2019); *see* U.S. Const. art. III, § 2. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."

*Census*, 139 S. Ct. at 2565; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). "The doctrine of standing 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong' and 'confines the federal courts to a properly judicial role.'" *Census*, 139 S. Ct. at 2565 (quoting *Spokeo*, 136 S. Ct. at 1547).

The Supreme Court's "cases have established that the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61; *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). Allegations of a "future injury" qualify "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). The injury-in-fact requirement is "a low threshold, which 'helps to ensure that the plaintiff has a personal stake in the outcome of the controversy.'" *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Susan B. Anthony List*, 573 U.S. at 158; other quotation omitted).

There must also "be a causal connection between the injury and the conduct complained of[,]" so that the injury is "not the result of the independent action of some third party not before the court." *United States v. Windsor*, 570 U.S. 744, 757 (2013) (quoting *Lujan*, 504 U.S. at 561) (alterations omitted). Yet a plaintiff "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test[,]" even "where the injury hinges on the reactions of third parties[.]" *NRDC v. NHTSA*, 894 F.3d 95, 104 (2d Cir. 2018)

(quotation omitted). "[T]he 'fairly traceable' standard is lower than that of proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citing *Bennett v. Spear*, 520 U.S. 154, 168-71 (1997); other citations omitted). It must also be more than "merely speculative" that a plaintiff's "injury will be redressed by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 561) (quotation marks omitted).

"[A]s the party invoking federal jurisdiction," the plaintiff "bears the burden of establishing these elements." *Id.*. "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (quotation and ellipsis omitted); *see also Hellas Telecomm.*, 790 F.3d at 417 (holding that at the pleading stage, the plaintiff bears the burden of "alleging facts that affirmatively and plausibly suggest that it has standing to sue" (quotation and alteration omitted)). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the pleading stage, the Court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party[.]" *Hellas Telecomm.*, 790 F.3d at 417 (quotation and alterations omitted).

Lawsuits by States against the Federal Government raise additional issues. States may sue "in one of three standing capacities: (1) proprietary suits in which the State sues much like a private party suffering a direct, tangible injury; (2) sovereignty suits requesting adjudication of boundary disputes or water rights; or (3) *parens patriae* suits in which States litigate to protect 'quasi-sovereign' interests." *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000) (citations omitted); *see also Gov't of Manitoba v. Bernhardt* (*Manitoba*), 923 F.3d 173, 178 (D.C. Cir. 2019) (explaining that for a State to sue as *parens patriae* means that the State sues "in a representative capacity to vindicate its citizens' interests"). "[W]hether a state has standing to sue the federal government 'seems to depend on the kind of claim that the state advances.'" *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271,

284 (S.D.N.Y. 2019) (quoting *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 n.10 (2015)) (brackets omitted).[6] Yet the Supreme Court has cautioned that its decisions on State standing are "hard to reconcile." *Arizona State Legislature*, 135 S. Ct. at 2664 n.10 (quoting R. Fallon, J. Manning, D. Meltzer & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 263-66 (6th ed. 2009)).

Further complicating matters, States are "entitled to 'special solicitude' in the standing analysis because they 'are not normal litigants for the purposes of invoking federal jurisdiction.'" *Vullo*, 378 F. Supp. 3d at 284 (quoting *Mass. v. EPA*, 549 U.S. 497, 518, 520 (2007)).  But "[t]he depth of this 'special solicitude' and its impact on other doctrines, such as the state's ability to bring suits on behalf of its citizens as *parens patriae*, is unclear."  *Id.* (citing *Conn. v. Am. Elec. Power Co.*, 582 F.3d 309, 336-38 (2d Cir. 2009), *aff'd in part by equally divided Court and rev'd in part*, 564 U.S. 410 (2011)).

