**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **STATE OF NEW YORK,** *et al*,       ) | |
|          ) | |
|     **Plaintiffs,**     ) | **Civil Action No. 20-cv-1689 (GHW)** |
|          ) | |
|    **vs.**        ) | |
|          ) | |
| **EUGENE SCALIA,** *et al*,      ) | |
|          ) | |
|    **Defendants.**    ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE BY THE
INTERNATIONAL FRANCHISE ASSOCIATION, THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA, HR POLICY ASSOCIATION, THE
NATIONAL RETAIL FEDERATION, ASSOCIATED BUILDERS AND
CONTRACTORS, AND THE AMERICAN HOTEL AND LODGING ASSOCIATION**

Eli Freedberg (Bar No. 4175816)
900 Third Avenue
New York, NY 10022-3298
Telephone: (212) 583-9600
Facsimile: (2120 832-2719

Maurice Baskin (pro hac vice movant)
815 Connecticut Ave., NW, Ste. 400
Washington, D.C., 2006
Telephone: (202) 842-3400
Facsimile: (202) 842-0011
*Counsel for Proposed Intervenors*

Steven P. Lehotsky (pro hac vice movant)
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
(202) 463-5346 (fax)
slehotsky@uschamber.com
*Counsel for Chamber of Commerce of the
United States of America*

## TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ................................................................................. 1

   A.  The Proposed Intervenors ........................................................................ 1

   B.  The Department's Joint Employer Rule ................................................... 3

   C.  The Pending Litigation Challenging the Joint Employer Rule ................ 5

II.  ARGUMENT ...................................................................................................... 5

   A.  The Proposed Intervenors Are Entitled to Intervene as a Matter of
       Right ........................................................................................................ 5

       1.  The Proposed Intervenors' Motion to Intervene is Timely ........ 6

       2.  The Proposed Intervenors Have an Interest in the Department's
           Ability to Implement the Joint Employer Rule ........................... 7

       3.  The Proposed Intervenors' Ability to Protect Their Interests Will
           Be Impaired Without Intervention ............................................ 14

       4.  The Department May Not Adequately Represent the Interests of the
           Proposed Intervenors ............................................................... 14

   B.  Alternatively, this Court Should Permit the Proposed Intervenors to
       Intervene under Rule 24(b)(1) ............................................................. 19

III.  CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Conn. Lobbyists LLC v. Garfield*,
  241 F.R.D. 100 (D. Conn. 2007)....................................................................................20

*Bonnette v. California Health & Welfare Agency*,
  704 F.2d 1465 (9th Cir. 1983)...............................................................................3, 8, 13

*Brennan v. N.Y. City Bd. of Educ.*,
  260 F.3d 123 (2d Cir. 2001)..........................................................................................6, 14

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
  647 F.3d 893 (9th Cir. 2011)......................................................................................16, 18

*Clean Water Action v. Pruitt*,
  315 F. Supp. 3d 72 (D.D.C. 2018).....................................................................................7

*Dow Jones & Co. v. United States Dep't of Justice*,
  161 F.R.D. 247 (S.D.N.Y. 1995)........................................................................................6

*Earth Island Inst. v. Baker*,
  1992 U.S. Dist. LEXIS 8604 (N.D. Cal. May 6, 1992)....................................................15

*Home Ins. Co. v. Liberty Mut. Ins. Co.*,
  1990 U.S. Dist. LEXIS 15762 (S.D.N.Y. 1990)...............................................................14

*Kane City v. United States*,
  928 F.3d 877 (10th Cir. 2019)...................................................................................16, 18

*Kleissler v. United States Forest Serv.*,
  157 F.3d 964 (3d Cir. 1988)...........................................................................................15

*Michigan State v. Miller*,
  103 F.3d 1240 (6th Cir. 1997)........................................................................................18

*Nat'l Resources Def. Council v. Nat'l Highway Traffic Safety Admin.*,
  894 F.3d 95 (2d Cir. 2018)..............................................................................................15

*New York v. Azar*,
  2019 U.S. Dist. LEXIS 129498 (S.D.N.Y. Aug. 2, 2019)...................................17, 19, 20

*N.Y. Pub. Interest Research Grp. v. Regents of Univ. of N.Y.*,
  516 F.2d 350 (2d Cir. 1975).............................................................................7, 8, 15, 18

*Pennsylvania v. President of the United States*,
    888 F.3d 52 (3d Cir. 2018)................................................................................16

*Trbovich v. United Mine Workers of America, et al*,
    404 U.S. 528 (1972).....................................................................................15

*United States v. New York*,
    820 F.2d 554 (2d Cir. 1987).............................................................................6

*United States v. N.Y. State Bd. of Elections*,
    312 Fed. App'x 353 (2d Cir. 2008).....................................................................6

*W. Energy Alliance v. Zinke*,
    877 F.3d 1157 (10th Cir. 2017)...............................................................16, 18

*Windsor v. United States*,
    797 F. Supp. 2d 320 (S.D.N.Y. 2011)................................................................6

