# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON, | No. 1:20-cv-01689-GHW |
| Plaintiffs, | |
| v. | ORAL ARGUMENT REQUESTED |
| EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 1

    I.    The Fair Labor Standards Act deliberately established a broad definition of the employer-employee relationship............................................................................... 1

    II.    Courts have consistently relied on the interrelated definitions of "employ," "employee," and "employer" to determine joint employment under the FLSA..... 4

    III.    DOL's joint employment standard has consistently relied on judicial interpretations. .................................................................................................... 5

    IV.    The Final Rule..................................................................................................... 7

STANDARD OF REVIEW ..................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    The States have standing based on economic injuries to their proprietary interests.. ......................................................................................................... 10

        A.  The Final Rule will cause the States to lose tax revenue. ..................................... 11

        B.  The Final Rule will cause the States to incur administrative and enforcement costs................................................................................................................... 12

    II.    The Final Rule is contrary to law.......................................................................... 13

        A.  The Final Rule violates the text of the FLSA. ..................................................... 13

        B.  The Final Rule defies the FLSA's purpose. ........................................................ 17

        C.  The Final Rule contradicts Supreme Court precedent. ........................................ 19

    III.    The Final Rule is arbitrary & capricious................................................................ 21

        A.  DOL failed to justify its change in position......................................................... 22

        B.  DOL failed to adequately consider the harm to workers, ignoring the record before it. ........................................................................................................................ 26

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Alliance Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ............................................................................................12

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ..............................................................................................30

*Barfield v. N.Y. City Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008) ............................................................................................7, 14

*Baystate Alt. Staffing, Inc. v. Herman*,
   163 F.3d 668 (1st Cir. 1998) ..................................................................................................2

*Bonnette v. Cal. Health & Welfare Agency*,
   704 F.2d 1465 (9th Cir. 1983) ...........................................................................5, 23, 24, 25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................................9

*CFTC v. Schor*,
   478 U.S. 833 (1986) ..............................................................................................................18

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ................................................................................................................9

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ..............................................................................................10, 12, 13

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018) ............................................................................................................2

*Falk v. Brennan*,
   414 U.S. 190 (1973) ..............................................................................................................14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..............................................................................................................22

*Fleming v. Demeritt Co.*,
   56 F. Supp. 376 (D. Vt. 1940) ................................................................................................3

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) ................................................................................................30

*Hall v. DIRECTV, LLC*,
  846 F.3d 757 (4th Cir. 2017) ...................................................................................24

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
  139 S. Ct. 628 (2019) .............................................................................................18

*Herman v. RSR Sec. Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999) ..................................................................14, 17, 24

*Huntington Hosp. v. Thompson*,
  319 F.3d 74 (2d Cir. 2003) .....................................................................................15

*In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*,
  683 F.3d 462 (3d Cir. 2012) ...................................................................................21

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996) ...............................................................................26

*Johns v. Stewart*,
  57 F.3d 1544 (10th Cir. 1995) ...............................................................................24

*Kimble v. Marvel Entm't, LLC*,
  135 S. Ct. 2401 (2015) .............................................................................................20

*Layton v. DHL Exp. (USA), Inc.*,
  686 F.3d 1172 (11th Cir. 2012) .............................................................................21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................10

*Make the Rd. New York v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019) ...........................................................................28

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) .......................................................................................27, 28

*Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*,
  536 F.3d 640 (7th Cir. 2008) .................................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................22, 23, 27

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) .................................................................................................15

*New York v. Dep't of Commerce*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................................10

*New York v. Dep't of Health & Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019), *appeal filed*, No. 20-41 (2d Cir. Jan. 3,
  2020) .................................................................................................................................9

*New York v. Mnuchin*,
  408 F. Supp. 3d 399 (S.D.N.Y. 2019) ............................................................................11

*New York v. Scalia*,
  1:20-CV-01689-GHW, 2020 WL 2857207 (S.D.N.Y. June 1, 2020) ........................... passim

*New York v. U.S. Dep't of Labor*,
  363 F. Supp. 3d 109 (D.D.C. 2019) ..........................................................................11, 13

*NRDC v. FDA*,
  710 F.3d 71 (2d Cir. 2013) .............................................................................................10

*People v. Sheffield Farms-Slawson-Decker Co.*,
  121 N.E. 474 (N.Y. Ct. App. 1918) .................................................................................4

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ..........................................................................................................30

*Powell v. U.S. Cartridge Co.*,
  339 U.S. 497 (1950) ..........................................................................................................2

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947) ..................................................................................................... passim

*S.E.C. v. Chenery*,
  318 U.S. 80 (1943) ..........................................................................................................23

*Salinas v. Commercial Interiors, Inc.*,
  848 F.3d 125 (4th Cir. 2017) ...........................................................................4, 13, 15, 21

*Sanford v. Main St. Baptist Church Manor, Inc.*,
  327 F. App'x 587 (6th Cir. 2009) ...................................................................................24

*Sekhar v. United States*,
  570 U.S. 729 (2013) ........................................................................................................16

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ..........................................................................................18

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ....................................................................................................10

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ............................................................................................................16

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................................10

*Swanson v. Am. Airlines Inc.,*
    213 F.3d 638 (Table), 2000 WL 554640 (5th Cir. 2000) ........................................17

*Tony and Susan Alamo Foundation v. Sec'y of Labor,*
    471 U.S. 290 (1985) ..............................................................................................2

*Torres-Lopez v. May,*
    111 F.3d 633 (9th Cir. 1997) ....................................................................14, 21, 23

*United States v. Latham,*
    754 F.2d 747 (7th Cir. 1985) ................................................................................17

*United States v. Rosenwasser,*
    323 U.S. 360 (1945) ............................................................................................14

*Walling v. Am. Needlecrafts,*
    139 F.2d 60 (6th Cir. 1943) ................................................................................18

*Zheng v. Liberty Apparel Co. Inc.,*
    355 F.3d 61 (2d Cir. 2003) .............................................................5, 7, 16, 20, 21

**FEDERAL STATUTES**

5 U.S.C.
    § 706 .....................................................................................................................9

29 U.S.C.
    § 202 .....................................................................................................................2
    § 203 ............................................................................................................passim
    § 206 .....................................................................................................................2
    § 207 .....................................................................................................................2

29 U.S.C.
    §§ 1801 *et seq.* ...............................................................................................18, 19

**FEDERAL REGULATIONS**

29 C.F.R. § 500.20(h) ...............................................................................................6

29 C.F.R. § 785.2 .....................................................................................................25

*Migrant and Seasonal Agricultural Worker Protection Act,* 62 Fed. Reg. 11,734
    (Mar. 12, 1997) ......................................................................................................6

*Joint Employer Status Under the Fair Labor Standards Act,* 85 Fed. Reg. 2820
    (Jan. 16, 2020) (to be codified at 29 C.F.R. §§ 791.1–791.3) .........................passim

*Joint Employment Relationship Under Fair Labor Standards Act of 1938*, 23 Fed. Reg. 5905 (Aug. 5, 1958)................................................................................5, 22

Notice of Proposed Rulemaking, *Joint Employer Status Under the Fair Labor Standards Act*, 84 Fed. Reg. 14,043, 14,050 (Apr. 9, 2019)........................................4

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................9

**MISCELLANEOUS AUTHORITIES**

81 Cong. Rec. 7657 (1937)................................................................................14

81 Cong. Rec. 7921 (1937)................................................................................3

Administrator's Interpretation No. 2014-2, 2014 WL 2816951 (June 19, 2014)........................6

Administrator's Interpretation No. 2016-1, 2016 WL 284582 (Jan. 20, 2016)........................16

Frankfurter, J., Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527 (1947)................................................................................16

H.R. Rep. 97-885, 1982 U.S.C.C.A.N. 4547................................................................19

*Joint Hearings Before the S. Comm. on Educ. and Labor and the H. Comm. on Labor on S. 2475 and H.R. 7200*, 75th Cong. Part 1 (June 2 to June 5, 1937)........................3

Kati L. Griffith, *The Fair Labor Standards Act At 80: Everything Old Is New Again*, 104 Cornell L. Rev. 557 (2019) ................................................................2, 3, 4

Restatement (Second) of Agency § 2 (1958)................................................................2, 17

S. 2475, 75th Cong. (1937)................................................................................3

S. Rep. No. 75–884 (1937) ................................................................................2

S. Rep. 884, 75th Cong., 1st Sess. (July 6 (calendar day July 8), 1937) ........................3

## INTRODUCTION

During the past several decades, businesses have increasingly outsourced work to subcontractors and staffing agencies, which depresses wages and worsens working conditions. Rather than recognize these realities and act to protect workers—in keeping with its stated mission to foster, promote, and develop the welfare of wage earners—the U.S. Department of Labor ("DOL") has decided to accelerate this trend, promulgating a rule that benefits employers at the expense of employees.  Joint employment liability provides crucial protection for workers to recover wages from businesses that benefit from their labor and substantially influence their working conditions.  In drastically narrowing the joint employer standard, the rule betrays the text and purpose of the Fair Labor Standards Act and reveals unreasoned decisionmaking.  DOL turns its back on 80 years of precedent and the people it is meant to protect, ignoring Congress's intent to prevent businesses from escaping liability through creative means and the significant harms that workers will endure as a result.  Its purported goals of increasing predictability and certainty for businesses do not justify the rule; nor will those goals actually be served.