### 2. Application

#### a. Reduction of Tax Revenue

The States have plausibly alleged that the Final Rule will reduce their tax revenue by limiting employer liability under the FLSA.  "Expected financial loss can constitute the sort of concrete and particularized injury that is capable of supporting standing."  *New York v. Mnuchin*, 408 F. Supp. 3d 399, 409 (S.D.N.Y. 2019) (citing *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019)). And "[l]ost tax revenues may serve as a cognizable injury-in-fact for standing purposes where an action caused 'a direct injury in the form of specific tax revenues,' and the state articulates a fairly direct link between the state's status as a collector and recipient of revenues and the legislative or

---

[6] *See also Manitoba*, 923 F.3d at 178 ("A State's standing depends on the capacity in which it initiates a lawsuit." (citing Erwin Chemerinsky, *Federal Jurisdiction* 121 (7th ed. 2016))); *Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992) (distinguishing between "claims of *parens patriae* standing" and "allegations of direct injury to the State itself").

administrative action being challenged." *New York v. U.S. Dep't of Labor* (*DOL*), 363 F. Supp. 3d 109, 125 (D.D.C. 2019) (quoting *Wyoming*, 502 U.S. at 448; other quotation omitted).

The States' theory for why the Final Rule will limit their tax revenue is simple. The States collect taxes on wages paid to employees in their states. *See, e.g.*, N.Y. Tax Law § 612(a); 72 Pa. Cons. Stat. § 7302. And the States allege that the Final Rule will reduce aggregate wages paid to employees in their jurisdictions. For example, Plaintiffs allege fewer workers will be able to recover back wages under the Final Rule. *See, e.g.*, Compl. ¶ 153. That is because the Final Rule limits the employers who are liable under the FLSA. The Department itself concedes this point. In the Final Rule, the Department acknowledges that it "may reduce the number of businesses currently found to be joint employers" and "may reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent." 85 Fed. Reg. at 2853. Plaintiffs also allege that the Final Rule will lead to increased wage theft because workers will be unable to recover back wages legally owed to them. That will decrease the States' wage tax base. *See, e.g.*, Compl ¶ 150.

Plaintiffs also allege that the Final Rule will lead to increased fissuring of workplaces. On top of increasing the prevalence of wage theft—which will reduce the States' tax bases—the complaint alleges that increased workplace fissuring will lead to lower wages because employers in fissured workplaces tend to pay less. *See, e.g.*, *id.* ¶ 154. That, too, will allegedly reduce the States' wage tax base. And Plaintiffs allege that the Final Rule will decrease contributions to the States' workers' compensation carriers and unemployment insurance funds. That is because fissured workplaces are more likely to misclassify workers and evade required payments to workers' compensation and unemployment insurance funds. *See, e.g.*, *id.* ¶ 151. Plaintiffs also allege that third-party staffing agencies and subcontractors are subject to lower tax rates for unemployment insurance and workers' compensation. *See, e.g.*, *id.* ¶ 159. If third-party staffing agencies and subcontractors employ a higher fraction of workers—as Plaintiffs allege will occur under the Final

Rule—then the States will generate less revenue for their unemployment insurance and workers' compensation funds under the Final Rule.

The States have plausibly pleaded that the Final Rule will reduce the total amount of wages paid to employees in their jurisdictions and lead to a corresponding reduction in the States' tax revenues. Contrary to Defendants' arguments, the States have identified a specific revenue stream that they plausibly link directly to the Final Rule. That is enough to allege injury in fact. Indeed, especially for employees' increased inability to collect back wages under the Final Rule, "[t]he link between the revenue loss and the administrative action could hardly be more direct." *Washington v. Trump*, No. 2:19-cv-01502, 2020 WL 949934, at *7 (W.D. Wash. Feb. 27, 2020).

This anticipated loss of tax revenues is also fairly traceable to the Final Rule. Defendants argue that the causal link between the Final Rule and the States' anticipated loss of tax revenue is too attenuated to support their assertion of standing here. But Plaintiffs have alleged a straightforward link between the Final Rule and a reduction in their tax revenues. As discussed above, the States have plausibly alleged that the Final Rule will reduce their respective tax bases and a smaller tax base leads, mechanically, to a reduction in tax revenue. The States have thus "staked out an entirely plausible theory of injury with the requisite specificity[.]" *Mnuchin*, 408 F. Supp. 3d at 409. The *Mnuchin* court held that the plaintiff States had standing because they alleged that "by effectively raising state property taxes, the [State and Local Tax Deduction] cap reduces the value of a homeowner's property, thereby discouraging home sales and decreasing the revenues the States are able to collect by taxing such sales." *Id.* at 409-10; *see also New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 343-44 (S.D.N.Y. 2019) (holding that plaintiffs had standing because they alleged "economic ripple effects" that were "fairly traceable to Defendants' promulgation of the Rule.") (quotation omitted), *preliminary injunction stayed pending appeal*, 140 S. Ct. 599 (2020). The causal chain here is no less attenuated than in *Mnuchin*, and the same result is warranted here.