**Statutes**

15 U.S.C. § 1051, *et seq*.............................................................................................7

29 U.S.C. § 201, *et seq*.............................................................................................3

**Rules**

Federal Rule of Civil Procedure 24........................................... 1, 5, 11, 12, 14, 15, 19, 20

**Regulations**

*Joint Employer Status Under the Fair Labor Standards Act*, 85 Fed. Reg. 2820 (Jan. 16, 2020),
    codified at 29 C.F.R. §§ 791.1-791.3......................................................3, 5, 8, 13, 18, 19

**Treatises**

J. Friedenthal, M. Kane & A. Miller, *Civil Procedure* § 6.10, at 370 (1985)..........................14, 15

Pursuant to Federal Rule of Civil Procedure 24, the International Franchise Association ("IFA"), the Chamber of Commerce of the United States of America ("Chamber"), the HR Policy Association ("HRPA"), the National Retail Federation ("NRF"), the Associated Builders and Contractors ("ABC"), and the American Hotel and Lodging Association ("AHLA") (collectively, the "Proposed Intervenors") have moved to intervene as a matter of right, or in the alternative, with the Court's permission, as defendants in the above-captioned lawsuit.

Counsel for the Proposed Intervenors have conferred regarding this motion with counsel for the parties. Plaintiffs' counsel stated they would object to the motion, while Defendants' counsel has not yet taken a position.

## I.    FACTUAL BACKGROUND

### A.    The Proposed Intervenors

IFA is the oldest and largest trade association in the world devoted to representing the interests of franchising. IFA works through its government relations and public policy, media relations and educational programs to protect, enhance and promote franchising on behalf of more than 733,000 franchise establishments, which support nearly 8.4 million jobs and $787.5 billion of economic output for the U.S. economy. IFA's membership currently spans more than 300 different industries, including more than 11,000 franchisee, 1,100 franchisor and 575 supplier members nationwide.

The Chamber is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry, and from every geographic region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.

HRPA is a public policy advocacy organization that represents the chief human resource

officers of more than 390 of the largest corporations doing business in the United States and globally. Collectively, their companies employ more than 10 million employees in the United States, nearly nine percent of the private sector workforce. Since its founding, one of HRPA's principle missions has been to ensure that laws and policies affecting human resources are sound, practical, and responsive to labor and employment issues arising in the workplace. Many HRPA members have agreements and oversight arrangements with third party entities and suppliers that may implicate joint employer issues, and thus HRPA has a vested interest in ensuring that the Department of Labor has an articulated joint employer standard that is proper in scope and consistent with the language and purposes of the FLSA. HRPA believes that the current joint employer rule is consistent with such.

NRF is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than forty-five countries. Retail is the largest private-sector employer in the United States, supporting one in four U.S. jobs—approximately forty-two million American workers—and contributing $2.6 trillion to the annual GDP.

ABC is a national construction industry trade association representing more than 21,000 members. ABC and its sixty-nine chapters help members develop people, win work and deliver that work safely, ethically and profitably for the betterment of the communities in which ABC and its members work. ABC's membership represents all specialties within the U.S. construction industry, who often work together on individual projects while remaining separate entities. The greater flexibility and efficiency allowed by such longstanding construction contracting and subcontracting methods, however, has been threatened in recent years with unwarranted expansion

of joint employment doctrine.

AHLA, serving the hospitality industry for more than a century, is the sole national association representing all segments of the U.S. lodging industry, including hotel owners, real estate investment trusts, chains, franchisees, management companies, independent properties, bed & breakfasts, state hotel associations, and industry suppliers. Headquartered in Washington, D.C., AHLA focuses on strategic advocacy, communications support, and workforce development programs for an industry that advances long-term career opportunities for employees, invests in local communities across the country, and hosts more than one billion guests in American hotels every year. AHLA proudly represents a dynamic hotel industry that is comprised of more than 54,000 properties, supports $1.1 trillion in U.S. sales, and generates nearly $170 billion in taxes to local, state and federal governments.

The Proposed Intervenors seek to intervene on behalf of themselves and their many thousands of members who will be directly harmed if the complaint by the Plaintiff States is allowed to prevail. The specific interests of the Proposed Intervenors supporting their intervention are explained in detail below.

B.    **The Department's Joint Employer Rule**

The Department's rule ("Joint Employer Rule"), entitled *Joint Employer Status Under the Fair Labor Standards Act*, 85 Fed. Reg. 2820 (Jan. 16, 2020), codifies at 29 C.F.R. §§ 791.1-791.3 a newly updated standard for determining whether two separate entities share liability for employees performing work covered by the Fair Labor Standards Act ("FLSA"). The new rule adopts a four-part test based upon the plain language of the FLSA at 29 U.S.C. § 203(d) and the test adopted by the Ninth Circuit in *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465 (9th Cir. 1983) and a majority of other federal courts of appeals.