As the rule took effect, the coronavirus pandemic wreaked havoc on the nation.  The States bringing this challenge asked DOL to stop implementation of the rule given the economic devastation wrought by COVID-19.  Indeed, an unprecedented 45 million people have filed new claims for unemployment insurance since mid-March.  But DOL refused to delay the rule's effective date.  The States now respectfully request that the Court invalidate the new rule.

## STATEMENT OF FACTS

### I.      The Fair Labor Standards Act deliberately established a broad definition of the employer-employee relationship.

Congress enacted the Fair Labor Standards Act ("FLSA") in 1938 to "protect the fundamental interests of free labor and a free people" by allowing "only goods which have been

produced under conditions which meet the minimum standards of free labor" to be "admitted to interstate commerce." *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 516 (1950) (quotation omitted) (superseded by statute on other grounds); *see also* 29 U.S.C. § 202.  The FLSA was meant to eradicate the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health."  S. Rep. No. 75–884, at 4 (1937).  The FLSA accomplishes these goals by requiring all employers to pay at least a federally prescribed minimum wage, and an overtime premium for all hours worked over forty in a given workweek.  29 U.S.C. §§ 206(a), 207(a).

The Supreme Court has construed the statute "liberally to apply to the furthest reaches consistent with congressional direction."  *Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 296 (1985).[1]  In particular, by broadly defining the terms "employ," "employee," and "employer," Congress intended to provide protection for workers who, prior to the FLSA's enactment, were not deemed to be within the scope of employer-employee relationships. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).  The "remedial purposes of the FLSA require courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications."  *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) (internal quotation omitted).[2]

In drafting the FLSA, Congress intended to reduce incentives for businesses to use intermediaries or change form in order to escape coverage.  *See* Kati L. Griffith, *The Fair Labor*

---

[1] *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018), is not to the contrary; there, the Court held that "exemptions to the FLSA" should be given a "fair reading" rather than construed narrowly.

[2] The common law only recognizes relationships between an employer and an employee when a principal employs an agent to perform service in its affairs and "controls or has the right to control the physical conduct of the other in the performance of the service." Restatement (Second) of Agency § 2 (1958).

*Standards Act At 80: Everything Old Is New Again*, 104 Cornell L. Rev. 557, 571–73 (2019). To do so, Congress created a framework flexible enough to withstand the tides of ever-evolving business models. *Id.* In the first iteration of the FLSA introduced in May 1937, proposed § 6(a) created a board to administer the Act and gave that board the power to determine whether an employer was attempting to circumvent coverage "through the use of agents, independent contractors, subsidiary or controlled companies . . . or by any other means or device." *Id*. at 572 (quoting S. 2475, 75th Cong. § 6(a) (1937)). Congress ultimately rejected any list of specified methods of evasion in favor of a broad, flexible concept of employment. *Id.* at 573–80.[3]

The definition of "employee" was "unquestionably designed to comprehend all the classes of relationship which previously had been designated individually, and regarded as likely means for attempts at circumvention of the Act." *Fleming v. Demeritt Co.*, 56 F. Supp. 376, 381 (D. Vt. 1940). "Thus in its report accompanying the bill, the Committee pointed out that it had revised the definition 'to include all employees with the exception of persons employed in a bona-fide executive . . . capacity.'" *Id.* (quoting S. Rep. 884, 75th Cong., 1st Sess., 6 (July 6 (calendar day July 8), 1937)).

---

[3] Congressional debate reveals legislators' concerns about businesses using creative means to avoid liability. In Joint Hearings on the bill, Rep. William Fitzgerald feared the bill might push "unfair manufacturers" to "extend the home work racket in this country by taking work out of the factory and putting it into the homes at miserable wages." *Joint Hearings Before the S. Comm. on Educ. and Labor and the H. Comm. on Labor on S. 2475 and H.R. 7200*, 75th Cong. Part 1 at 77 (June 2 to June 5, 1937). Then-Assistant Attorney General Robert H. Jackson responded that "home work" would be swept up by the bill, explaining that "the factory which sends out and makes use of people in their homes are [sic] not exempted just because they are using premises they do not pay any rent for." *Id.* Sen. Robert La Follette expressed a similar concern over businesses exploiting loopholes: "I am opposed to [an exemption] lest it might provide a device whereby employers could, through a commission arrangement, take themselves out from under the terms of the bill." 81 Cong. Rec. 7921 (1937).

The history of the definition of "employ" used in the FLSA—to suffer or permit to work–further underscores Congress's intent to prevent evasion of the FLSA through outsourcing.  The definition was derived from the child labor statutes of thirty-two states and the District of Columbia.  *Rutherford*, 331 U.S. at 728 n.7.  The language creates a nondelegable responsibility to establish compliant working conditions.  *See People v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 476 (N.Y. Ct. App. 1918) (explaining that an employer "may not escape" the commands of a New York child labor law by delegating his duties as an employer to others).  It is clear that Congress foresaw potential attempts by employers to shirk their responsibilities to employees through webs of contracting agreements and intended to stop those attempts in their tracks by focusing the FLSA on the realities of employment.[4]

## II.     Courts have consistently relied on the interrelated definitions of "employ," "employee," and "employer" to determine joint employment under the FLSA.

The FLSA's definitions of "employ," "employee," and "employer" "work in harmony."  Notice of Proposed Rulemaking, *Joint Employer Status Under the Fair Labor Standards Act*, 84 Fed. Reg. 14,043, 14,050 (Apr. 9, 2019).  "'Employ' includes to suffer or permit to work."  29 U.S.C. § 203(g).  An "'employee' means any individual employed by an employer."  *Id.* § 203(e)(1).  "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d).  "Congress repeatedly has reaffirmed that the FLSA's definitions of 'employ,' 'employee,' and 'employer' dictate that two or more entities can constitute 'joint employers' for purposes of the FLSA."  *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 135 (4th Cir. 2017).

---

[4] Congress also considered and rejected proposals specifying threshold limits on the number of employees to prevent businesses from splintering into networks of smaller units to avoid FLSA coverage.  *See* Griffith, *The Fair Labor Standards Act At 80*, 580–87.

Courts have relied on all three, interrelated definitions to determine the scope of joint employment liability.  Indeed, in the Supreme Court's seminal decision in *Rutherford*, it observed that "there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the employer-employee relationship under the Act."  *Rutherford*, 331 U.S. at 728. The Court relied not on "isolated factors but rather upon the circumstances of the whole activity" to determine workers employed by an intermediary were also employees of the slaughterhouse that contracted with the intermediary.  *Id.* at 728, 730.

Consistent with *Rutherford*, in this Circuit, the joint employer determination is "to be based on the circumstances of the whole activity viewed in light of economic reality."  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71 (2d Cir. 2003) (quotations omitted).  The *Zheng* Court rejected a four-factor test from *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) that "focuses solely on the formal right to control" as "unduly narrow," holding that a test consisting of *only* the *Bonnette* factors and requiring a positive finding on each, is incompatible with the Supreme Court's decision in *Rutherford*.  *Zheng*, 355 F.3d at 69.