17

The length of the causal chain between the Final Rule and the States' alleged injury does not defeat Plaintiffs' traceability argument. Indeed, the number of steps in a causal chain will always be artificial, at least to some degree.[7] Thus, "what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." *California v. Ross*, 358 F. Supp. 3d 965, 1006 (N.D. Cal. 2019) (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014)). So it is immaterial to the Court's analysis whether the causal chain between the Final Rule and Plaintiffs' injury consists of few or many causal links—so long as both chains are equally plausible. And the States' allegations of a causal linkage between the Final Rule and reduced tax revenue *are* plausible.

It is also immaterial that Plaintiffs' causal theory depends on illegal actions by employers. The Supreme Court's decision in the *Census* case is instructive.[8] There, the Federal Government argued that "any harm to respondents is not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census." *Census*, 139 S. Ct. at 2565. But the Supreme Court rejected that argument because the respondents "met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." *Id.* at 2565. So too here: Plaintiffs have alleged that the Final Rule will predictably lead to increased noncompliance with FLSA minimum wage and overtime laws. The States' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 2566. And that is enough to satisfy the traceability requirement.

---

[7] Is the injury flowing from the reduction in the States' tax base the result of two links in a causal chain—that is, (1) a reduction in aggregate wages and (2) lower State tax revenues based on this reduced tax base—or is this merely one step in a causal chain? The question has a how-many-angels-can-dance-on-the-head-of-a-pin flavor to it.

[8] The *Census* case reached the Supreme Court after a bench trial, while this case is at the pleading stage. If anything, that further strengthens Plaintiffs' arguments because "'at the pleading stage of the litigation,' the plaintiffs' 'burden of alleging that their injury is "fairly traceable" to' the challenged act 'is relatively modest.'" *Rothstein*, 708 F.3d at 92 (quoting *Bennett*, 520 U.S. at 171).

Defendants' argument that Plaintiffs lack standing because "many of the harms alleged [were] already occurring before the promulgation of the" Final Rule is hard to take seriously. Memorandum of Law in Support of Defendants' Motion to Dismiss ("Mem."), Dkt No. 63, at 24. Yes, wage theft and worker misclassification were occurring before the promulgation of the Final Rule. But Plaintiffs' argument is that these problems will grow *worse* if the Final Rule remains in effect. The mere fact that a problem is already occurring—if, as here, a plaintiff alleges that a defendant's actions will exacerbate the problem—is not a basis to deny the plaintiff standing.

In sum, the States have alleged a "sufficient likelihood" that the Final Rule will lead to a reduction in their tax revenues. *Census*, 139 S. Ct. at 2565. That is sufficient for their claims to survive this motion.

### b. Increased Administrative and Enforcement Costs

The States have also plausibly alleged that the Final Rule will force them to incur increased administrative and enforcement costs. Among other administrative and enforcement burdens, Plaintiffs allege that they will need to rewrite current guidance that incorporates existing FLSA jurisprudence into explanations of state law standards for joint employer liability. *See, e.g.*, Compl. ¶¶ 173-74. Plaintiffs also allege that the Final Rule will force them to expend more resources on the enforcement of state-law analogues of the FLSA. *See, e.g., id.* ¶¶ 181-86. "Monetary expenditures to mitigate and recover from harms that could have been prevented absent [an agency action] are precisely the kind of 'pocketbook' injury that constitute an injury to a proprietary interest for standing purposes." *DOL*, 363 F. Supp. 3d at 126 (quoting *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018)). The *DOL* court held that "the States have standing based on the Final Rule's direct imposition of an increased regulatory burden on them." *Id.* That increased burden included "hiring staff and designating staff time to regulation and enforcement of state and federal laws because of the Final Rule." *Id.* The same is true here.