The Joint Employer Rule's test calls for examination of whether a potential joint employer (1) hires or fires the employee; (2) supervises and controls the employee's work schedule or

conditions of work; (3) determines the employee's rate and method of payment; and (4) maintains the employee's records. *See* 29 C.F.R. § 791.2(a)(1)(i-iv). The new rule provides that the "ability, power, or reserved right to act in relation to the employee may be relevant…but such ability, power, or right alone does not demonstrate joint employer status without some actual exercise of control." *See id.* § 791.2(a)(3)(1).

The Joint Employer Rule brings much-needed clarity to this area of the law. The Department of Labor first promulgated a joint employer rule in 1959, when franchising was in its infancy and many other types of business relationships were different than they are today. That previous rule has proven unworkable, particularly as franchising and temporary staffing became increasingly essential aspects of modern business practice. For example, in guidance based on that rule, the Department opined that some secondary employers could be responsible for the employees of a primary employer, based on concerns that large businesses were outsourcing work to smaller businesses to avoid creating employment relationships with workers. As such, under the Department's prior interpretation, a secondary employer, such as a franchisor or a business using the services of a staffing agency, could constitute a joint employer even where the secondary employer did not exercise any meaningful control over the terms and conditions of the employee's employment with the primary employer. In addition, the Department's prior standard made it difficult for employers to determine their level of responsibility for employees in the first place, precipitating litigation.

The Department addressed these concerns in promulgating the Joint Employer Rule, which "promote[s] certainty for employers and employees, reduce[s] litigation, promote[s] greater uniformity among court decisions, and encourage[s] innovation in the economy." 85 Fed. Reg. 2820. Notably, the Joint Employer Rule does not preempt stricter rules on joint employment under

state wage laws.

        C.      **The Pending Litigation Challenging the Joint Employer Rule**

On February 26, 2020, a group of eighteen state governments ("Plaintiffs") filed suit in this Court seeking to enjoin the Joint Employer Rule, asserting that the new rule violates the Administrative Procedures Act for being (1) contrary to the FLSA; and (2) arbitrary and capricious. *See* ECF No. 1, Compl. ¶¶ 7-8. The Plaintiffs speculate that the Joint Employer Rule will make workers "more vulnerable to underpayment and wage theft," because businesses will "offload their employment responsibilities to smaller, less-sophisticated companies with fewer resources to track hours, keep payroll records, and train managers." *Id.* ¶ 6. On May 11, 2020, the Department filed a Motion to Dismiss the Complaint, arguing that Plaintiffs lack standing to challenge the rule. *See* ECF No. 63, Mot. to Dismiss, at 2. The Court denied the Department's motion on June 1, 2020, in an order entered on June 2. ECF No. 74. On June 3, the Court set a briefing schedule for cross-motions for summary judgment. ECF No. 75. The Department has not yet filed its answer to Plaintiffs' complaint, nor has the Administrative Record been filed. The Proposed Intervenors' answer to Plaintiffs' complaint is attached to this Motion, in accordance with Fed. R. Civ. P. Rule 24.

## II.      ARGUMENT

        A.      **The Proposed Intervenors Are Entitled to Intervene as a Matter of Right.**

Federal Rule of Civil Procedure 24(a) requires a court to permit an applicant to intervene where the applicant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Under Rule 24(a), an applicant may intervene as of right in a lawsuit

where (1) the applicant's motion is timely; (2) the applicant has an interest in the property or transaction at issue in the lawsuit; (3) without intervention, the applicant's ability to protect its interests would be impaired; and (4) the other parties in the lawsuit do not adequately represent the applicant's interests. *See Brennan v. N.Y. City Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001); *Windsor v. United States*, 797 F. Supp. 2d 320, 323 (S.D.N.Y. 2011) (quoting *United States v. N.Y. State Bd. of Elections*, 312 Fed. App'x 353, 354 (2d Cir. 2008)).

### 1.    *The Proposed Intervenors' Motion to Intervene is Timely*

Courts do not impose a bright line rule in determining whether a motion to intervene is timely under Rule 24(a). *See Dow Jones & Co. v. United States Dep't of Justice*, 161 F.R.D. 247, 251 (S.D.N.Y. 1995). Instead, courts evaluate the following factors:

> (1) [T]he length of time the applicant knew or should have known of his [or her] interest before making the motion; (2) prejudice to existing parties resulting from the applicant's delay; (3) prejudice to applicant if the motion is denied; and (4) presence of unusual circumstances militating for or against a finding of timeliness.

*See United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987); *see also Dow Jones & Co.*, 161 F.R.D. at 252 (finding a motion to intervene timely even though the applicant did not file its motion until eighteen days after the court issued summary judgment and noting that post-judgment intervention may be timely); *Windsor*, 797 F. Supp. 2d at 324 (finding a motion to intervene timely when it was filed 160 days after the complaint was filed).