### III.   DOL's joint employment standard has consistently relied on judicial interpretations.

For more than 80 years, DOL has consistently relied on judicial interpretations of the FLSA to determine whether a joint employment relationship exists.  DOL originally codified the joint employment standard at 29 C.F.R. §§ 791.1–791.2 in 1958, making clear that it relied on the related definitions of "employ," "employee," and "employer."  *Joint Employment Relationship Under Fair Labor Standards Act of 1938*, 23 Fed. Reg. 5905 (Aug. 5, 1958). Section 791.2 begins: "A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering

into an employment relationship with a different employer." *Id.* at 5906.  As such, whether one is a joint employer "depends upon all the facts in the particular case." *Id.*

In 1997, DOL issued regulations defining joint employment under the Migrant and Seasonal Agricultural Worker Protection Act ("MSPA Regulations"), a statute that incorporates the FLSA's definitions of "employ," "employee," and "employer."  29 C.F.R. § 500.20(h).  The MSPA Regulations explain that, under the statute, the "definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act" and, in particular, that "[i]n determining whether or not an employment relationship exists between the agricultural employer/association and the agricultural worker, the ultimate question to be determined is the economic reality—whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." *Id.* § 500.20(h)(5)(iii).  In promulgating the MSPA Regulations, DOL explained that "the courts have given an expansive interpretation to the statutory definition of employ under the FLSA" and reviewed Supreme Court and appellate court jurisprudence relating to the definition of employee and the joint employment doctrine.  62 Fed. Reg. 11,734, 11,745 (Mar. 12, 1997).

In 2014, DOL again explained that "[w]hether an entity is an employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court and other federal appellate courts interpreting the Act."  Administrator's Interpretation No. 2014-2, "Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act," 2014 WL 2816951, at *2 (June 19, 2014) (withdrawn Mar. 10, 2020).

And in 2016, DOL reaffirmed its longstanding reliance on judicial precedent, reflecting that "[t]he growing variety and number of business models and labor arrangements have made joint employment more common."  Administrator's Interpretation No. 2016-1, "Joint

employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act," 2016 WL 284582 (Jan. 20, 2016) (withdrawn June 7, 2017) ("2016 AI") (citation omitted).  DOL explained that the joint employer inquiry, in the context of a subcontracting relationship, is concerned with the "economic realities," that is, whether the worker is "economically dependent on, and thus employed by, another entity involved in the work."  *Id.* at \*2.  DOL pointed to *Zheng*, 355 F.3d 61, and *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143–49 (2d Cir. 2008), among other cases, explaining that the "joint employment analysis must be an economic realities analysis and cannot focus only on control." *Id.* \*9.  "The particular economic realities factors relied upon differ somewhat depending on the court, and courts routinely note that other additional relevant factors may be considered, but regardless, it is not a control test."  *Id.*

### IV.    The Final Rule

DOL published a Notice of Proposed Rulemaking on April 9, 2019, which elicited over 57,000 comments and drew strong opposition from organizations advocating for workers—*i.e.*, the individuals the FLSA protects—including, for example, comments from: AFL-CIO; Economic Policy Institute; Farmworker Justice; Greater Boston Legal Services; Low Wage Worker Legal Network; National Employment Law Project; National Employment Lawyers Association; National Women's Law Center; SEIU; Southern Migrant Legal Services; and United Brotherhood of Carpenters and Joiners of America.  *See* Exs. 1, 3–6, 8–10, 12–13, 15. DOL promulgated the rule challenged in this case on January 16, 2020, with an effective date of March 16, 2020.  *Joint Employer Status Under the Fair Labor Standards Act*, 85 Fed. Reg. 2820 (Jan. 16, 2020) (to be codified at 29 C.F.R. §§ 791.1–791.3) ("Final Rule" or "Rule").

In issuing the Rule, DOL claimed that the prior, longstanding joint employer rule "does not provide adequate guidance for the most common joint employer scenario under the Act—

where an employer suffers, permits, or otherwise employs an employee to work, and another person simultaneously benefits from that work." *Id.* at 2820. Deviating from 80 years of precedent and DOL's own interpretations, the Rule provides only four factors that DOL finds relevant to the joint employer inquiry, modified from *Bonnette*—whether the putative employer:

(i) Hires or fires the employee;
(ii) Supervises and controls the employee's work schedule or conditions of employment to a substantial degree;
(iii) Determines the employee's rate and method of payment; and
(iv) Maintains the employee's employment records.

*Id.* at 2859. The Rule clarifies that the "potential joint employer must actually exercise—directly or indirectly—one or more of these indicia of control to be jointly liable under the Act." *Id.* The Rule permits consideration of other factors "only if they are indicia of whether the potential joint employer exercises significant control over the terms and conditions of the employee's work." *Id.* The Rule cites the 2016 AI but does not explain its about-face in position from an "economic realities" test to requiring the actual exercise of significant control. *See id.* at 2822–23 & n.38.

The Final Rule categorically excludes certain factors as irrelevant, such as those "used to assess economic dependence," including: whether the employee "is in a specialty job or a job that otherwise requires special skill"; "has the opportunity for profit or loss"; "invests in equipment or materials"; and "the number of contractual relationships . . . that the potential joint employer has entered into to receive similar services." *Id.* at 2859. While recognizing that "some business models could be more likely to involve joint employers"—though making no attempt to quantify this, *id.* at 2841—the Rule also prohibits the consideration of whether the potential joint employer uses a franchise or brand and supply model, and of certain contractual terms between businesses—such as mandating compliance with legal obligations, establishing policies, or requiring training. *Id.* at 2859. Considering other business arrangements, such as

providing a sample employee handbook, allowing a business to operate on the premises, and

joint participation in a health or retirement plan, among others, is also prohibited.  *Id.*  DOL

reasons that "other factors remain the true test of whether a particular business using such

models is indeed a joint employer."  *Id.* at 2841.  Indeed, the Rule's preamble explains that:

> [b]usinesses should not be discouraged from entering into and enforcing against
> other businesses such contractual agreements out of fear that encouraging
> compliance with health, safety, or legal obligations among their suppliers,
> vendors, sub-contractors, or franchisees will cause them to be considered joint
> employers of the employees of these other businesses.

*Id.* at 2842.

In the Rule, DOL "acknowledges that there may be transfers from employees to

employers."  *Id.* at 2821.  But DOL claimed that it "lacks the data needed to calculate the

potential amount or frequency of these transfers."  *Id.*  Likewise, "the cost-savings attributable to

this rule have not been quantified."  *Id.* at 2854.

## STANDARD OF REVIEW

Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The APA

requires "plenary review of the Secretary's decision."  *Citizens to Pres. Overton Park v. Volpe*,

401 U.S. 402, 420 (1971).

Summary judgment is proper where "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex

Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).  APA claims are particularly "amenable to

summary disposition" because "'[t]he entire case on review is a question of law.'"  *New York v.

Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (quotation omitted),

*appeal filed*, No. 20-41 (2d Cir. Jan. 3, 2020).

## ARGUMENT

### I.    The States have standing based on economic injuries to their proprietary interests.

To show standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[5] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  To satisfy the injury-in-fact requirement, a plaintiff must show either actual or imminent harm or a "concrete" risk of harm.  *Id.* at 1548; *see also NRDC v. FDA*, 710 F.3d 71, 82 (2d Cir. 2013) (requiring a "credible threat" of harm).  Allegations of a "future injury" qualify "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation omitted).  Plaintiffs meet the causation prong where third parties will likely react in predictable ways to government action.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Unless the Final Rule is vacated, the States will suffer two independent injuries traceable to the rule and redressable by the requested relief: first, the Rule will decrease the States' tax revenue; second, the Rule will impose administrative and enforcement costs on the States.