Plaintiffs' alleged injuries are not self-inflicted. Defendants argue that they are because the Final Rule does not legally require Plaintiffs to take any action. *See* Mem. at 17 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). Defendants overlook that "[g]overnmental administrative costs caused by changes in federal policy are cognizable injuries." *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.* (*USCIS*), 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (citing *Cal. v. Trump*, 267 F. Supp. 3d 1119, 1126 (N.D. Cal. 2017); *Cal. v. Azar*, 911 F.3d 558, 573 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019)). Indeed, the Government presented essentially the same argument in *USCIS* as it presents here. *See id.* ("Defendants argue that such costs are self-imposed and not cognizable."). The argument fares no better in this case. The States have plausibly alleged that they will incur administrative costs by reviewing current guidance on joint employer liability and either retracting or issuing new or revised guidance. As in *USCIS*, the alleged burden associated with educating the public about a new administrative rule is enough to confer standing. That is because these increased administrative costs are "predictable, likely, and imminent." *Id.* at 1124.

*Ross* also undercuts Defendants' argument. There, the court held that the State of California had standing because it "reasonably increased its expenditures on census outreach to attempt to mitigate" the ill effects of the Federal Government's decision to add a citizenship question. *Ross*, 358 F. Supp. 3d at 1004. By Defendants' logic, California's injury should not have been cognizable because California chose to increase its own expenditures and so any harm was self-inflicted. But the *Ross* court rejected that logic because California's decision to increase its expenditures was a reasonable response to the challenged action by the Federal Government. The same conclusion is warranted here. Thus, the States have met their burden to plausibly allege that the Final Rule will increase their administrative and enforcement costs.

### c. Parens Patriae Standing

The Court does not decide whether the States also have *parens patriae* standing.  As noted above, "in a *parens patriae* lawsuit," a State can "sue in a representative capacity to vindicate its citizens' interests."  *Manitoba*, 923 F.3d at 178.  To establish standing in a *parens patriae* lawsuit, "the State must do more than meet Article III's irreducible minimum; it must assert a quasi-sovereign interest 'apart from the interests of particular private parties.'"  *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  At minimum, a "State has a quasi-sovereign interest 'in the health and well-being—both physical and economic—of its residents' and 'in not being discriminatorily denied its rightful status within the federal system.'"  *Id.* (quoting *Alfred L. Snapp*, 458 U.S. at 607).  "One helpful indication" of "whether an alleged injury to the health and welfare of" a State's "citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  *Id.* (quoting *Alfred L.* Snapp 458 U.S. at 607).

Under "[t]he traditional rule, the so-called '*Mellon* bar,'" States "lack[] standing as *parens patriae* to bring an action against the federal government."  *Id.* at 179-80 (citing *Mass. v. Mellon*, 262 U.S. 447, 485-86 (1923)).[9]  Yet "the *Mellon* bar speaks to prudential, not Article III, standing which the courts designed to prevent a State from encroaching on the federal government's power."  *Id.* at 180 (citations omitted).[10]  "Because the *Mellon* bar is prudential . . . Congress may by statute authorize a State to sue the federal government in its *parens patriae* capacity."  *Id.* (citation omitted).

So the question is whether the Congress authorized States to sue the Federal Government under the APA.  "The APA generally provides a cause of action to any 'person adversely affected or aggrieved by agency action.'"  *Id.* at 181 (quoting 5 U.S.C. § 702).  Although "[t]here is little doubt

---

[9] *See also Mellon*, 262 U.S. at 485 ("It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof.  While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government.") (citation omitted).