Here, the Proposed Intervenors' Motion to Intervene is timely. The Plaintiffs filed their Complaint on February 26, 2020; the period between when the Plaintiffs filed their Complaint and the Proposed Intervenors filed their Motion to Intervene is far shorter than the 160 day period that this Court found permissible in *Windsor*. *See Windsor*, 797 F. Supp. 2d at 324. The Proposed Intervenors properly waited here until after the Court resolved the Article III standing issues, as to which the Proposed Intervenors took no position. If the Court had granted the Department's motion

to dismiss, then there would have been no need for the Proposed Intervenors to participate in the case. Once the Court denied the Department's motion, the Proposed Intervenors filed their Motion promptly, within a week after the Court set its briefing schedule on the merits.  The Proposed Intervenors are prepared to file their motion for summary judgment and opposition to the States' motion according to the schedule that the Court set during the June 3, 2020 Conference Call, which they do not seek to delay.

Moreover, neither the Plaintiffs nor the Department will suffer any prejudice from the Proposed Intervenors' Motion to Intervene at this time. The Proposed Intervenors seek to join the case 12 days before the Plaintiffs' motion for summary judgment is due, 37 days before any opposition and cross-motion from the Defendants would be due, and 49 days before any cross-opposition and Reply by the Plaintiffs must be filed. Thus, there is ample time for the Proposed Intervenors to participate in the merits of the case, without prejudice to the parties. And of course the Court has not yet ruled on any of the substantive merits in this lawsuit. *See Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, No. 1:17-cv-00817-DLF, ECF No. 33 (D.D.C. 2018) (granting an applicant's motion to intervene where the court had not yet ruled on any substantive matters in the lawsuit, noting that "intervention will not unduly delay or prejudice the adjudication of the original parties' rights"). The Motion to Intervene is therefore timely under Rule 24(a).

2.   *The Proposed Intervenors Have an Interest in the Department's Ability to Implement the Joint Employer Rule.*

An applicant must assert an interest that is "direct, substantial, and legally protectable." *New York News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992). An applicant has a direct and substantial interest under Rule 24(a) in the validity of an agency rule when the rule would affect the applicants' economic status or the way the applicants conduct their business. *See N.Y. Pub. Interest Research Grp. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 351-52 (2d Cir. 1975) [hereinafter

7

*NYPIRG*]. Moreover, intervening organizations may properly assert the interests of their members. *See id.* at 352.

Here, the Proposed Intervenors individually and collectively have a strong interest in opposing the Plaintiffs' complaint and defending the Joint Employer Rule. As more specifically detailed in the attached individual public comments submitted by each of the Proposed Intervenors to the Administrative Record (see attached exhibits A through E), the Proposed Intervenors will suffer direct adverse impact if the previous Department rule or guidance are reinstated, and will benefit economically from a declaration that the rule is valid. *Compare* 85 Fed. Reg. 2820 (noting the benefits of the Joint Employer Rule to businesses and to the economy overall), *with NYPIRG*, 516 F.2d at 351-52 (noting that one reason for the agency rule at issue in the lawsuit was to "protect[] the economic interests of certain pharmacists").

The IFA described the economic impact of the prior joint employer rule in the comment they submitted to the Department during the notice and comment period:

> Almost three-quarters of franchisors surveyed (74%) indicated that changes in behaviors around guidance, training, performance standards, and other policies impacted their bottom line. Perhaps more troubling, over three out of four franchisors (77%) indicated that the threat of joint employer liability had directly increased their legal costs, including defending joint employer claims and adapting policies and operations to minimize the risk of joint employer liability.

*See* IFA Comment (Exhibit A), at 12-13.

Similarly, the Chamber emphasized the economic consequences of the prior joint employer rule, while highlighting the benefits of the revised Joint Employer Rule:

> Collective actions under the FLSA are expensive, time- and resource-consuming endeavors that can take years to resolve. If an employee or plaintiff's attorney can simply name a large business in a complaint and survive a motion to dismiss based on a vague or uncertain joint employer test, an entity may be tied up in litigation even when it is clearly not a joint employer under a test like *Bonnette*. The Proposed Rule's simplicity and clarity will reduce this risk and ensure that employers will not suffer liability merely because of they use one of the myriad productive, arms-

length business relationships that make the American economy thrive.

*See* Chamber Comment (Exhibit B), at 2.

IFA public comments further articulated its interests in supporting the Joint Employer Rule by explaining the manner in which franchising has become a significant contributor to the growth of the economy and creator of small business expansion and jobs. That growth has been imperiled by recent expansion of the joint employer tests, relying in part on the outdated 1959 text of the previous rule, which did not address the franchise business model. The number of different standards and factors employed inconsistently by regulators and courts around the country has "bewildered and frustrated employers seeking to operate franchise businesses efficiently and profitably, without inadvertently creating joint employment. \*\*\* [T]he Department's current, outdated rule has played a significant role in creating the judicial confusion described above on the joint employment issue…." IFA Comments (Exhibit A) at 8-9.

The interpretations (and misinterpretations) of the prior joint employer rule by government regulators and some courts have hindered franchisors' efforts "to maintain[] a brand's reputation" without potentially exposing them to joint employer liability. *Id.* at 8, 11 (noting that the prior rule created significant problems for franchisors in the event of a franchisee's employee's misconduct: "the franchisor was left with the difficult choice of either: (a) doing nothing and hoping that the franchisee would address and resolve the situation in a manner that was satisfactory to the franchisor; or (b) communicating with the franchisee to ensure that the situation would be resolved without damage to the brand").