---

[5] In denying Defendants' motion to dismiss, this Court held that "[t]he States have plausibly alleged that the Final Rule will reduce their tax revenue and increase their administrative and enforcement costs."  *New York v. Scalia*, 1:20-CV-01689-GHW, 2020 WL 2857207, at *2 (S.D.N.Y. June 1, 2020) (citing 85 Fed. Reg. at 2853) ("MTD Op.").  Because a plaintiff must support standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), the States set forth here the "specific facts," *id.*, that support standing.  Because standing is jurisdictional, courts adjudicating APA challenges can and do consider evidence outside the Administrative Record for standing purposes.  *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 572–73 & n.30 (S.D.N.Y. 2019).

### A.  The Final Rule will cause the States to lose tax revenue.

"Lost tax revenues may serve as a cognizable injury-in-fact for standing purposes where an action caused a direct injury in the form of specific tax revenues, and the state articulates a fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged."  *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 125 (D.D.C. 2019); *see also New York v. Mnuchin*, 408 F. Supp. 3d 399, 409 (S.D.N.Y. 2019) ("Expected financial loss can constitute the sort of concrete and particularized injury that is capable of supporting standing.").

The Final Rule will result in more uncollectable judgments when employers violate the FLSA because the Rule reduces the number of businesses who can be held liable under the Act. *See* R. 56.1 Stmt. ¶ 6.  As this Court has recognized, DOL concedes this point, noting that the Rule "may reduce the number of businesses currently found to be joint employers" and "may reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act and, for example, their employer is or becomes insolvent."  MTD Op. at 2.  Furthermore, subcontracting entities have lower rates of compliance with wage statutes.  R. 56.1 Stmt. ¶ 8.  And the Rule reduces wage theft deterrence under the FLSA.  *Id.* ¶ 16.  Workers in the States will lose at least $66.9 million per year in wages due to wage theft caused by the Rule, resulting in a loss of at least $2.6 million in annual tax revenue for the States.  *Id.*

The Final Rule's limitation on liability will also result in lower wages for the States' workers due to increased fissuring.  Outsourced positions pay on average 10 percent less than jobs that are not outsourced.  *Id.* ¶ 17.  As employers increasingly outsource work due to the Rule, wages will decline by $460 million per year, resulting in an additional loss of at least $17.9 million in annual tax revenue for the States.  *Id.*

The Final Rule will also result in decreased contributions to the States' unemployment insurance and workers' compensation funds.  Outsourced businesses more frequently misclassify their workers.  *Id.* ¶ 18.  The Rule encourages businesses to outsource their labor, and the intermediary businesses will shirk their contributions to States' funds more frequently than would the original employers.  *Id.*  The increased wage theft caused by the Rule will amount to an annual loss of at least $879,000 in workers' compensation premiums and $176,000 in unemployment insurance taxes for the States.  *Id.* ¶ 19.  The increased workplace fissuring caused by the Rule will result in an annual loss of $6.1 million in workers' compensation premiums and an annual loss of $1.2 million in contributions to States' unemployment insurance funds.  *Id.* ¶ 20.  The predictable effect of government action on the decisions of third parties can support standing, regardless of whether third parties' decisions are lawful or even rational.  *Dep't of Commerce*, 139 S. Ct. at 2566.

### B.  The Final Rule will cause the States to incur administrative and enforcement costs.

The Final Rule will also injure the States by increasing administrative and enforcement expenses to avoid and mitigate the substantial harms that result from the Rule.

The States are reviewing current guidance on joint employment liability and will either retract or issue new or revised guidance, will develop and disseminate public education campaigns, and will conduct new training of staff members on the Final Rule.  R. 56.1 Stmt. ¶¶ 22–25, 27–28, 30–34.  Some States are undertaking or considering temporary and permanent rulemaking, which will impose several hundred hours of staff time and hundreds of thousands of dollars to fund.  *Id.* ¶¶ 22, 26, 29.  These increased burdens establish injury and confer standing. *See, e.g.*, *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the

[Final Rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself.");
*New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d at 127.

Further, the Final Rule curtails federal enforcement of joint employer liability and
simultaneously causes increased wage theft, which will force the States to fill in the gaps of
enforcement and wage collection.  *See* R. 56.1 Stmt. ¶¶ 36–46.  The increased enforcement costs
are fairly traceable to the Rule, since the States' "theory of standing . . . relies . . . on the
predictable effect of Government action on the decisions of third parties."  *Dep't of Commerce*,
139 S. Ct. at 2566.

**II.     The Final Rule is contrary to law.**

Plaintiffs are entitled to summary judgment because the Final Rule conflicts with the
FLSA and Supreme Court precedent interpreting it.

**A.  The Final Rule violates the text of the FLSA.**

The text of the FLSA imposes liability on entities that suffer or permit individuals to
work.  The Final Rule's new definition of "joint employer" provides a de facto exemption from
liability for putative employers that outsource hiring and supervision of employees.  As
discussed above, to meet DOL's novel test, the "potential joint employer must actually
exercise—directly or indirectly—one or more of [the four] indicia of control," though
satisfaction of the fourth factor alone "will not lead to a finding of joint employer status."  85
Fed. Reg. at 2859; *see also supra* 8.  This standard conflicts with the FLSA's text.

As this Court has already recognized:  "Consistent with the FLSA's 'remedial and
humanitarian' purpose, Congress adopted definitions of 'employ,' 'employee,' and 'employer'
that brought a broad swath of workers within the statute's protection."  MTD Op. at 2 (quoting
*Salinas*, 848 F.3d at 133).  The FLSA does not create two separate kinds of employers—an
"employer" and a "joint employer."  Instead, the text indicates that in any employment situation,

13

the three terms (employ, employee, and employer) must be read together to provide the broadest

protections for workers. *See* 2016 AI at *3 ("The concept of joint employment, like employment

generally, 'should be defined expansively' under the FLSA." (quoting *Torres-Lopez v. May*, 111

F.3d 633, 639 (9th Cir. 1997)). The Final Rule, however, attempts to create a separate kind of

"joint employer"—narrowing the meaning of employer where a business outsources certain

employment responsibilities to third parties. In narrowly defining employer solely for this

context, the Rule unlawfully exempts certain employers from FLSA liability.

As noted above, the FLSA defines "employ" broadly as "to suffer or permit to work." 29

U.S.C. § 203(g). An "employee means any individual employed by an employer," *id.*

§ 203(e)(1), which the Supreme Court has recognized as the "broadest . . . ever" statutory

definition. *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting 81 Cong. Rec.

7657 (1937) (statement of Sen. Hugo Black)). And the "Supreme Court has emphasized the

'expansiveness' of the FLSA's definition of employer," *Herman v. RSR Sec. Servs. Ltd.*, 172

F.3d 132, 139 (2d Cir. 1999) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)), which

"includes any person acting directly or indirectly in the interest of an employer in relation to an

employee," 29 U.S.C. § 203(d). The three terms are interrelated, and courts consider them

together in analyzing joint employment status. *See Rutherford*, 331 U.S. at 728 (citing all three

definitions in analysis of whether lead business was employer); *see also Barfield*, 537 F.3d at

140–42, 144; *Torres-Lopez*, 111 F.3d at 638. Therefore, the Final Rule's assertion that Section

203(d) is the only provision relevant to joint employment cannot be reconciled with the statute.[6]

---

[6] DOL asserts that "only section 3(d) addresses whether a worker who is an employee under the
Act has another employer for his or her work," 85 Fed. Reg. at 2821, and it "believes that section
3(d), not section 3(g), is the touchstone for joint employer status." *Id.* at 2857. But "[i]n the
other joint employer scenario under the Act—where multiple employers suffer, permit, or

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), is instructive because it distinguishes the FLSA from statutes that define "employee" but not "employ."  The Supreme Court noted, "We have often been asked to construe the meaning of 'employee' where the statute containing the term does not helpfully define it."  503 U.S. at 322.  *Darden* addressed the meaning of "employee" under ERISA, which uses the same definition as the FLSA—"any individual employed by an employer."  *Id.* at 326.  However, the Court observed that the FLSA defines "employ" expansively, "stretch[ing] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles," whereas, by contrast, ERISA does not define "employ."  *Id.*  Given the "textual asymmetry" the Court concluded that ERISA's coverage does not exceed common law boundaries.  *Id.*[7]

Under the FLSA, any individual or entity that suffers or permits an employee to work enters into an employment relationship with that employee and constitutes an employer.  The meaning of "to suffer or permit to work" was well known when adopted by Congress in 1938.  *See supra* 4.  Congress imported the "suffer or permit to work" definition of employ from state child labor statutes, which "imposed liability not only on businesses that directly employed children but also on businesses that used middlemen to illegally hire and supervise children."  *Salinas*, 848 F.3d at 133 (internal quotation omitted).  "[W]here words are employed in a statute

---

[7] otherwise employ the employee to work separate sets of hours in the same workweek—the multiple employers are joint employers if they are *sufficiently associated* with respect to the employment of the employee."  *Id.* at 2821 (emphasis added).  DOL's differing treatment of the other joint employment scenario belies its claim that only section 3(d) determines joint employer status.  And a rule that "constru[es] the same act of Congress in a totally inconsistent manner . . . . cannot stand."  *Huntington Hosp. v. Thompson*, 319 F.3d 74, 75 (2d Cir. 2003).