[10] The difference between so-called "prudential" standing and constitutional standing is discussed below.

that a State qualifies as a 'person' under the APA[,]" the *Manitoba* court held that "the APA evinces no congressional intent to authorize a State as *parens patriae* to sue the federal government." *Id.*

Defendants invoke *Manitoba* and argue that the Court should adopt its reasoning here. Plaintiffs counter that the Second Circuit's decision in *Carey v. Klutznick* authorized States to bring *parens patriae* lawsuits against the Federal Government. 637 F.2d 834 (2d Cir. 1980). Plaintiffs point to the *Carey* court's statement that "New York ha[d] standing in its capacity as *parens patriae*" to sue the Census Bureau. *Id.* at 838 (citations omitted). Defendants respond that, in a subsequent case, the Second Circuit expressly declined to consider whether Connecticut had standing to sue the Federal Government as *parens patriae*. *See Conn. v. U.S. Dep't of Commerce*, 204 F.3d 413, 414 n.2 (2d Cir. 2000). Indeed, the *Connecticut* court cited *Carey* in the same footnote in which it declined to decide whether the State had standing to sue in its capacity as *parens patriae*. *Id.* Further muddying the waters, in *Massachusetts v. EPA*, the Supreme Court devoted a long footnote to *parens patriae* standing that does not resolve the issue. *See* 549 U.S. at 520 n.17. And, more recently still, the Supreme Court observed that its decisions about "the standing of states to sue the federal government[,]" including questions of *parens patriae* standing, "are hard to reconcile." *Arizona State Legislature*, 135 S. Ct. at 2664 n.10 (quotation omitted).[11]

The Court declines to wade into this doctrinal morass. A court—and especially a district court—should be reluctant to opine on an unsettled issue of law when the court can resolve a case on an alternative ground. *See Penn v. New York Methodist Hosp.*, 884 F.3d 416, 426 n.5 (2d Cir. 2018) (noting the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more" (quoting *PDK Labs. Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))). Because the

---

[11] Plaintiffs also cite two district court decisions from 1984, *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984) and *City of N.Y. v. Heckler*, 578 F. Supp. 1109, 1122-23 (E.D.N.Y. 1984), both of which purportedly authorized States to bring APA claims against the Federal Government. Even if that is true, the persuasive value of these decisions is limited at best because of the intervening higher court authority discussed above.

States have plausibly alleged a direct injury sufficient to confer constitutional standing, the Court need not—and so does not—decide whether they have also sufficiently alleged *parens patriae* standing.

### B. Prudential Standing

#### 1. Legal Standard

On top of Article III standing, the Supreme Court has created a doctrine of "prudential standing."  One pillar of the so-called "prudential standing" doctrine is "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quotation omitted).  The Supreme Court has observed that "'prudential standing' is a misnomer" as applied to the zone-of-interests analysis, which asks whether "'this particular class of persons has a right to sue under this substantive statute.'"  *Id.* at 127 (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675-76 (D.C. Cir. 2013) (Silberman, J., concurring)).  Although the Supreme Court has "occasion[ally] referred to this inquiry as 'statutory standing' and treated it as effectively jurisdictional," the use of the word "standing" is "misleading."  *Id.* at 128 n.4.  That is because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case."  *Id.* at 128 n.4 (citations and quotation marks omitted).[12]

So the touchstone of the prudential standing inquiry is congressional intent.  The zone-of-interests test asks whether the plaintiff has a valid "cause of action under the statute."  *Id.* at 128.  "That question requires [a court] to determine the meaning of the congressionally enacted provision creating a cause of action" by "applying traditional principles of statutory interpretation."  *Id.*  The

---

[12] The Supreme Court has further observed that prudential standing requirements are "in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."  *Id.* at 126 (quotations omitted).

question is not whether in the court's "judgment Congress should have authorized" a plaintiff's "suit, but whether Congress in fact did so." *Id.* (emphasis omitted). "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* (citation omitted).