Efforts to "maintain[] a brand's reputation" are "not merely an essential element of franchising." *See id.* at 2, 8. Rather, "[t]he Lanham Act, the federal law regulating trademarks, service marks, and unfair comp[etition], mandates that owners of trademarks," such as franchisors,

"maintain[] sufficient control of the licensee's use of the mark to assure the nature and quality of foods or services that the licensee distributes under the mark." *See id.* at 2 (quoting 15 U.S.C. § 1064(5)(A)). Failing to maintain requisite control may cause the franchisor to "abandon" their trademark. *See id.* (quoting 15 U.S.C. § 1127). As such, the prior joint employer rule placed franchisors in the virtually impossible position of incurring joint employer liability if they exerted too much control over their brand, or abandoning their trademark if they exerted too little control over their brand.

IFA's members are particularly concerned about the harms caused by dealing with the proliferation of class action lawsuits claiming joint employer status, and their frustration in being unable to obtain clarity in the application of the Department's previous rule. In particular, the previous outdated standard made it harder to resolve crises that jeopardize franchise brands. *Id.* at 9-10. The old rule's expansive joint employer standard imposed under the old rule also forced franchisors to eliminate or curtail vital training and support to franchisees. *Id.* at 11-12 ("IFA's Franchise Survey indicated that the increased threat of a joint employer finding led over 84% of the respondent franchisors to change its interactions with franchisees around training and compliance."). The previous regulatory guidance similarly forced franchisors to compromise or restrict their relationships with new, disadvantaged franchisees. *Id.* at 13-14.

The previous regulation and inconsistent court rulings also directly harmed franchisees, many of whom are small businesses lacking the tools to comply with regulatory burdens. Until DOL's change in the joint employment rule, franchisor training of franchisees has been curtailed, previous collaboration between franchisors and franchisees was lost, and franchisees lost sales and increased costs. *Id.* at 14-16. Indeed, the prior joint employer rule "directly impacted franchisor costs, revenues, and profits" according to surveyed franchisors. *See id.* at 12-13. A recent study of

the economic impact of expanded joint employer standards concluded that the standard had a significant adverse impact on the US. Economy, equivalent to a loss of output of $17.2 billion to $33.3 billion annually for the franchise business sector and likely multiple times that for all sectors affected. *Id*. at 16.

The Chamber's interests in this proceeding are similarly outlined in the Chamber's public comments in support of the proposed rule. (Exhibit B). In its comment, the Chamber emphasized the "tangible benefits" that the proposed rule provides the business community as a whole. *See id.* at 5. The Chamber explained that the proposed rule will benefit both larger businesses, which can continue to rely on contractor business models that allow for cost-effective specialization along the supply chain, and small businesses, which rely on resources from larger business partners to help them grow. *See id.* Of particular significance are Sections d(3) and d(4), which recognize that "common forms of [business-to-business] cooperation...do not affect the joint employer analysis." *See id.* As stated in the Chamber's comment:

> These are fundamental aspects of contracts that allow a business to ensure its partnership with another will not erode its core values or endanger its brand. These broad, baseline expectations allow businesses to contract with one another with confidence that their company's core principles will not be violated.

*See id*. The Chamber also supported the proposed rule's "significant control" requirement for "encourag[ing] businesses to engage in limited oversight duties without fear of intervening in appropriate circumstances." *See id.* at 6. For these reasons as well as the grounds particular to franchises, many of whom are members of both organizations, the Chamber and its members will be directly harmed if the States' lawsuit succeeds in nullifying the Department's new Joint Employer Rule.

HRPA's interests are outlined in their public comments in support of the proposed rule as well. (Exhibit C). In its comments, HRPA applauded the proposed rule for creating "greater

certainty" for companies wishing to engage in corporate social responsibility ("CSR") initiatives. *See* Ex. C, at 4. HPRA explained that "[a]lthough companies may differ on the CSR initiatives they choose to adopt, they agree that it is critical to ensure that laws and regulations do not discourage companies from selecting suppliers that share a commitment to the same CSR initiatives that the companies hold themselves." *See id.*

NRF also submitted public comments in support of the proposed rule that demonstrate their interests in supporting the new rule. (Exhibit D). In its comments, NRF explained that retailers frequently "contract with third-party business partners to facilitate various aspects of their businesses." *See* Ex. D, at 2. Under the prior joint employer rule, however, the "the uncertainty surrounding joint employer status and its subsequent liability discourages retailers and other businesses from entering into beneficial contractual relationships with third-party business parties, inhibiting business-to-business collaboration and even job growth." *See id.* at 3. NRF further explains that retailers with national and multi-state presences struggled with "impossibly complex and burdensome compliance requirements" under the prior joint employer rule because "[t]hese entities are joint employers in some states and not joint employers in others, even though business practices are exactly the same throughout." *See id.*

ABC's interests are similarly outlined in the public comment it submitted in support of the proposed rule. (Exhibit E). In its comments, ABC highlighted the importance of recognizing that the construction industry "has long consisted primarily of specialized, separate employers who come together on specific construction projects to achieve the highest degree of productivity while maintaining their separate status from project to project." * * * "The Department's final rule must recognize that standard construction methods require project owners and/or prime contractors to exercise routine control over the site in ways that indirectly impact many employees' terms and conditions of employment, without in any legitimate sense converting the independent employers of

12

such employees into "joint employers" within the meaning of the Act." Ex. E, at 2.