[7] While *Darden* addressed the term "employee" rather than "employer," there is no reason to distinguish between the two.  The *Darden* Court notes that "employee" is "completely circular."  503 U.S. at 323.  The term "employer" is also circular as it uses the word "employer" in the definition.  29 U.S.C. § 203(d).

which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. v. United States*, 221 U.S. 1, 59 (1911); *see also Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("'[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" (quoting Justice Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947))). Because Congress transplanted "to suffer or permit to work" from the child labor statutes, it clearly intended to impose liability on businesses using middlemen to hire and supervise employees.

But the Final Rule allows an individual or entity that suffers or permits an employee to work to avoid FLSA liability by limiting joint employer status to those that meet its novel four-factor test and by requiring "some actual exercise of control." 85 Fed. Reg. at 2858–59 (§ 791.2(a)(1)–(3)). As discussed, the Rule applies a modified version of the four-factor *Bonnette* test to determine joint employer status. *See supra* 8. But as this Circuit has held, the *Bonnette* test "cannot be reconciled with the 'suffer or permit' language in the statute, which necessarily reaches beyond traditional agency law." *Zheng*, 355 F.3d at 69. The Rule's four-factor test is even narrower than the common law standard, rendering it clearly inconsistent with the text of the FLSA. Accordingly, the Final Rule must be vacated and set aside.

Further, the Final Rule adopts an impermissible construction of Section 203(d). The Final Rule dictates that a person "is the employee's joint employer *only if* that person is acting directly or indirectly in the interest of the employer in relation to the employee." 85 Fed. Reg. at 2858 (§ 791.2(a)(1)) (citing 29 U.S.C. 203(d)) (emphasis added). However, Section 203(d) states that that the term employer "*includes* any person acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203(d) (emphasis added). Congress's use of the term "includes"

16

plainly contemplates other scenarios where employer status exists.  It is obvious that within the context of 29 U.S.C. § 203, the "word 'includes' is a term of enlargement not of limitation, and the reference to certain entities or categories is not intended to exclude all others."  *Swanson v. Am. Airlines Inc.*, 213 F.3d 638 (Table), 2000 WL 554640, at *1 (5th Cir. 2000) (rejecting plaintiff's argument that he was not an "employee" under provision of the Internal Revenue Code because he was neither of the explicitly enumerated categories of "employee" and "includes" was a term of limitation) (quoting *United States v. Latham*, 754 F.2d 747, 750 (7th Cir. 1985)).  Therefore, the Final Rule misconstrues 29 U.S.C. § 203(d) and must be invalidated.

**B.  The Final Rule defies the FLSA's purpose.**

The Final Rule also flouts the purpose of the FLSA.  As this Court has noted, "'Above and beyond the plain language' of the FLSA, 'the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy.'"  MTD Op. at 3 (quoting *Herman*, 172 F.3d at 139).  In enacting the FLSA, Congress sought to extend the employer-employee relationship beyond the common law boundaries of the agency relationship, which focused on whether a principal "controls or has the right to control the physical conduct the other in the performance of the service."  Restatement (Second) of Agency § 2 (1958).  The Final Rule unlawfully makes the definition of employer even narrower than the common law agency standard by requiring that the potential joint employer actually exercise control over the employee.  *Compare id. with* 85 Fed. Reg. at 2859 ("The potential joint employer must actually exercise—directly or indirectly—one or more of these indicia of control to be jointly liable under the Act.").

The Rule also undermines Congress's intent to prevent evasion of liability through creative means.  As discussed above, testimony during the House and Senate hearings on the bill shows that lawmakers were opposed to employers shielding themselves from liability through

17

use of business practices that fell outside of the traditional employer-employee relationship, such as requiring employees to work from home or paying employees on a commission basis. *See supra* n.3. Legislators concluded that in light of the statute's clear and expansive coverage over employers and their intermediaries, they did not need to include an express provision forbidding employers from "circumvent[ing] . . . the [A]ct . . . through the use of agents, independent contractors, subsidiary or controlled companies, or home or off-premise employees, or by any other means or device." *See supra* 3; *see also Walling v. Am. Needlecrafts*, 139 F.2d 60, 64 (6th Cir. 1943). The Final Rule enables businesses to dodge FLSA liability by offloading direct control over employees to intermediaries—"fly[ing] in the face" of what Congress sought to achieve. *Shays v. FEC*, 414 F.3d 76, 106 (D.C. Cir. 2005) (invalidating campaign finance regulation that facilitated circumvention of the statute).

Moreover, congressional action since the FLSA's enactment confirms that the prior joint employer interpretation was the one intended by Congress. As this Court noted, when Congress amended the FLSA in 1988 it "recognized the FLSA joint employment rule." MTD Op. at 6 n.3 (internal quotation omitted). "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846 (1986); *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 633–34 (2019) ("[W]e presume that when Congress reenacted the same language . . . , it adopted the earlier judicial construction of the phrase.").

Further, Congress explicitly endorsed the FLSA's joint employment doctrine in enacting the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801 *et seq.*

18

("MSPA").  Congress adopted the same definition of "employ" as the FLSA to ensure that the joint employer doctrine would provide protection for agricultural workers and "to make clear that it is the economic reality, not contractual labels, nor isolated factors which is to determine employment relationships" under the MSPA.  H.R. Rep. 97-885, 7, 1982 U.S.C.C.A.N. 4547, 4553; *see id.* at 6, 1982 U.S.C.C.A.N. at 4552 ("Subsection 3(5) defines the term employ as having the meaning given it under section 3(g) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(g)).  The Committee's use of this term was deliberate and done with the clear intent of adopting the 'joint employer' doctrine as a central foundation of this new statute.").

### C.  The Final Rule contradicts Supreme Court precedent.

The Final Rule also runs counter to the seminal Supreme Court decision on joint employment, *Rutherford*, 331 U.S. 722, and subsequent case law.  *Rutherford* provides the definitive test for when an employee is employed by two employers and sets forth a range of factors to determine when each employer suffers or permits an employee to work.  In *Rutherford*, a meatpacking company contracted with a meat boner who assembled a group of deboners to "be his employees" working in the company's slaughterhouse.  331 U.S. at 725.  The question posed in *Rutherford* was whether the deboners were also employed by the slaughterhouse.  The Supreme Court affirmed the Tenth Circuit's holding that the "underlying economic realities lead to the conclusion that the boners were and are employees of [the slaughterhouse]," noting that the FLSA "concerns itself with the correction of economic evils through remedies which were unknown at common law."  *Id.* at 726–27 (internal quotation omitted).

The *Rutherford* Court held that the determination of whether an employer-employee relationship existed "depend[ed] . . . on the circumstances of the whole activity," including, but not limited to: whether the slaughterhouse's activities functioned as an "integrated economic unit"; whether the workers performed a specialty job in the slaughterhouse's production line;

whether the slaughterhouse supplied the equipment and the premises for the work; whether the slaughterhouse's manager kept close touch on the operation; and whether the amount the slaughterhouse paid the workers depended on the workers' skill, initiative, and judgment. 331 U.S. at 726, 730 (internal quotation omitted). Neither the fact that the workers were hired and supervised by the contractor, *id.* at 724–25, nor the fact that the slaughterhouse "never attempted to control the hours of the boners," *id.* at 726, changed the analysis. And while not addressed by the Supreme Court, the Tenth Circuit record indicates that the slaughterhouse did not maintain the boners' employment records. *See Zheng*, 355 F.3d at 70 n.7. Additionally, the *Rutherford* Court did not consider whether the slaughterhouse was "acting in the interest of" the contractor.