The zone-of-interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). A plaintiff flunks the zone-of-interests test—and so has no cause of action—when its claim hinges on interests that are "so marginally related to or inconsistent with the purposes implicit in the statute [the defendant allegedly violated] that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* "[T]he question [is] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970). "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke*, 479 U.S. at 399-400 (footnote and citation omitted). And "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

## 2. Application

Plaintiffs satisfy the prudential standing requirement. Defendants devote a half-hearted paragraph to their argument that the States lack prudential standing in this case. *See* Mem. at 25. The central premise of their argument is that "no provision in the FLSA . . . was enacted to protect States' financial streams." *Id.*[13]

---

[13] The Court observes that Defendants moved to dismiss Plaintiffs' complaint only under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *See* Dkt No. 62. If Defendants sincerely hoped that the Court would dismiss Plaintiffs' complaint for lack of prudential standing, Defendants probably should have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Lexmark* is clear that prudential standing doctrine does not implicate the Court's subject-matter jurisdiction but whether the plaintiff has a valid cause of action. And a defendant can challenge a plaintiff's complaint for failure to state a valid cause of action only under Rule 12(b)(6). This distinction is not always trivial. For example, as noted above, a court may look beyond the pleadings on a Rule

Plaintiffs' claims fall within the APA's zone of interests.  Defendants ignore the fact that Plaintiffs are suing under the APA, not the FLSA.  So the question here is whether the States' "interests are so marginally related to or inconsistent with the purposes implicit in the" APA "that it cannot reasonably be assumed that Congress intended to permit" States to challenge agency rules. *Patchak*, 567 U.S. at 225 (quotation omitted).  That is not a close call.  The APA's judicial review provision is exceedingly broad.  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  More importantly, "Congress's evident intent when enacting the APA" was "to make agency action presumptively reviewable." *Patchak*, 567 U.S. at 225 (quotation omitted).  Defendants' argument runs aground on that "evident intent." *Id.* (quotation omitted).

Even if the FLSA is relevant to Plaintiffs' prudential standing, it supports the same conclusion.  The States have alleged that the Final Rule will decrease their tax revenue by decreasing aggregate wages paid to workers in their jurisdictions. *See, e.g.*, Compl. ¶¶ 153-57.  Because the States collect taxes on wages, the States' interest in protecting their tax base perfectly coincides with their interest in ensuring workers in their jurisdictions are compensated fairly.  And that interest in protecting workers is exactly the sort of interest that the FLSA was enacted to protect.  So the States' interest in protecting their tax base—and their precisely overlapping interest in ensuring that workers in their jurisdictions receive their wages—falls squarely within the "zone of interests to be protected or regulated by the" FLSA. *Patchak*, 567 U.S. at 224.

Defendants' prudential standing argument is off the mark for yet another reason:  Plaintiffs have alleged secondary economic injuries adequate to satisfy the prudential standing requirement. Plaintiffs have alleged that the Final Rule will reduce their tax revenue and increase their

---

12(b)(1) motion but ordinarily cannot do so on a Rule 12(b)(6) motion.  Yet because the Court chose not to do so here, the distinction has no practical consequences.  And in any event, Plaintiffs have satisfied the zone-of-interests test.

administrative and enforcement costs.  "[C]laims of financial injury[,]" including "lost tax revenue and extra municipal expenses . . . satisfy the 'cause-of-action' (or 'prudential standing') requirement." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017).  Miami, the plaintiff in *Bank of America*, sued under the Fair Housing Act ("FHA"), not the APA.  Yet the Supreme Court stressed the breadth of the FHA's judicial review provision:  "The FHA permits any 'aggrieved person' to bring a housing-discrimination lawsuit. . . .  This Court has repeatedly written that the FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing broadly."  *Id.* (citation omitted).  The APA uses similarly broad language—indeed, the very same language that appears in the FHA.  *See* 5 U.S.C. § 702 ("A person . . . aggrieved by agency action . . . is entitled to judicial review thereof.").  And just as with the FHA, the Supreme Court has noted that Congress intended to confer prudential standing under the APA liberally.  *See Patchak*, 567 U.S. at 225.  So under the APA, no less than the FHA, claims of "lost tax revenue and extra municipal expenses" are enough to confer prudential standing.  *Bank of Am.*, 137 S. Ct. at 1303.  The States have met their minimal burden to allege that their interest in challenging the Final Rule is "*arguably* within the zone of interests" to be protected or regulated by the APA.  *Id.* (quotation omitted).

## III. CONCLUSION

Plaintiffs have adequately alleged constitutional and prudential standing, so Defendants' motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 62.

SO ORDERED.

Dated: June 1, 2020

_____
GREGORY H. WOODS
United States District Judge