Finally, AHLA's public comment submitted in support of the proposed rule similarly highlights its interests. (Exhibit F). Noting that "nearly sixty percent of hotels [are] considered small businesses," AHLA "commends" part (g) of the proposed rule, as the illustrations provided therein "will provide small businesses with the ability to gauge whether a situation they encounter involves joint employer status...which will help employers with fewer resources to comply." *See* Ex. F, at 4-5.

For all of the reasons set forth above and in the Proposed Intervenors' comments on the Proposed Rule, and as will be further articulated in the Proposed Intervenors' motion for summary judgment, the Department's new Joint Employer Rule  has properly modernized the prior joint employer rule. By codifying the four part *Bonnette* test, the Department produced a rule that is clearer and more predictable than the diverging tests adopted by other courts. The Department's efforts to list practices that should <u>not</u> lead to a finding of joint employer status are of particular importance to the Proposed Intervenors' members. *See also* 85 Fed. Reg. 2859. If the new Rule is struck down in accordance with the States' complaint, the economy will be harmed, the industries represented by the Proposed Intervenors will be harmed, and jobs will be lost in the midst of a national emergency.

Of particular significance, the Proposed Intervenors and the businesses they represent have a special interest in defending the business community against the States' misguided attack on long-established business methods as somehow inimical to compliance with the FLSA and other laws. For example, the Complaint derisively labels as "fissuring" the well settled business methods of subcontracting, outsourcing, and franchising, and specifically attacks longstanding business practices that are fundamental to the construction industry, agriculture, janitorial services,

warehousing, logistics, hospitality, and many other industries. The Complaint wrongly alleges that such practices have had a "devastating impact" on workers. In reality, the industries represented by the Proposed Intervenors have been responsible, prior to the tragic circumstances of the ongoing pandemic, for dramatic expansion of jobs and growth of small and large business opportunities benefiting the economy as a whole.

3.    *The Proposed Intervenors' Ability to Protect Their Interests Will Be Impaired Without Intervention.*

Where an applicant demonstrates a legally protectable interest in the outcome of litigation, courts have frequently found that the applicant also demonstrates that its interests will be impaired without intervention due to the effect of an adverse decision. *See, e.g.*, *Brennan v. N.Y. City Bd. of Educ.*, 260 F.3d 123, 132 (2d Cir. 2001) ("Appellants have thus satisfied the second requirement for intervention under Rule 24(a)(2). For the same reasons, appellants have also adequately 'demonstrated that the interest may be impaired by the disposition of the action'"); *N.Y. Public Interest Research Grp., Inc.*, 516 F.2d at 352 ("We think it is likewise clear that the pharmacists and the association are so situated that the disposition of the action may as a practical matter impair or impede their ability to protect their interests.").

Here, in the event that the Proposed Intervenors cannot intervene and this Court issues an adverse decision, the Proposed Intervenors will have no further recourse. A negative decision would adversely affect the Proposed Intervenors' economic interests. *See, e.g.*, IFA Comment, at 12-13; Chamber Comment, at 2. That the Court could decide to uphold the Joint Employer Rule without intervention of the Proposed Intervenors does not preclude the Proposed Intervenors from meeting the requirements of Rule 24(a)'s third prong. As this Court has held, an applicant need not show that "practical harm" "will result"; the applicant need only show only that an adverse judgment in the lawsuit at issue would cause the applicant "practical[l] harm." *Home Ins. Co.*,

14

1990 U.S. Dist. LEXIS 15762, at *13 (quoting J. Friedenthal, M. Kane & A. Miller, *Civil Procedure* § 6.10, at 370). As such, the Proposed Intervenors have demonstrated a sufficient impairment to their interests in the absence intervention.

4.    *The Department May Not Adequately Represent the Interests of the Proposed Intervenors.*

To satisfy Rule 24(a)'s final requirement, an applicant must show that the representation of its interests by the existing parties "may be" inadequate. *See Trbovich v. United Mine Workers of America, et al*, 404 U.S. 528, 538 n.10 (1972). Although the Second Circuit requires applicants to make a stronger showing that their interests are not adequately represented where they seek the same outcome as a government entity representing its constituents, that court has nevertheless found that applicants satisfy the requirements of Rule 24(a) in circumstances similar to those here. *See NYPIRG*, 516 F.2d at 352; *see also Nat'l Resources Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) (court granted motions to intervene of two trade organizations despite the presence of a federal government defendant).