The Supreme Court has held that "[a]ll [its] interpretive decisions, in whatever way reasoned, effectively become part of the statutory scheme." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015). Therefore, *Rutherford*'s conclusion that a joint employment analysis under the FLSA must examine "the circumstances of the whole activity," including the economic relationship between employees and the potential joint employer, has been part of the FLSA's scheme since 1947. As noted above, the Final Rule categorically excludes from consideration whether the employee is economically dependent on the potential joint employer, including whether the employee is in a specialty job or a job that otherwise requires special skill, initiative, judgment, or foresight—factors which led to the finding of an employer-employee relationship in *Rutherford*. 85 Fed. Reg. at 2859 (§ 791.2(c)).[8] Thus, the Rule's requirement of "some actual

---

[8] Additionally, the Final Rule states that the "potential joint employer's practice of . . . allowing the employer to operate a business on its premises . . . does not make joint employer status more or less likely under the Act." 85 Fed. Reg. at 2859 (§ 791.2(d)(5)). But in *Rutherford*, the slaughterhouse "furnish[ed] a room in its plant for the work, known as the boning vestibule," 331 U.S. at 725, and the Court noted that the work was "done at one place and under one roof," in recognizing that the slaughterhouse operations created an integrated economic unit, *id.* at 726.

exercise of control," exclusion of certain factors deemed material in *Rutherford*, and focus on other factors absent in *Rutherford* renders it illegitimate.

The Final Rule also conflicts with circuit court decisions, which have consistently followed *Rutherford*, establishing multi-factor tests which analyze the "circumstances of the whole activity," considering economic dependence and indirect control to evaluate joint employment.  *See, e.g.*, *Zheng*, 355 F.3d at 72 (announcing six nonexclusive factors and holding that "in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them"); *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 469–70 (3d Cir. 2012) (discussing nonexhaustive factors and emphasizing that joint employment "must be based on consideration of the total employment situation" (internal quotation omitted)); *Salinas*, 848 F.3d at 141–42 (discussing six nonexhaustive factors and emphasizing that the "ultimate determination of joint employment must be based upon the circumstances of the whole activity" (internal quotation omitted)); *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (considering joint employment under the FMLA, which mirrors the FLSA, and reasoning that "[a]lthough [the *Bonnette*] factors are certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important"); *Torres-Lopez*, 111 F.3d at 642–44 (applying a 13-factor test to determine joint employment under the FLSA); *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176–78 (11th Cir. 2012) (discussing eight factors as a guide to examine economic reality in determining joint employment status).

### III.    The Final Rule is arbitrary & capricious.

Beyond violating the FLSA, the Final Rule is arbitrary and capricious.  An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). An agency's explanation is deficient if it "entirely fail[s] to consider an important aspect of the problem" or "runs counter to the evidence before the agency." *Id.* And when, as here, an agency changes a prior policy, "a reasoned explanation is [also] needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

Here, DOL has departed from 80 years of deeply entrenched legal and regulatory precedent for misguided reasons, while disregarding material facts and evidence demonstrating the Rule's significant harms. *State Farm*, 463 U.S. at 43; *Fox Television*, 556 U.S. at 516. Accordingly, this Court should vacate the Final Rule.

### A.  DOL failed to justify its change in position.

Consistent with the language and purpose of the FLSA enacted in 1938, DOL's own interpretation issued in 1939, and the Supreme Court's 1947 decision in *Rutherford*, DOL adopted a holistic definition of joint employment in 1958 that required consideration of "all the facts in the particular case." 23 Fed. Reg. at 5906. DOL reaffirmed this longstanding interpretation as recently as 2016. *See supra* 6–7. Discarding that well-settled policy, the Rule identifies a test from the Ninth Circuit's 1983 *Bonnette* case that the Circuit itself no longer uses, strips it for parts while purporting to rely on it, and dismisses decades of caselaw highlighting why it is insufficient. DOL then fails to provide any reasoned explanation for taking this unfounded departure, asserting only that it "hopes to encourage greater consistency for stakeholders." 85 Fed. Reg. at 2831. DOL's stated wish not only fails to justify the Final Rule but is also baseless. The Rule will likely create more confusion and irregularity, not less.

As an initial matter, the Rule's invocation of the four-factor *Bonnette* test is both unexplained and inexplicable.  As DOL notes, the Ninth Circuit itself abandoned *Bonnette* for a far broader test in *Torres-Lopez*, 111 F.3d 633.  *See* 85 Fed. Reg. at 2822 n.27.  DOL makes no attempt to justify why it has now adopted the original *Bonnette* test, except to describe *Bonnette* as a "seminal joint employer decision" that is "supported by other case law."  *Id.* at 2830.  But, as an initial matter, this does not explain why the Rule then adopts a test that upends the *Bonnette* test.  Indeed, the Final Rule guts *Bonnette*'s first factor—"whether the alleged employer . . . had the power to hire and fire employees."  *Bonnette*, 704 F.2d at 1470.  Instead, the Rule's first factor "consider[s] only whether the potential joint employer hires or fires the employee, rather than whether the potential joint employer has the 'power' to hire or fire the employee (as *Bonnette* articulates the factor)."  85 Fed. Reg. at 2830.  This so-called "modification" shrinks *Bonnette*'s first factor beyond recognition, transforming the original *Bonnette* test while purporting to rely on its continued legitimacy.  This is not "reasoned decisionmaking."  *State Farm*, 463 U.S. at 52.

That conclusion is borne out by the fact that the Final Rule rejects or mischaracterizes *Bonnette* and its progeny in other ways, despite rhapsodizing about them.  *See S.E.C. v. Chenery*, 318 U.S. 80, 94 (1943) (holding that agency action "may not stand if the agency has misconceived the law").  In *Bonnette*, the Ninth Circuit explained that the four factors "provide a useful framework for analysis in this case, but they are not etched in stone and will not be blindly applied."  *Bonnette*, 704 F.2d at 1470.  Consistent with *Rutherford*, "[t]he ultimate determination must be based 'upon the circumstances of the whole activity.'"  *Id.* (quoting *Rutherford*, 331 U.S. at 730).  As a result, nearly every court to examine *Bonnette* has adopted additional factors beyond the four "to reflect Congress's original intent for the FLSA to extend protections beyond

common-law employment relationships."  *Hall v. DIRECTV, LLC*, 846 F.3d 757, 766 (4th Cir.

2017) (discussing cases).  If "other case law" supports any proposition, it is that limiting the joint

employment inquiry to *Bonnette*'s four-factor test has been disfavored for decades.  *See supra* 21

(collecting cases); *see also Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587,

594 (6th Cir. 2009) (applying looser five factor test); *Johns v. Stewart*, 57 F.3d 1544, 1559 n.21

(10th Cir. 1995) (noting that "[w]e have not adopted the *Bonnette* test in this circuit").

Despite conceding that "[t]here is no basis for DOL to depart from this legal precedent of

allowing the consideration of additional factors," DOL then turns around and proclaims that

"there must be limits on the consideration of additional factors."  85 Fed. Reg. at 2836.

Specifically, the Final Rule prohibits any such consideration beyond whether the potential joint

employer actually exercises control over the employee.  *Id.*  And the Rule explicitly provides that

economic dependence is irrelevant and the reserved right to control is insufficient to demonstrate

that an employer-employee relationship exists.  *Id.* at 2821.  But the gravamen of the FLSA, the

*Bonnette* test, and derivative tests is "economic reality," *see Bonnette*, 704 F.2d at 1469,

animated by "the overarching concern [that] the alleged employer possessed the *power* to control

the workers in question," not that the alleged employer actually exercised that control, *Herman*,

172 F.3d at 139 (emphasis added).  By rejecting this framework, DOL turns both *Bonnette* and

decades of judicial interpretation on their heads.