In *NYPIRG*, a consumer group challenged the validity of a state agency rule that affected the pharmacy profession; subsequently, three pharmacists and a pharmaceutical society sought to intervene. *NYPIRG*, 516 F.2d at 351. The Second Circuit specifically determined that the state agency did not adequately represent the interests of the pharmacists even though both the applicants and the state agency sought to uphold the agency rule at issue:

> [W]e are satisfied that there is a likelihood that the pharmacists will make a more vigorous presentation of the economic side of the argument than would the Regents. Indeed, the Regents acknowledge that the pharmacists should have an opportunity to make their own arguments to protect their own interests as pharmacists since, as the Regents admit, their interests "may significantly differ" from those of the pharmacists. We agree.

*See id.* at 352.

Courts in other circuits similarly have determined that a government defendant may not

adequately represent the economic interests of a private party. *See, e.g.*, *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 973-74 (3d Cir. 1988) ("[T]he government represents numerous complex and conflicting interests in matters of this nature. The straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies."); *Earth Island Inst. v. Baker*, 1992 U.S. Dist. LEXIS 8604, at *4 (N.D. Cal. May 6, 1992) ("Moreover, NFI has a strong economic stake in the validity of the challenged governmental action, an interest which the government defendant cannot adequately represent.").

Such holdings apply equally to this case. Government defendants, and the Department of Labor in particular, have to consider the interests of multiple stakeholders. Private businesses, in contrast, represent a smaller and more focused group of interested parties. Thus, even where a government defendant and a private entity seek the same outcome, it is not surprising that courts often find government defendants do not adequately represent the interests of the private parties.

For example, in *Pennsylvania v. President of the United States*, the proposed intervenor, a religious organization, argued that its interests differed from the government's in upholding an executive order. *See* 888 F.3d 52, 61 (3d Cir. 2018). Although the government represented the interests of "nonprofit and for-profit religious objectors, moral objectors, and women seeking access to contraceptive services," the applicant argued that its singular focus on the executive order's moral and religious exemptions entitled it to intervene. *See id.* at 61. The Third Circuit agreed. *Id.* at 62; *see also Kane City v. United States*, 928 F.3d 877, 894-95 (10th Cir. 2019) (finding that a federal government defendant did not adequately represent the applicant, an environmental organization, because the federal government defendant represented "broad-ranging and competing interests"); *W. Energy Alliance v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017) ("Also, we have held that the government cannot adequately represent the interests of a

private intervenor *and* the interests of the public."); *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) ("Applicants seek to secure the broadest possible restrictions on recreational uses in the Study Area to protect its interest in the wilderness character, while the Forest Service has made clear its position that, while the Interim Order does not violate the MWSA, much narrower restrictions would suffice to comply with its statutory mandate.").[1]

For the reasons stated above, the Proposed Intervenors here are unlikely to receive adequate representation from the Department. The Proposed Intervenors' interests are narrower and more focused than the interests of the government. The IFA's comment, for example, specifically urged the Department to ensure that the final rule accounts for franchisor-franchisee relationships:

> The Department's final rule must avoid disrupting commonplace and necessary reservations of rights wholly unrelated to the direct control of the terms and conditions of franchisee employees' employment, but which are rather in place to ensure brand consistency and uniformity or protection of Marks. The final rule should make clear that such provisions are not indicia of a joint employer relationship. As discussed further below, *it is critical that the Department use this rulemaking as an opportunity to clarify that those exercises of "control" which are vital to the franchise model*, but may in no way touch directly on the terms and conditions of franchisee employees' employment, are *not* indicia of joint employment.

IFA Comment, at 6 (emphasis added); *see also* Chamber Comment, at 5 (highlighting the positive impact of the Proposed Rule on both large and small businesses).

The Department's discussion of the Joint Employer Rule appearing in the Federal Register

---

[1] In a recent decision within this District, *New York v. Azar*, 2019 U.S. Dist. LEXIS 129498 (S.D.N.Y. Aug. 2, 2019), the court found the Department of Health and Human Services ("HHS") could adequately defend the interests of proposed intervenors who supported one of its rules against another state challenge. The Court did not address and did not find that HHS in that case represented conflicting stakeholders as is unquestionably true of the Department of Labor in the present case. *See id.* at *21-25. Nevertheless, even without such an argument, the court in *Azar* found the adequacy of HHS's representation to be "close" and ultimately *permitted* applicants to intervene under Rule 24(b). *See id.* at *20, 27-28.

highlights that the Department does not represent the business community; rather, the Department properly considered the effect of its rules on various parties, including employees, large employers, small employers, states, and Indian tribes. *See, e.g.*, 85 Fed. Reg. 2820 ("[T]he Department[] is updating and revising the Department's interpretation of joint employer status...to promote certainty for *employers and employees*"); 85 Fed. Reg. 2851 ("Therefore, there would be *no impact on workers* in the form of lost overtime, and no transfers between employers and employees."); 85 Fed. Reg. 2853 ("[T]he revision could promote innovation and certainty in business relationships, *which also benefits employees*."); 85 Fed. Reg. 2841 ("In light of these comments [from worker representatives], the Department has decided to modify proposed § 791.2(d)(2) to make it clear that... models could be devised that... would involve the exercise of control over employees' conditions of employment and would thus make joint employer status more likely"). See also 85 Fed. Reg. 2842 (where the Department changed its determination in the final Rule on a wage "floor" issue, notwithstanding the Chamber's support, based on the input of "worker representatives" who commented on this provision).