DOL asserts that its prohibitions are "sensible" because "evaluating control of the

employment relationship" is the purpose of its newfound test.  85 Fed. Reg. at 2836.  But this

assertion borders on tautology—akin to saying it is sensible to be unduly strict when adopting an

unduly strict rule.  DOL leaves unexplained why it has promulgated a test that conflicts with the

FLSA, *see supra* Part II.A. & B., MTD Op. at 3 (discussing FLSA's "expansive" definitions);

24

the Supreme Court's repeated holdings, *see supra* Part II.C., MTD Op. at 3 (explaining that "[t]he Supreme Court has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction" (internal quotation omitted)); *Bonnette* itself, *see Bonnette*, 704 F.2d at 1470 (rejecting rigid application of test); and the great weight of circuit precedent, *see supra* 21 (collecting cases).

DOL's suggestion that the Rule will encourage greater certainty and predictability is, as its own equivocal language belies, wishful thinking. The Final Rule neither eliminates the holistic tests established in different jurisdictions nor offers any basis for DOL's "hope" that the test will promote greater consistency. As an initial matter, DOL does not have the power to supersede decades of appellate court precedent. *See* 29 C.F.R. § 785.2 ("The ultimate decisions on interpretations of the act are made by the courts."). And as discussed above, nearly every circuit court applies a broad "economic reality" test. *See supra* 21, 24. As a result, courts and stakeholders alike will be forced to try to navigate between well-settled precedents and the Rule's novel test. But reconciling the two will prove impossible. Economic dependence is at the heart of economic reality tests, but irrelevant under DOL's test.

Even the minority of courts that purport to follow a stricter reading of *Bonnette* will not be able to escape the conflict between precedent and the Final Rule. Because the Rule departs from *Bonnette* by restricting the first factor and severely limiting consideration of additional factors, DOL's prohibitions render its test inconsistent with *any* test based on *Bonnette*. Far from harmonizing existing law, the Final Rule creates confusion by promulgating a new test that is

25

incompatible with every legal precedent in the country.  DOL fails to acknowledge this paradox, much less justify it.[9]

The confusion that the Rule produces does not end there.  As noted in DOL's motion to dismiss, the new regulatory standard conflicts with many States' statutory schemes that either incorporate longstanding FLSA interpretations or impose more stringent standards.  Defs' Mem., ECF No. 63, at 2–3, 8, 24.  As a result, businesses will be forced not only to try to comport with two irreconcilable standards—DOL's and the courts'—but also to account for any inconsistencies between those standards and state law.  In light of these facts, DOL's suggestion that its Rule will produce predictability and consistency is downright fanciful.  This Court should reject DOL's attempt to depart from decades of established precedent without justification.

### B.  DOL failed to adequately consider the harm to workers, ignoring the record before it.

DOL's unjustified departure from its longstanding policy is all the more egregious given its failure to consider overwhelming evidence that the Final Rule will harm workers by depressing wages and increasing wage theft.  Rather than grapple with the evidence, DOL shrugs it off by asserting that it does not have sufficient data to assess the costs to workers.  That conclusory assertion not only "entirely fail[s] to consider an important aspect of the problem,"— indeed, the *most* important aspect of the problem—but also "offer[s] an explanation for its

---

[9] The Final Rule also creates an irreconcilable conflict between the FLSA regulations and the MSPA Regulations regarding joint employment.  DOL's MSPA Regulations remain in effect and are not affected by the Final Rule.  *See* 85 Fed. Reg. at 2828 n.55.  They consider "whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee."  *See supra* 6.  As discussed above, the MSPA incorporates the FLSA's definitions of "employ," "employee," and "employer."  *Id.*  Interpreting the same language in radically different ways to determine joint employer status further shows the arbitrariness of the Rule.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) ("The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent.  This is the very meaning of the arbitrary and capricious standard.").

decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. DOL's failure to identify and weigh the Rule's serious costs against its only purported benefit—an unsound "hope" for regulatory consistency—and to respond to significant comments renders the Rule arbitrary and capricious.

As the Supreme Court has noted, "[a]gencies have long treated cost as a centrally relevant factor." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Id.* (emphasis in original). Importantly, "'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost." *Id.* Costs must be identified, considered, then weighed against any advantages, as a regulation cannot stand "if it does significantly more harm than good." *Id.* Indeed, "[o]ne would not say that it is even rational . . . to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Id.*

Here, the record before DOL is replete with data demonstrating that workers will suffer serious losses as a result of the Rule. In its comment, the Economic Policy Institute ("EPI") estimated that the Rule will cost workers $1 billion in wages *per year* due to increased outsourcing, subcontracting, and use of staffing agencies. *See* Ex. 3 at 10. Specifically, EPI explained that these practices would cause workers to lose an estimated $954.4 million due to lower wages, as well as $138.6 million due to wage theft each year. *Id.* at 4, 6, 10.

DOL neither disputes EPI's numbers or the methodology used to reach them nor, indeed, contends that the harms will not occur. To the contrary, "[t]he Department agrees that . . . [the Final Rule] may reduce the number of businesses currently found to be joint employers" and that, "[t]his, in turn, may reduce the amount of back wages that employees are able to collect

when their employer does not comply with the Act and, for example, their employer is or becomes insolvent." 85 Fed. Reg. at 2853. The result, the Rule concedes, will be "transfers from employees to employers." *Id.* at 2821.

Despite these concessions based on EPI's undisputed data, DOL asserts it "does not believe there are data to accurately quantify the impact of this rule." *Id*. at 2853. This explanation fails to meaningfully respond to EPI's estimates, dismissing the data by claiming a "belief" without providing any empirical evidence or other support to back it up. Indeed, DOL does not even attempt to explain the origin of its belief, describe any foiled efforts to gather and quantify evidence, or justify why its unfounded belief should carry the day over data that, again, DOL has not even disputed. But "it is the very definition of arbitrariness in rulemaking if an agency refuses to acknowledge (or fails to obtain) the facts and figures that matter prior to exercising its discretion to promulgate a rule." *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 60 (D.D.C. 2019). DOL's failure to quantify the harms or engage with EPI's estimates is fatal to the Rule.

Equally problematic is DOL's failure to explain why EPI's undisputed estimate of $1 billion in lost wages per year does not outweigh its only stated justification for the Rule—the entirely notional "hope[] to encourage greater consistency for stakeholders." 85 Fed. Reg. at 2831. If "imposing billions of dollars in economic costs in return for a few dollars in health or environmental benefits" is not "even rational," then surely the APA does not countenance trading billions of dollars of lost wages in exchange for greater legal and regulatory irregularity for employees, employers, and other stakeholders. *Michigan*, 135 S. Ct. at 2707.

Notably, other comments did not even get the cursory treatment that DOL afforded EPI. Almost all of the data demonstrating increased fissuring in recent years and how the Rule further

encourages it was disregarded or glossed over.  For example, a coalition of State Attorneys General, including many of the Plaintiffs, explained that independent contractors, freelancers, on-call workers, contract workers, and workers employed by temporary staffing agencies accounted for 94 percent of employment growth from 2005 to 2015.  *See* Ex. 14 at 4.  A group of Massachusetts legislators and a North Carolina advocacy group also offered data showing that fissured workplaces are on the rise.  *See* Ex. 7; Ex. 11 (explaining that temporary employment in North Carolina increased by 52 percent from 2009 to 2014).  And the Center for Law and Social Policy explained that there are currently 3.1 million workers employed through temporary staffing agencies—a number that "has increased dramatically in recent years."  Ex. 2.  Many of these commenters and others explained how the Rule promotes further fissuring by reducing liability for outsourced workers.  *See, e.g.*, Ex. 3, Ex. 4, Ex. 6, Ex. 7, Ex. 8, Ex. 14.

Commenters also provided a wealth of data showing that these fissured workplaces result in lower wages, greater wage theft, and less job security, which will grow considerably worse if the Final Rule stands.  For example, according to EPI, outsourced workers earn around 10 percent less relative to direct hires.  *See* Ex. 3 at 6.  And the National Employment Law Project ("NELP") found that workers employed through staffing agencies "earn 41 percent less than do workers in standard work arrangements."  Ex. 8 at 21.  By sector, NELP found that outsourced security guard positions experience a wage penalty of 8 to 24 percent, outsourced janitors experience a 4 to 7 percent penalty, and recent increases in staffing agency hires in the manufacturing sector have lowered compensation in that sector by 4 percent.  *See id.* at 20. NELP also found that, according to DOL's own data, workers in heavily subcontracted industries, such as janitorial, cable installation, construction, home care, and distribution and logistics, experience wage and hour violations the most frequently.  *Id.* at 20–21.