In light of the discrepancy between the Department's and Proposed Intervenors' goals and interests, the Department cannot adequately represent the Proposed Intervenors. *See, e.g.*, *Kane City*, 928 F.3d at 894-95; *W. Energy Alliance*, 877 F.3d at 1168; *Citizens for Balanced Use*, 647 F.3d at 899; *see also Michigan State v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997) (holding the Chamber was entitled to intervene as a matter of right). Just as this Circuit recognized in *NYPIRG*, the Proposed Intervenors "will make a more vigorous presentation of the economic side of the argument" than would the Department. *See* 516 F.2d at 352.

Finally, as discussed above, the Plaintiffs' Complaint is filled with unwarranted, direct attacks on the business community, particularly those industries who are primarily represented by

the Proposed Intervenors, including franchising, construction, janitorial services, warehousing, logistics, and hospitality, as well as retail, healthcare, and manufacturing. The Complaint decries many well-established business methods that are fundamental to the success of the American economy, including the basic precepts of franchising, along with subcontracting and outsourcing, which the States' Complaint incorrectly equates with wage "theft." Complaint, ¶¶ 77-79, 131-143, 147-170.

The Complaint alleges (without support) that such practices have had a "devastating impact" on workers, when in reality the industries represented by the Proposed Intervenors have been responsible, prior to the ongoing pandemic, for one of the greatest expansions of jobs in U.S. history. The Department cannot be expected to adequately defend the Proposed Intervenors' members and the business community as a whole against such a broad-based, unfounded attack on them. Only the Proposed Intervenors have the necessary business focus and economic expertise to adequately defend against the Plaintiff States' unjustified attacks against the business community.

B.    **Alternatively, this Court Should Permit the Proposed Intervenors to Intervene under Rule 24(b)(1).**

If the Court determines that the Proposed Intervenors are not entitled to intervene as of right under Rule 24(a), the Court should alternatively grant permissive intervention under Rule 24(b). In evaluating whether to permit intervention under Rule 24(b), courts look to whether (1) the motion is timely; (2) the claims or defenses share a common question of law or fact with the main action. *See New York v. Azar*, 2019 U.S. Dist. LEXIS 129498, at *26 (S.D.N.Y. Aug. 2, 2019).

The Proposed Intervenors satisfy the test for permissive intervention. As discussed above, the Proposed Intervenors' Motion to Intervene is timely. Similarly, the arguments that the Proposed Intervenors wish to present—that the economic and business needs of the country as a

19

whole fully justify the Joint Employer Rule and help to show why it does not violate the Administrative Procedure Act. Certainly the expertise being brought to bear on this issue by the broad-based business groups representing the many diverse business interests of their members, will benefit the Court and assist it in addressing the primary questions in this lawsuit.

In *New York v. Azar*, this Court permitted applicants to intervene as defendants in support of a Department of Health and Human Services rule after noting that "there is no palpable harm in permitting this participation." *See* 2019 U.S. Dist. LEXIS 129498, at *27-28. There is similarly no harm in permitting the IFA and the Chamber to participate, and "[i]ntervention [would] not unduly delay, or prejudice, the adjudication of the original parties' rights," or "occasion any revision of the existing schedule." *Id.* at *27-28; *see also Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 103-04 (D. Conn. 2007) ("[I]ntervention will not prejudice any of the parties nor will it unduly delay the adjudication. In fact, the additional briefing and argument will only help to facilitate a speedy, fair and accurate resolution of the case."). As discussed above, the Proposed Intervenors are prepared to file their motion for summary judgment by the same time (July 17) as the Department's motion.

Therefore, this Court should exercise its discretion to permit the Proposed Intervenors to intervene, even if it determines that they are not entitled to intervene as of right.

## III.    **CONCLUSION**

For all of the reasons set forth above, the Proposed Intervenors respectfully request that the Court grant this Motion and permit the Proposed Intervenors to intervene in the underlying lawsuit.

Respectfully submitted,


*/s/ Eli Freedberg*

Eli Freedberg (Bar No. 4175816)
900 Third Avenue
New York, NY 10022-3298
Telephone: (212) 583-9600
Facsimile: (2120 832-2719

Maurice Baskin (pro hac vice movant)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW, Ste. 400
Washington, D.C., 2006
Telephone: (202) 842-3400
Facsimile: (202) 842-0011
mbaskin@littler.com

*Counsel for International Franchise
Association and U.S. Chamber of Commerce*

Steven P. Lehotsky (pro hac vice movant)
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
(202) 463-5346 (fax)
slehotsky@uschamber.com

*Counsel for Chamber of Commerce of the
United States of America*

## CERTIFICATE OF SERVICE

Counsel certifies that is filing this motion and memorandum in support, plus attached exhibits from the Administrative Record by ECF filing, with electronic service to counsel for all parties.


*/s/Eli Freedberg*