The record demonstrated how the Rule's promotion of fissuring through reduced liability results in other harms as well. NELP explained that workers employed through staffing agencies "typically work in more hazardous jobs than permanent workers, and yet they often receive insufficient safety training and are more vulnerable to retaliation for reporting injuries than workers in traditional employment relationships." *Id.* at 21. And the National Women's Law Center explained how the Rule would "weaken key protections for women at work," by making it more difficult for outsourced workers to ensure equal pay or enforce the FLSA's protections for working mothers. Ex. 10 at 4–6.

DOL addresses none of this data—a clear violation of the APA. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."). At best, the Final Rule acknowledges commenters' disagreement while completely ignoring the undisputed data that lays out how workers will suffer as a result of DOL's abandonment of its longstanding joint employment framework. But "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). Glossing over or outright ignoring these material facts violates the APA's prohibition against arbitrary agency action. *See, e.g.*, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (faulting agency for "brush[ing] aside critical facts" because "record facts are the grist of reasoned agency decisionmaking"). Accordingly, this Court should vacate the Final Rule.

## CONCLUSION

The States respectfully request that the Court grant this motion for summary judgment, declare the Final Rule unlawful, and vacate and set aside the Final Rule.

DATED: June 22, 2020

Respectfully submitted,

JOSH SHAPIRO
*Attorney General of the Commonwealth of Pennsylvania*

By: */s/ Nancy A. Walker*
Nancy A. Walker
   *Chief Deputy Attorney General, Fair Labor Section*
Michael J. Fischer
   *Chief Deputy Attorney General for Impact Litigation*
Ryan B. Smith*
   *Deputy Attorney General*

Pennsylvania Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2704
nwalker@attorneygeneral.gov

*Attorneys for the Commonwealth of Pennsylvania*

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Fiona J. Kaye*
Fiona J. Kaye
   *Assistant Attorney General*
Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Jessica Agarwal
Daniela Nogueira
Michael O'Keefe Cowles
   *Assistant Attorneys General*

Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8036
fiona.kaye@ag.ny.gov

*Attorneys for the State of New York*

XAVIER BECERRA
*Attorney General of the State of California*

By: */s/ Jennifer C. Bonilla*
Satoshi Yanai
  *Supervising Deputy Attorney General*
Jennifer C. Bonilla*
  *Deputy Attorney General*

California Department of Justice
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9145
jennifer.bonilla@doj.ca.gov

*Attorneys for the State of California*

PHILIP J. WEISER
*Attorney General of the State of Colorado*

By: */s/ Eric R. Olson*
Eric R. Olson*
  *Solicitor General*
Adam T. Rice
  *Counsel to the Attorney General*

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov
adam.rice@coag.gov

*Attorneys for the State of Colorado*

KATHLEEN JENNINGS
*Attorney General of the State of Delaware*

By: */s/ Christian Wright*
Christian Douglas Wright*
  *Director of Impact Litigation*
Oliver J. Cleary
  *Deputy Attorney General*

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
oliver.cleary@delaware.gov

*Attorneys for the State of Delaware*

KARL A. RACINE
*Attorney General for the District of Columbia*

By: */s/ Kathleen Konopka*
Kathleen Konopka
  *Deputy Attorney General, Public Advocacy Division*
Alacoque Hinga Nevitt
  *Assistant Attorney General*

Office of the Attorney General for the District of Columbia
441 4th Street, N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
kathleen.konopka@dc.gov
alacoque.nevitt@dc.gov

*Attorneys for the District of Columbia*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: */s/ Alvar Ayala*
Alvar Ayala*
   *Bureau Chief, Workplace Rights Bureau*

Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 793-3895
aayala@atg.state.il.us

*Attorney for the State of Illinois*

BRIAN E. FROSH
*Attorney General of the State of Maryland*

By: */s/ Jeffrey P. Dunlap*
Steven M. Sullivan
   *Solicitor General*
Jeffrey P. Dunlap*
   *Assistant Attorney General*

Maryland Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-7906
jdunlap@oag.state.md.us

*Attorneys for the State of Maryland*

MAURA HEALEY
*Attorney General of the Commonwealth of Massachusetts*

By: */s/ Andrew H. Cahill*
Andrew H. Cahill*
  *Assistant Attorney General, Fair Labor Division*

Office of Attorney General Maura Healey
1 Ashburton Place
Boston, MA 02108
(617) 727-2200, extension 2330
Drew.H.Cahill@MassMail.State.MA.US

*Attorney for the Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General of the State of Michigan*

By: */s/ Zachary A. Risk*
Fadwa A. Hammoud
   *Solicitor General*
Zachary A. Risk*
Matthew L. Walker*
Debbie K. Taylor
   *Assistant Attorneys General*

Michigan Attorney General
Labor Division – Payroll Fraud Enforcement Unit
PO Box 30736
Lansing, MI  48909
(517) 335-1950
RiskZ1@michigan.gov
WalkerM30@michigan.gov
TaylorD8@michigan.gov

*Attorneys for the State of Michigan*

33

KEITH ELLISON
*Attorney General of the State of Minnesota*

By: */s/ Jonathan D. Moler*
Jonathan D. Moler*
   *Assistant Attorney General*

Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101
(651) 757-1330
jonathan.moler@ag.state.mn.us

*Attorney for the State of Minnesota*

GURBIR S. GREWAL
*Attorney General of the State of New Jersey*

By: */s/ Estelle Bronstein*
Estelle Bronstein*
   *Deputy Attorney General*
Mayur Saxena
   *Assistant Attorney General*

New Jersey Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-9643
estelle.bronstein@law.njoag.gov
mayur.saxena@law.njoag.gov

*Attorneys for the State of New Jersey*

HECTOR BALDERAS
*Attorney General of the State of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas*
   *Chief Deputy Attorney General*

New Mexico Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
(505) 490-4060
tmaestas@nmag.gov

*Attorney for the State of New Mexico*

ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

By: */s/ Marc Abrams*
Fay Stetz-Waters
   *Director of Civil Rights*
Marc Abrams*
   *Assistant Attorney-in-Charge, Civil Litigation Section*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Fay.Statz-Waters@doj.state.or.us
Marc.Abrams@doj.state.or.us

*Attorneys for the State of Oregon*

PETER F. NERONHA
*Attorney General of the State of Rhode Island*

By: */s/ Justin J. Sullivan*
Justin J. Sullivan*
   *Special Assistant Attorney General*

Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2007
jsullivan@riag.ri.gov

*Attorneys for State of Rhode Island*


MARK R. HERRING
*Attorney General of the Commonwealth of Virginia*

By: */s/ Mamoona H. Siddiqui*
Samuel T. Towell
   *Deputy Attorney General*
R. Thomas Payne II
   *Senior Assistant Attorney General*
Mamoona H. Siddiqui*
   *Assistant Attorney General*

Office of the Attorney General
202 N. Ninth Street
Richmond, Virginia 23219
(804) 786-1068
stowell@oag.state.va.us
rpayne@oag.state.va.us
msiddiqui@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*


*Appearing pro hac vice or application for admission pro hac vice pending*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Julio A. Thompson*
Julio A. Thompson*
   *Assistant Attorney General*
Joshua R. Diamond, *Deputy Attorney General*
Jill Abrams, *Assistant Attorney General*

Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
jill.abrams@vermont.gov
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*


ROBERT W. FERGUSON
*Attorney General of Washington*

By: */s/ James P. Mills*
Jeffrey T. Sprung*
   *Assistant Attorney General*
Jeffrey G. Rupert
   *Division Chief, Complex Litigation Division*
James P. Mills*
   *Senior Trial Counsel*

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 326-5492
Jeff.Sprung@atg.wa.gov
Jeffrey.Rupert@atg.wa.gov
James.Mills@atg.wa.gov

*Attorneys for the State of Washington*